**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

TOBY HOY, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

MEDICARE HEALTH ADVISORS LLC

      Defendant.

CIVIL ACTION FILE NO. 4:25-cv-00207-RGE-HCA

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

*INTRODUCTION*................................................................................................................ *1*

*FACTUAL BACKGROUND* ................................................................................................ *3*

*LEGAL STANDARD* ........................................................................................................... *7*

*ARGUMENT*......................................................................................................................... *7*

**1.   A jury must decide whether MHA called Mr. Hoy using an artificial or prerecorded voice.**........................................................................................................................... **7**

  a.   Mr. Hoy's sworn account of what he personally heard is competent evidence that defeats summary judgment. ............................................................................................. 8

  b.   The "admissions" MHA cites concerned only partial recordings that begin after the automated portion of each call. ......................................................................................... 9

  c.   MHA's remaining evidence is the say-so of its CEO, whose credibility is for the jury. 11

  d.   The calling pattern Mr. Hoy describes, an automated call followed by a transfer to live agents, violates § 227(b), even though live agents later joined the calls. .............................. 11

**2.   MHA fails to meet the statutory requisites for its claimed safe harbor.**.................... **12**

  a.   Plaintiff has established a prima facie Do Not Call Registry claim, and MHA does not argue otherwise. ................................................................................................................ 12

  b.   The safe harbor is an affirmative defense on which MHA bears the burden of proving every element. Failure on any one element defeats it. ......................................................... 13

  c.   MHA proves none of the five minimum standards......................................................... 14

  d.   MHA's claimed "reasonable reliance" on the Inbounds lead in fact proves its procedures were neither reasonable nor implemented. The lead was facially invalid and otherwise riddled with red flags, and MHA dialed it anyway. ............................................ 16

  e.   Months of calling is not an "isolated error," as distinguished by MHA's authorities. . 19

**3.   A jury could readily find that MHA violated the FTSA because MHA admitted it dialed Mr. Hoy with DialedIn, a commercial automated dialing platform.**....................... **19**

*CONCLUSION*..................................................................................................................... *20*

**INTRODUCTION**

This Court should deny Defendant Medicare Health Advisors LLC's ("MHA" or "Defendant") motion for summary judgment. The telemarketing conduct at issue here presents genuine disputes on every count and this is a case that a jury should decide.

MHA's motion rests on three pillars, and each collapses on inspection. *First*, MHA contends that Plaintiff Toby Hoy "admitted" that no prerecorded or artificial voice was used because the voices on four audio recordings that MHA itself selected, produced, and played at his deposition were live. But those recordings are *partial*. They do not capture the beginnings of the calls, exactly as Mr. Hoy testifies, from personal knowledge, that the automated, artificial, robotic portion occurred. That the recordings are only partial is supported by Mr. Hoy's US Cellular carrier records, by MHA's own logs, which split the very same call into multiple rows with durations that do not reconcile with the recordings, and by Mr. Hoy's consistent deposition testimony that "[y]ou get transferred to a live person from the robot." (Hoy Dep. 88:16-17.) Which records to believe, what the unrecorded portions of the calls contained, and whether the Plaintiff's supported deposition testimony is to be believed are quintessential jury questions.

*Second*, MHA seeks summary judgment on Plaintiff's National Do Not Call Registry claim by invoking the regulatory safe harbor, 47 C.F.R. § 64.1200(c)(2)(i), an affirmative defense on which *MHA* bears the burden of proving *every* element. MHA proves none of them. There is no evidence that MHA ever purchased or accessed the national do not call database, no evidence of any process to prevent solicitations to registered numbers, no written do not call procedures in effect during the relevant period, and no do not call training. When asked in discovery to describe its scrubbing process and to identify its do not call compliance personnel, MHA answered only that it was "continuing to investigate." (Responses to First Set of

1

Discovery, Interrogatory 13, Plaintiff's Appendix, PLAPPX_10-11.) Worse, MHA's claimed "reasonable reliance" on a purchased lead was anything but reasonable. The lead's own vendor told MHA that the same personal information "shows as 'Yolanda'" in its system, the lead listed a Texas address for a lifelong Iowan, the lead was "accepted" in July *2023*, a year before the website visit MHA says generated it, and the lead listed a date of birth that is not Mr. Hoy's and that, even taken at face value, identified a consumer in his fifties, a person ineligible for Medicare and therefore ineligible for the very Medicare plans MHA exists to sell. A seller that buys and dials a facially bogus lead it could not even lawfully sell to does not maintain procedures "reasonably designed" to prevent unlawful calls. And months of repeated calls to a number on the Do Not Call Registry is no "isolated error."

*Third*, MHA argues that there is "no competent evidence" that it used an automated dialing system or recorded message within the meaning of the FTSA. There is. MHA's own *sworn interrogatory answer* admits that it "used DialedIn f/k/a Chase Data to dial Plaintiff's telephone number." (Plaintiff's Appendix, PLAPPX_5). DialedIn is a commercial automated dialing platform whose manufacturer advertises software that "automates the process of dialing phone numbers," "dials several numbers at once," and "intelligently connects answered calls to available agents." MHA's own call log bears the hallmarks of exactly that automation, including answering machine detection and rotating, sequential caller IDs. A reasonable jury could readily find that MHA's calls involved an automated system for the selection and dialing of telephone numbers, the playing of a recorded message, or both.

Because it is not merely possible but likely that a reasonable jury could return a verdict in Plaintiff's favor on each count, summary judgment must be denied.

**FACTUAL BACKGROUND**

Plaintiff Toby Hoy is a 57-year-old mechanic who lives and works in Iowa. (Hoy Dep. 8:1–11.) His cellular telephone number ending in 0280 (the "Subject Number") is his personal, residential number, serviced by US Cellular, and he registered it on the National Do Not Call Registry before any of the calls at issue. (Declaration of Toby Hoy ("Hoy Decl.").) Mr. Hoy is not a Medicare recipient. As he testified: "I don't qualify. I'm not old enough." (Hoy Dep. 38:24–39:4; *see also* Def.'s Statement of Material Facts ("SOF") ¶¶ 58, 73-75.)

Beginning by at least October 2024, and as early as August 2024, Mr. Hoy received a barrage of unsolicited Medicare telemarketing calls on the Subject Number from a rotating series of telephone numbers. (Hoy Decl. ¶ 7; Compl. ¶ 43.) When he answered, the calls typically began with a pause and then an automated, artificial, prerecorded, robotic, or avatar-like voice before any live person came on the line. (Hoy Decl. ¶ 8.) The most significant call came on November 21, 2024, from 515-317-1035. That call began with an automated, artificial, robotic portion, Mr. Hoy was connected to a live woman who identified herself as "Maria," and he was later transferred to another representative of MHA. (*Id.* ¶ 9.) MHA's own transcript of its partial recording of that call shows "Maria," a "fronter" supplied by MHA's offshore calling vendor, Virtual Buddy 24/7, using a qualification script prepared by MHA, pressing Mr. Hoy to confirm that he had Medicare Parts A and B and that he was "over 65 years old," and then transferring him to a "Medicare specialist." (Call 27 Tr., APPX_105-08; SOF ¶¶ 24-27; Jaffy Dep. 38:14-18.)

MHA did not obtain Mr. Hoy's number from Mr. Hoy. It purchased the number from a lead vendor, Inbounds.com f/k/a Data Prosper, which in turn obtained it from an unidentified third-party website that MHA has never dealt with, never audited, and whose name MHA's CEO could not recall at deposition. (SOF ¶¶ 12, 21; Jaffy Dep. 21:1-18, 25:13-25, 28:1-29:23.) MHA

3

dialed the number using "DialedIn f/k/a Chase Data," a commercial dialing platform. (Plaintiff's Appendix, PLAPPX_5); Jaffy Dep. 38:19-25.) Live "fronters" employed by Virtual Buddy worked the campaign from scripts. (SOF ¶¶ 24-27.)

Mr. Hoy never consented to MHA's calls. He never requested information from MHA and never provided his telephone number to MHA or anyone acting on its behalf. (Hoy Decl. ¶ 21.) He did not submit the "consent" form MHA relies upon, which MHA says was completed on a job search website, arcamaxjobs.com, on July 6, 2024. (*Id.* ¶¶ 22-23.) The date of birth on that lead record is not Mr. Hoy's, as he testified when shown the record, "That's not right for my birthday" (Hoy Dep. 86:2-6), and the IP address on the record is not associated with any device of his. (Hoy Decl. ¶ 22.) The lead record itself is facially irregular. It lists an address of "1002 Stone St," Weslaco, *Texas* 78596 for Mr. Hoy, a lifelong Iowan with a 515 area code number, and a 1968 date of birth, a person who would have been in his fifties, roughly a decade from Medicare eligibility, on the date the lead was supposedly generated. (APPX_102.)

Inbound's COO reported to MHA's CEO that "[t]he only time this lead was accepted was 7/27/23," nearly a year *before* the purported July 6, 2024 website visit, that the lead was later "rejected for dupe," and that the "name does n[o]t match and this shows as 'Yolanda' with the same PII in each lead." (APPX_005-06.) MHA's CEO described the source of Plaintiff's lead in his own email as "[f]rom 350k aged," that is, from a 350,000 record aged data file, and the response from Inbounds.com lists a different lead and telephone number entirely. (APPX_006.) Most importantly, the consent disclosures relied upon by MHA and allegedly captured for the lead event the Plaintiff is alleged to have submitted *do not even mention MHA at all*. They authorize contact by "a licensed sales agent associated with" a number of companies, but critically, *not MHA*. (APPX_010-11.)

4

As he explained at deposition, "[y]ou're wasting your breath telling them because they just usually[,] most of the time they just keep calling. It's on a machine." (Hoy Dep. 56:13-17.) Finally, after having testified to attempting to get the calls to stop on numerous occasions, on December 5, 2024, after months of calls, Mr. Hoy demanded in no uncertain terms: "Get my name off your list. Get my number off your list." (Call 31 Tr. 3:9-11, APPX_122.) Only then does MHA's log reflect a "DO NOT CALL" disposition. (APPX_124.)

The four recordings MHA produced do not match the calls Mr. Hoy actually received. For the November 21 call, three different durations appear in the record. Mr. Hoy's US Cellular records show a single six-minute incoming call from 515-317-1035. (Plaintiff's Appendix, PLAPPX_36). MHA's produced recording runs only five minutes and ten seconds, and MHA's own dialer log breaks the same event into multiple rows, including a 288 second "Pre Sale" segment and a separate 60 second agent segment. (Hoy Decl. ¶¶ 11-12; APPX_124.) Similar discrepancies infect Calls 28, 29, and 31, each of which Mr. Hoy's carrier records show as a one-minute incoming call while MHA's recordings and log segments run 18, 28, and 31 seconds and (incorrectly) reflect that they were answered by an answering machine. (Hoy Decl. ¶ 14; Plaintiff's Appendix, PLAPPX_36; APPX_124.) MHA's produced call log also does not begin at the beginning. It starts at "Attempt 17," meaning at least sixteen earlier dialing attempts were never produced, and it omits entirely numerous October 2024 calls reflected in Mr. Hoy's carrier records from numbers in the same 515-328 caller ID pool MHA used in December. (Hoy Decl. ¶¶ 16-17; Plaintiff's Appendix, PLAPPX_37-40; APPX_124.) And although MHA asserts that its "ordinary practice" was to record "connected" calls (thus implicitly admitting it does not record robot portions of calls) (SOF ¶ 59), MHA produced no recording for the connected, 12 second November 18, 2024 call that appears on its own log. (APPX_124.)

5

Discovery into MHA's "compliance" fared no better. MHA's CEO admitted that MHA had no "formal written TCPA compliance policy," only "outlines in our training materials" and "some documentation in our agent onboarding." (Jaffy Dep. 39:25-40:3.) The training deck MHA cites addresses sales technique and CMS marketing rules. The National Do Not Call Registry appears nowhere in it. (APPX_042-101.) The only specific document in the record addressing Do Not Call matters is a vendor "Campaign Memorandum" dated February 20, 2025, *after* every call at issue, and it opens by admitting that "Recently, there have been instances where fronters did not take this policy seriously, leading to client complaints," a likely nod to Plaintiff's complaint. (APPX_125.) Asked in an interrogatory to describe the process by which it "scrubbed" telephone numbers against the National Do Not Call Registry, MHA answered only that it was "continuing to investigate." (Plaintiff's Appendix, PLAPPX_9-10.) Asked to identify the persons responsible for TCPA or Do Not Call Registry compliance, MHA gave the same non-answer. (Plaintiff's Appendix, PLAPPX_10-11.) Mr. Jaffy admitted that MHA never hired anyone to audit Inbounds, does not know what website generated Plaintiff's lead, has never seen any access logs or analytics for that website, took no steps outside this litigation to confirm that Mr. Hoy ever visited any website, and simply "relies on Inbounds.com's representations with respect to any alleged consent." (Jaffy Dep. 21:17-18, 28:23-29:5, 30:3-22.) Shown the lead record itself, Mr. Jaffy admitted MHA did not create it, that MHA "is unable to testify about any of the specifics of how this document was created," and that MHA did nothing "to independently verify the accuracy of the document." (Jaffy Dep. 31:16-32:4.) After this lawsuit was filed, MHA stopped purchasing lead data outright. (Jaffy Dep. 24:11-19 ("Q. Was that decision in any way related to this lawsuit? A. Honest answer, yes.").)

**LEGAL STANDARD**

Summary judgment is proper only if the record shows that there is "no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The evidence of the nonmovant "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). These principles especially apply to MHA's safe harbor argument, because the safe harbor is an affirmative defense on which *MHA*, not Plaintiff, bears the burden. *Benzion v. Vivint, Inc.*, No. 12-61826-CIV, 2014 WL 11531368, at *6 (S.D. Fla. Jan. 17, 2014). A defendant seeking summary judgment on an affirmative defense must come forward with evidence establishing every element of that defense so conclusively that no reasonable jury could find otherwise. *Eaton v. Marion Cnty. Fair Ass'n*, 172 F. Supp. 2d 1184, 1187 (S.D. Iowa 2001).

**ARGUMENT**

**1.      A jury must decide whether MHA called Mr. Hoy using an artificial or prerecorded voice.**

MHA's entire argument on Count I is that Mr. Hoy "admitted" the calls used live voices and that its own "preserved" recordings show only conversational exchanges. (MSJ at 3-4.) That argument depends on an assumption, that MHA's selected recordings completely captured the *entire* calls Mr. Hoy received, that is refuted by this record. Mr. Hoy's sworn testimony, his carrier's records, and MHA's own dialer logs all show that the produced recordings are *partial* recordings of later call segments that omit the very beginnings of the calls, the portions in which Mr. Hoy heard the automated, artificial, prerecorded, robotic, or avatar-like voice. At the absolute minimum, that is a genuine dispute of material fact, and the self-serving "recordings" defense MHA has constructed is exactly the kind of credibility contest that juries, not courts, resolve. This is a jury trial worth having.

*a. Mr. Hoy's sworn account of what he personally heard is competent evidence that defeats summary judgment.*

Mr. Hoy answered his telephone and heard what was on the line. He testifies that the calls typically began with a pause followed by an automated, artificial, prerecorded, robotic, or avatar-like voice or sound before any live person came on, and that, for the November 21, 2024 call in particular, he "personally heard the automated portion at the beginning of that call, before [he] reached any live person." (Hoy Decl. ¶¶ 8-9.) That is classic, admissible percipient witness testimony about a matter within his personal knowledge, and a plaintiff's testimony about what he heard when he answered a call is sufficient, standing alone, to create a genuine dispute about whether an artificial or prerecorded voice was used. *See Anderson*, 477 U.S. at 255. MHA may argue Mr. Hoy is mistaken or not credible. But it must make that argument to the jury.

Nor is Mr. Hoy's account an afterthought driven by this litigation. It is what he alleged in the Complaint (ECF 1 ¶¶ 45, 53), and, critically, it is what he testified to at his deposition, in the very testimony MHA now cherrypicks. When asked whether the voice on one of MHA's clips was a robot, Mr. Hoy answered: "No. *You get transferred to them.* You get transferred to a live person *from* the robot." (Hoy Dep. 88:13-17 (emphasis added).) When played another clip, he explained: "That was a live one. She's called back. *Robots don't call back. They're the first ones. We get transferred to [humans].*" (Hoy Dep. 82:7-11 (emphasis added).) And again: "That was a callback." (Hoy Dep. 79:19-21; *see also id.* 83:9-12 ("It's a callback. . . . How would they have my name[?]").) Far from "collaps[ing]" his claim, Mr. Hoy's deposition testimony is *consistent* with it. The robot comes first, the live agents come after, and the recording produced only capture the live agent portion of the call, not the robot portion.

b. *The "admissions" MHA cites concerned only partial recordings that begin after the automated portion of each call.*

Every deposition answer MHA cites (SOF ¶¶ 62-65) was an answer about a *specific audio clip* that MHA's counsel selected and played. Each of those clips begins at or near the point at which a live agent or transfer was already underway, and none contains the beginning of the call as Mr. Hoy received it. (Hoy Decl. ¶¶ 10, 19-20.) Testimony that the voices on *MHA's excerpts* were live says nothing about the portions of the calls MHA did not record or did not produce, to say nothing of the call recordings it never produced. Mr. Hoy's declaration makes this point expressly. His deposition answers "concerned only the partial recordings I was played, each of which began after the automated portion of the call," and "[n]othing in my testimony indicated that the automated, artificial, or robotic portion I heard at the beginning of the calls did not occur. It did." (Hoy Decl. ¶ 20.) There is no contradiction between acknowledging that a live human spoke on a clip and testifying that a robot spoke before the clip began.

The objective records prove the recordings are partial. For example, three independent data sources describe the November 21, 2024 call, and none of them match. Mr. Hoy's US Cellular records show a single six-minute incoming call from 515-317-1035. (Hoy Decl. ¶¶ 11-12; Plaintiff's Appendix, PLAPPX_36.) But MHA's produced recording for that call runs only 5 minutes and 10 seconds, and its dialer log splits the same event into multiple rows, including a zero-duration connected outbound row, which likely reflects the robotic portion of the call, transfer rows, reflecting transfers from the robot, a 288-second "Pre Sale" agent segment with a human name, and a separate 60-second agent segment with a username. These durations cannot all describe the same complete call. (Hoy Decl. ¶ 12.) The shorter calls confirm this pattern. For Calls 28, 29, and 31, MHA's recordings and log segments run 18, 28, and 31 seconds and

9

incorrectly reflect an answering machine, despite producing recordings with Mr. Hoy's voice, while U.S. Cellular reflects each as a one-minute incoming call. (*Id.* ¶ 14.)

The records thus all reflect different things. MHA's system logged and recorded internal *segments* and agent legs, while the carrier recorded the duration of the call from the moment it was answered. (*Id.* ¶¶ 13-14, 26.) And the time missing from MHA's recordings is the *beginning* of each call, "exactly the portion in which I heard the automated, artificial, or robotic voice. A recording that starts after that portion cannot show what I heard before it." (*Id.* ¶ 13.)

Courts routinely hold that conflicts between a plaintiff's carrier records and a defendant's internal call records create jury questions in TCPA cases. *E.g.*, *Holt v. MRS BPO, LLC*, No. 12 C 2571, 2013 WL 5737346, at *3 (N.D. Ill. Oct. 21, 2013) (denying summary judgment where the parties' respective phone records conflicted and noting "The problem . . . is the alleged calls do not all match up."); *Brown v. NRA Grp., LLC,* No. 6:14-CV-610-ORL-31, 2015 WL 3562740, at *1 n.1 (M.D. Fla. June 5, 2015) (crediting plaintiff's cell phone records over defendant's lower call count where defendant produced no contrary evidence); *Hinman v. M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152, 1156 (N.D. Ill. 2009) (telephone records used to establish transmissions).

Here, the conflict is even starker, because MHA's records are incomplete on their face. The produced dialer log begins at Attempt "17," omitting at least *sixteen* earlier attempts, and omits entirely the multiple October 2024 calls that appear in Mr. Hoy's carrier records from 515-328 prefix numbers in the same caller ID pool MHA itself used on December 3 and 5. (Hoy Decl. ¶¶ 16-17; APPX_124.) MHA also produced no recording at all for the connected, 12-second November 18 call on its own log, despite swearing that its "ordinary practice" was to record connected calls, and provides no explanation for why it has recordings of Mr. Hoy answering calls that its own systems logged as having been answered by an answering machine.

10

(SOF ¶ 59; APPX_124.) A movant cannot obtain summary judgment by producing a partial set of its own records and asking the Court to assume their completeness, including in light of contrary carrier records and sworn testimony.

    c.   *MHA's remaining evidence is the say-so of its CEO, whose credibility is for the jury.*

       Stripped of the partial recordings, MHA's case for summary judgment on Count I reduces to the declaration testimony of its CEO, Max Jaffy, that MHA "never used prerecorded or artificial voices" and never allowed its vendor to do so. (SOF ¶ 46.) Mr. Jaffy is the defendant's most interested witness, and "[c]redibility determinations . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. His categorical assurance is also undercut by his own deposition. Asked how he knew that his outbound calling vendor never used prerecorded messages, Mr. Jaffy conceded that MHA's "primary way to verify" was listening back to *previously completed* recordings, the very recordings that are partial, and admitted: "of course, there's no way to guarantee, but relationship and trust with Virtual Buddy would tell me that they do not." (Jaffy Dep. 39:2-18.) "Relationship and trust" with an offshore call center is not undisputed evidence. It is a credibility argument for trial to be compared to the third-party nationwide telephone provider that provide a clear dispute of the Defendant's position.

    d.   *The calling pattern Mr. Hoy describes, an automated call followed by a transfer to live agents, violates § 227(b), even though live agents later joined the calls.*

       Finally, MHA's premise that the presence of live voices *anywhere* on a call defeats a prerecorded voice claim is wrong as a matter of law. The TCPA is violated when a call "us[es] . . . an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). Nothing in the statute requires that the *entire call* consist of a recording, and courts have repeatedly held that calls employing prerecorded audio at the front end, followed by transfers to live agents, "use" a prerecorded voice. *E.g.*, *Braver v. NorthStar Alarm Servs., LLC*, No. CIV-17-0383-F, 2019 WL 3208651, at

*3 (W.D. Okla. July 16, 2019) (describing similar arrangement in which "every initial call began with the soundboard agent" and granting summary judgment *to plaintiff*); *Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 6699188, at *1, *3-4 (N.D. Ill. Dec. 9, 2019) (describing automated calls transferred to humans and giving the term "prerecorded" its ordinary, plain meaning in denying summary judgment to defendant). Mr. Hoy describes precisely that the calls began with a prerecorded voice at the start of the call, followed by a transfer to a live human. (Hoy Decl. ¶¶ 8-9, 18.) The type of voice the calls began with is a paradigmatic jury question. Summary judgment on Count I should be denied.

**2.      MHA fails to meet the statutory requisites for its claimed safe harbor.**
*a. Plaintiff has established a* prima facie *Do Not Call Registry claim, and MHA does not argue otherwise.*

The TCPA's implementing regulations prohibit initiating "any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry," 47 C.F.R. § 64.1200(c)(2), a protection that extends to cellular telephone subscribers like Mr. Hoy, *id.* § 64.1200(e), and a person who receives more than one such call within any 12-month period by or on behalf of the same entity has a private right of action, 47 U.S.C. § 227(c)(5). Here, Mr. Hoy registered the Subject Number, his personal, residential cell phone, on the National Do Not Call Registry years before the calls at issue, and it remained registered at all relevant times. (Hoy Decl. ¶¶ 4-5.) MHA's own dialer log then records *fifteen* outbound solicitation attempts to that number between November 1 and December 5, 2024 *alone* (Attempts 17 through 31), several of which connected, all made to pitch MHA's Medicare Part C services. (APPX_124; SOF ¶¶ 1, 59-60, 76-80; Call 27 Tr., APPX_105-08.) Mr. Hoy's carrier records show still more calls in October 2024 from numbers in the same caller ID pools. (Hoy Decl. ¶¶ 16-17; Plaintiff's Appendix, PLAPPX_38-40.) MHA's motion does not contest any element of the *prima facie* DNC claims. Its challenge rests entirely on the regulatory

12

safe harbor, which in any event only applies to Count II DNC claims, not Count I prerecorded claims.

     b.  *The safe harbor is an affirmative defense on which MHA bears the burden of proving every element. Failure on any one element defeats it.*

The safe harbor on which MHA's motion depends provides that a seller "will not be liable for violating" the Registry rules "if [it] can *demonstrate*" that the violation "is the result of error" *and* that "as part of its routine business practice," it meets each of five minimum standards. 47 C.F.R. § 64.1200(c)(2)(i). As MHA's own authority recites, those standards are:

> (a) the establishment and implementation of *written procedures* to comply with the national do-not-call rules; (b) the *training* of its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules; (c) the *maintenance and recording* of a list of telephone numbers that the seller may not contact; (d) the use of a *process to prevent telephone solicitations* to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and the maintenance of records documenting this process; and (e) the use of a process to ensure that it does not sell, rent, lease, *purchase or use the national do-not-call database* except in compliance with the do-not-call rules.

*Klassen v. Advanced Mktg. & Processing, Inc.*, No. 8:21-CV-761-MSS-MRM, 2023 WL 11910565, at *3-*4 (M.D. Fla. Mar. 1, 2023) (cleaned up); 47 C.F.R. § 64.1200(c)(2)(i)(A)-(E).

Because the safe harbor is an affirmative defense, MHA, not Plaintiff, bears the burden of proof on each element. *Benzion*, 2014 WL 11531368, at *6. A defendant must establish it meets each of the standards in 47 C.F.R. § 64.1200(c)(2)(i) in order to fall within the "safe harbor" provision. *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 129 (D. Conn. 2016), *aff'd*, 686 F. App'x 48 (2d Cir. 2017). The case law is clear: if you don't meet the statutory requirements, you don't qualify for the safe harbor. *Mey v. Liberty Home Guard, LLC*, No. 5:23-CV-281, 2026 WL 486556, at *3 (N.D.W. Va. Jan. 5, 2026) ("Liberty has not demonstrated that it had implemented the minimum compliance requirements at § 64.1200(c)(2)(1) [sic]."); *Tyner*

*v. Hi.Q, Inc.*, No. CIV-21-608-F, 2022 WL 17490500, at *7 (W.D. Okla. Dec. 7, 2022) (failure to meet any element of the safe harbor defeats the affirmative defense); *LaGuardia v. Designer Brands Inc.*, No. 2:20-CV-2311, 2021 WL 4125471, at *10 (S.D. Ohio Sept. 9, 2021) (same). And because MHA seeks *summary judgment* on its own affirmative defense, it must prove every element with evidence so one-sided that no reasonable jury could find against it, with all inferences drawn in Mr. Hoy's favor. *Eaton*, 172 F. Supp. 2d at 1187. MHA does not come close to meeting its burden on any element, let alone all five.

   c. *MHA proves none of the five minimum standards.*

   **MHA maintains no written procedures and did not train its personnel.** The first and second requirements are the establishment *and implementation* of written do-not-call compliance procedures and training of personnel. 47 C.F.R. § 64.1200(c)(2)(i)(A), (B). MHA's CEO admitted at deposition that MHA has *no formal written TCPA compliance policy*, only "outlines in our training materials." (Jaffy Dep. 39:25-40:3.) The training deck MHA cites (SOF ¶¶ 29-38) is a sales onboarding presentation for *licensed agents*, not the offshore "fronters" from Virtual Buddy who actually placed the outbound calls with whom Plaintiff spoke, and does not even contain procedures for complying with the National Do Not Call Registry. (APPX_042-101.)

   The only document in the record that even addresses do-not-call practices is a "Campaign Memorandum" to the vendor's fronters, and it is dated *February 20, 2025*, months *after* every call to Mr. Hoy. (APPX_125.) It is self-evident that a memo issued *after* the violations occurred cannot be a procedure or training program that was "established and implemented" as part of MHA's "routine business practice" when the calls were made. Worse for MHA, the memo is an admission that whatever policy nominally existed was *not* implemented and that any "training" was inadequate: it announces "concerns about adherence" to the DNC policy because "leading to

14

client complaints," presumably Plaintiff. (*Id.*) When Plaintiff asked MHA in discovery to identify the persons responsible for TCPA and Do Not Call Registry compliance, MHA answered only that it was "continuing to investigate." (Plaintiff's Appendix, PLAPPX_10-11.) A company that cannot identify its own compliance personnel under oath has not carried its burden of proving written, implemented compliance procedures.

**MHA did not implement the National or Internal do not call registries.** The third, fourth, and fifth requirement are the maintenance and recording of national and internal lists of numbers the seller may not contact. 47 C.F.R. § 64.1200(c)(2)(i)(C), (D), (E). MHA touts an internal list with hundreds of thousands of entries (SOF ¶ 40), but the size of the list says nothing about whether it was *used*, and the record shows it was not. MHA kept calling Mr. Hoy for months. Its own vendor memo admits fronters were ignoring the DNC policy, "leading to client complaints." (APPX_125.) And by MHA's own written standard, which required immediate DNC, Mr. Hoy should never have needed to scream profanity to get the calls to stop. (Call 31 Tr., APPX_122.) An unimplemented list is exactly what the regulation's "establishment and implementation" language excludes.

The record also contains *nothing* on the central element of *National* Do Not Call Registry compliance. When Plaintiff served an interrogatory asking MHA to "[i]dentify and describe in detail the process by which you (or any vendor acting on your behalf) 'scrubbed' telephone numbers against the National Do Not Call Registry," including the persons involved, the software or service providers used, and the frequency of scrubs, MHA answered and stated that it would investigate and supplement. (Plaintiff's Appendix, PLAPPX_9-10.) It never supplemented, and its summary judgment papers are equally silent. Neither the brief, nor the Statement of Facts, nor the Jaffy declaration identifies any NDNC scrubbing process, any

15

Registry subscription (as required by subsection (E)), or any records of either. The most probative evidence of MHA's "process to prevent" solicitations to Registry numbers is that MHA called a number registered on the Registry at least fifteen times in five weeks. (APPX_124; Hoy Decl. ¶¶ 4-5.) Defendant has adduced no evidence that it actually obtained or used the national do-not-call database. 47 C.F.R. § 64.1200(c)(2)(i)(E). In short, MHA has not met its burden of demonstrating at summary judgment that it has met *any* of the required standards to even potentially begin to avail itself of this safe harbor. *Simmons*, 222 F. Supp. 3d at 129; *Mey*, 2026 WL 486556, at *3. That alone requires denial of summary judgment on Count II.

> *d.   MHA's claimed "reasonable reliance" on the Inbounds lead in fact proves its procedures were neither reasonable nor implemented. The lead was facially invalid and otherwise riddled with red flags, and MHA dialed it anyway.*

MHA's centerpiece is that it "reasonably relied" on a purportedly consensual lead purchased from Inbounds.com. (MSJ at 7; SOF ¶¶ 12-23, 47-55.) The argument backfires. The lead MHA relied on was facially invalid in at least five independent respects, each apparent from MHA's own documents, and any seller operating reasonable, implemented compliance procedures would have rejected it rather than dialed it more than fifteen times.

Start with the date of birth. The purported lead record relied upon, APPX_102, lists a 1968 date of birth that is not Mr. Hoy's. Even taken at face value, the lead identified a consumer *ineligible for Medicare*. A person born in 1968 was in their 50s at the claimed July 6, 2024 "lead event," roughly a decade away from Medicare eligibility. MHA exists to sell Medicare Part C optimization to Medicare recipients. (SOF ¶ 1.) Its own qualification script requires confirming the consumer is "over 65 years old." (Call 27 Tr. 5:8-13.) The lead's own data thus told MHA, before a single call, that this consumer could not be sold the very thing MHA was calling to sell.

Separately, the lead(s) apparently belonged to someone else. The lead lists a residential address in Weslaco, Texas, for a man who has lived and worked in Iowa his whole life with a

16

515-area code number MHA dialed. When MHA asked Inbounds for the consent records after this suit was filed, Inbounds reported that "[t]he only time this lead was accepted was 7/27/23," that later submissions were "rejected for dupe," and, remarkably, that the "name does n[o]t match and this shows as 'Yolanda' with the same PII in each lead." (APPX_005-06.) That 'Yolanda' lead also listed a different phone number and address in New York. (*Id.*) This is to say nothing of the impossible timeline here. The lead was allegedly "accepted" on July 27, 2023, a year *before* the July 6, 2024 website visit MHA claims generated the consent, and more than a year before MHA even signed its insertion order with Inbounds on September 18, 2024. (*Id.*; SOF ¶¶ 12-18.) And, apropos of this, the lead doesn't even purport to provide consent *for MHA* to contact anyone at all, as MHA's name appears *nowhere* on it. (APPX_0010-11.)

Even setting aside that the lead is facially invalid and factually impossible with minimal investigation, the consent language MHA invokes does not authorize *MHA* to call anyone. The FCC's rules require "prior express written consent" to be "an agreement, in writing," that authorizes "the seller," i.e., MHA, to call. 47 C.F.R. § 64.1200(f)(9); *In re Rules & Regs. Implementing the TCPA*, 27 FCC Rcd. 1830, 1844 (2012) (consent must identify the seller to whom it is given). "[Consenting] to receive [calls] from Chevrolet is not consent to receive texts from Mercedes." *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 397 (D. Mass. 2024). Nor can companies rely on a form continuously updated after the fact, since it is mere speculation that only the specific companies relied on it. *Id.*

There is also a threshold admissibility problem. The lead record and Verisk report are out of court statements, generated by Inbounds, ArcaMax, and Verisk, layered one atop another, offered for the truth of the matters they assert (that Mr. Hoy visited a website and consented). No witness with personal knowledge has authenticated them. Mr. Jaffy admitted he cannot testify to

17

how the records were created and did nothing to verify them (Jaffy Dep. 31:16-32:4), and MHA offers no declaration from Inbounds, ArcaMax, or Verisk. Courts routinely hold that such layered, unauthenticated records are inadmissible hearsay that cannot support summary judgment. *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024) (denying summary judgment and holding third party consent records were "hearsay within hearsay" absent foundation from someone with knowledge). Mr. Hoy, meanwhile, testifies from personal knowledge. He never visited arcamaxjobs.com, never provided his number, and never consented to calls from MHA or anyone else, minimally rendering this disputed. (Hoy Decl. ¶¶ 21-23.)

The safe harbor requires *implemented* procedures "reasonably designed" to prevent unlawful solicitations, and reasonable implementation is measured by what the seller actually does with the information in front of it. A seller whose "procedures" permit it to buy a lead not even giving the seller consent to call, bearing someone else's name, a wrong address, a date of birth that is both inaccurate and disqualifying for the product being sold, and an acceptance date that predates both the supposed consent event and the parties' own contract, and then to dial that lead more than fifteen times, does not have procedures that are reasonable, implemented, or designed to prevent anything. How can there have been compliant calling when MHA was robocalling a consumer whom its own evidence showed was ineligible for the very services it was offering? Any reasonable seller would have rejected this lead. MHA dialed it for months.

The reason MHA missed every red flag is that it never looked. Mr. Jaffy admitted that MHA never audited Inbounds, took no steps to confirm that Mr. Hoy actually visited the website that supposedly generated the lead, and "rel[ied] on [Inbounds'] representations." (Jaffy Dep. 30:3-22.) And after this lawsuit, MHA stopped buying third party data altogether, with Mr. Jaffy conceding that the decision related to this case. (Jaffy Dep. 24:11-19.)

18

    *e.  Months of calling is not an "isolated error," as distinguished by MHA's authorities.*

The safe harbor excuses a violation only if it "is the result of error" occurring despite routinely practiced compliance. 47 C.F.R. § 64.1200(c)(2)(i). More than fifteen dialing attempts to a single number registered on the Registry is not one errant call slipping through a functioning system. It is a course of conduct. And MHA's own statistic cuts against it. An internal do not call list with roughly 400,000 entries, SOF ¶ 40, is evidence of a dirty outbound calling machine generating complaints at industrial scale, whose own operations team admitted in writing that fronters were lackadaisical about compliance. (APPX_125.)

It is on this basis that Defendant's authorities are distinguishable. In *Johansen*, for example, defendant established written policies, and vendor oversight. In *Klassen*, the defendant scrubbed against the Registry and documented its procedures. MHA, by contrast, cannot produce a written TCPA policy, cannot describe a scrubbing process, cannot name its compliance personnel, never audited its lead vendor and relied on a lead that vendor said belonged to "Yolanda." On this record, the cases MHA cites describe everything MHA lacks. Finally, MHA's claim that it "honored" Mr. Hoy's DNC request is no defense. Count II is a *Registry* claim: MHA needed to refrain from soliciting DNC numbers from the first call, not merely after the thirty-first attempt, when he was reduced to profanity to get the calls to stop. Summary judgment on Count II must be denied. Indeed, the present record would comfortably support a verdict for Mr. Hoy.

**3.    A jury could readily find that MHA violated the FTSA because MHA admitted it dialed Mr. Hoy with DialedIn, a commercial automated dialing platform.**

The FTSA makes it unlawful to "make or knowingly allow to be made an unsolicited telephonic sales call if such call involves an automated system for the selection and dialing of telephone numbers or the playing of a recorded message." Fla. Stat. § 501.059(8)(a). MHA's

sworn interrogatory answers admit the dialing system used was DialedIn f/k/a Chase Data. (Plaintiff's Appendix, PLAPPX_5.)

What DialedIn *is* can be established from its own manufacturer. DialedIn (formerly ChaseData) publicly markets its product as "Predictive Dialer Software" that "automates the process of dialing phone numbers and intelligently connects answered calls to available agents," and that dials several numbers at once with AI-assisted pacing. *Predictive Dialer Software*, DIALEDIN, https://getdialedin.com/outbound-call-management/predictive-dialer-software/. In other words, the very platform MHA swears it used to dial Plaintiff is, per its maker, an automated system for the selection and dialing of telephone numbers. That live agents spoke with Mr. Hoy *after* calls connected is no defense. The FTSA addresses the *selection and dialing* of numbers, not who speaks after the connection is completed. Fla. Stat. § 501.059(8)(a). On MHA's reading, no campaign staffed with live agents could ever violate the statute, a construction that would read the "selection and dialing" clause out of the statute entirely.

And, because the FTSA is also violated when a prerecorded message is played, for the reasons set forth in Section 1, *supra*, whether MHA's calls began with a prerecorded message is disputed, precluding summary judgment on the FTSA's alternate prong. These issues create, at minimum, a genuine factual dispute. Summary judgment on Count III should be denied.

**CONCLUSION**

MHA built its motion on partial recordings, an affirmative defense it cannot prove, and a dialing platform it hoped the Court would overlook. The record presents genuine disputes of material fact on every count, and on Count II, MHA has failed to carry its burden on every element of its safe harbor defense. The Court should deny Defendant's Motion for Summary Judgment in its entirety, and grant such other relief as the Court deems just.

20

RESPECTFULLY SUBMITTED AND DATED this 11th day of June, 2026.

> *s/ Anthony I. Paronich*
> Anthony I. Paronich
> **PARONICH LAW, P.C.**
> 350 Lincoln Street, Suite 2400
> Hingham, MA 02043
> Tel: (617) 485-0018
> Fax: (508) 318-8100
> anthony@paronichlaw.com
> *Counsel for the Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2026, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all attorneys registered with the CM/ECF system.

> *s/ Anthony I. Paronich*
> Anthony I. Paronich
> **PARONICH LAW, P.C.**
> 350 Lincoln Street, Suite 2400
> Hingham, MA 02043
> Tel: (617) 485-0018
> Fax: (508) 318-8100
> anthony@paronichlaw.com
> *Counsel for the Plaintiff*

21