**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| TOBY HOY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDICARE HEALTH ADVISORS LLC<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>/ | CIVIL ACTION FILE NO. 4:25-cv-00207-RGE-HCA |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT

Plaintiff Toby Hoy moves under Federal Rule of Civil Procedure 23(a), (b)(3), and (g) to certify two classes of persons called by Defendant Medicare Health Advisors LLC ("MHA"): a National Do Not Call Registry class under 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2) (the "DNC Class"), and an automated-dialing class under the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059(8)(a) (the "FTSA Class").

## INTRODUCTION

MHA sold Medicare plans by phone. It dialed with a commercial predictive dialer, DialedIn f/k/a ChaseData, staffed by an offshore vendor reading a script MHA helped write, and it called numbers it bought from lead vendors without verifying the consent those vendors promised. MHA's corporate designee admits that MHA has never accessed the National Do Not Call Registry, "because we have consent." (Rule 30(b)(6) Dep. of MHA (Max Jaffy) ("30(b)(6) Dep."), Ex. 4, at 65:16–66:3 (Oct. 27, 2026); Order, ECF No. 67, at 10–11 (no evidence of how or whether MHA accessed the Registry).) And as this Court has recognized, MHA "concedes it did call individuals on the National Do-Not-Call Registry." (*Id.* at 7.)

The only question now is whether the resulting claims can be tried together. They can. MHA's own call records show who it called, when, and how often, and Plaintiff's expert has already applied objective criteria to two months of those records. He identified 327,417 telephone numbers that had been on the Registry for more than thirty days and that MHA called at least twice within a year (3,370,704 calls), and 120,429 numbers with Florida area codes that MHA called with the same dialer (709,208 calls). (Woolfson Decl. (Ex. 5) ¶¶ 35, 41, 53–54.) MHA's defenses, a regulatory safe harbor and "consent" obtained through a lead vendor, turn on MHA's own policies and its own lead-buying practices, which are the same for every class member. Whether MHA answers for the calls placed by its telemarketing vendor is likewise a question about MHA's relationship with that vendor, not about any class member. MHA's designee confirmed that the numbers in the August–September 2025 call data are all Inbounds leads and that MHA takes the same consent position as to every one of them. (30(b)(6) Dep. 51:3–18, 52:19–54:8.) On consent, the Court has already observed that the disclosure MHA relies on does not name MHA, and that "[c]onsent to be contacted by one seller is not consent to be contacted by all sellers." (Order at 13.) One ruling answers that question for everyone. The Court should certify both classes.

## PROPOSED CLASSES

Plaintiff seeks certification of the classes pleaded in the Complaint (ECF No. 1 ¶ 66):

> **DNC Class:** All persons in the United States whose (1) residential telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendant, (3) within a 12-month period, (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

> **FTSA Class:** All persons in the U.S., who, (1) received a telephonic sales call from Defendant made from or into Florida regarding insurance goods and/or services, (2) using the same equipment or type of equipment utilized to call Plaintiff (3) since July 1, 2021.

Excluded from both classes are Defendant, its employees and agents, any entity in which Defendant has a controlling interest, counsel, and the Court and its staff and immediate family. (Compl., ECF No. 1, ¶¶ 66, 68.)

## FACTUAL BACKGROUND

*A. MHA's calling operation.*

MHA is a Deerfield Beach, Florida company that markets Medicare Part C plans by calling prospective customers. (Answer, ECF No. 10, ¶ 10; Def.'s Statement of Material Facts ("SOF"), ECF No. 46-2, ¶¶ 1, 10; Order at 2.) Its CEO, Max Jaffy, has overseen its marketing programs since MHA began in January 2023. (SOF ¶¶ 3–4.) MHA obtains the numbers it calls "from multiple sources" (*id.* ¶ 11), including Inbounds.com f/k/a Data Prosper, under an insertion order dated September 18, 2024. (*Id.* ¶¶ 12–14, 20–21.) Inbounds warranted that its leads came from people who gave "prior express written consent," and MHA took it at its word. Mr. Jaffy admitted that MHA never audited Inbounds, never saw access logs for the website that supposedly generated Plaintiff's lead, took no steps outside this litigation to confirm that any consumer consented, and "relies on Inbounds.com's representations with respect to any alleged consent." (*Id.* ¶ 18; Jaffy Dep. 21:17–18, 28:23–29:5, 30:3–22, ECF No. 52-2.) The same is true of the numbers at issue here. MHA's designee testified that the August–September 2025 call data are all Inbounds leads; that consent is collected on the vendors' platforms, not MHA's; that it travels from the consumer to a publisher, to Data Prosper/Inbounds, to MHA; and that he does not know Inbounds' consent-retention policy and would "have to check" whether MHA holds a single publisher consent form. (30(b)(6) Dep. 51:3–18, 53:4–25, 56:4–13, 58:4–13, 59:10–60:9, 62:17–21.)

MHA dials with DialedIn f/k/a ChaseData. (Pl.'s App., PLAPPX_5 (Interrog. Resp. 9); Jaffy Dep. 38:19–25.) DialedIn markets itself as "Predictive Dialer Software" that "automates the process of dialing phone numbers and intelligently connects answered calls to available agents" and "dials several numbers at once using AI-powered algorithms." (ECF No. 52-4 ¶ 16; Order at 15.) The calls were worked by "fronters" employed by Virtual Buddy 24/7, an offshore vendor MHA used from 2023 to 2025. Virtual Buddy was given the numbers to call and read a script MHA prepared "[a]longside Virtual Buddy," and MHA audited Virtual Buddy's calls weekly. (SOF ¶¶ 24–27, 38; Jaffy Dep. 38:4–39:21.) MHA's own agents and Virtual Buddy's agents recorded call outcomes as dispositions in the same dialing system. (SOF ¶¶ 41–44.) MHA's defense is likewise uniform. Its sworn interrogatory answer is that "a call was placed to a number that Medicare Health had consent to contact" and that its calls "are informational in nature." (Pl.'s App., Interrog. Resp. 10, ECF No. 52-2.)

*B. MHA's Do Not Call compliance.*

MHA has no "formal written TCPA compliance policy," only "outlines in our training materials" and "some documentation in our agent onboarding." (Jaffy Dep. 39:25–40:3.) Asked about training, MHA's designee identified a single source, a slide deck that "encompasses all training," which he could not date; he knows of no records of any training session; and he could not testify to what MHA's weekly compliance meetings cover. (30(b)(6) Dep. 74:2–10, 75:1–76:7.) Asked to describe how it scrubbed numbers against the National Do Not Call Registry, MHA first answered that it "is continuing to investigate" (Pl.'s App., PLAPPX_9–10), and its amended answer says only that, because it calls people who consented, it "does not 'scrub' these individuals against the National Do Not Call Registry." (Am. Resp. to Interrog. 11, ECF No. 64-2, SUPPAPPX_015; see Order at 10–11.) Its designee confirmed that MHA has never accessed

the Registry; that he does not know whether any vendor scrubbed numbers and has no firsthand knowledge that one did; that he does not know what share of the numbers MHA called are on the Registry; and that MHA collects no data on which are. (30(b)(6) Dep. 65:16–66:21, 67:7–18.) The only Do Not Call document MHA directed to its calling vendor is a February 20, 2025 memorandum that opens by acknowledging "instances where fronters did not take this policy seriously, leading to client complaints." (APPX_125; 30(b)(6) Dep. 68:12–21.)

*C. Plaintiff Toby Hoy.*

Mr. Hoy is a 57-year-old Iowa mechanic who is not eligible for Medicare. (Hoy Dep. 8:1–11, 38:24–39:4; Order at 1–2.) His personal cellular number, serviced by US Cellular, was on the Registry before the calls at issue. (Hoy Decl., ECF No. 52-1; Compl. ¶¶ 34–42; Hoy Class Decl. (Ex. 3) ¶¶ 3–4.) From at least October 2024, and by his account as early as August 2024, he received repeated Medicare telemarketing calls from a rotating series of numbers. (Hoy Decl. ¶ 7; Order at 2; Ex. 3 ¶ 5.) MHA's purported consent record for his number lists a date of birth, a Texas address, and an IP address that are not his, and MHA's own lead vendor told MHA that the lead was accepted only once, nearly a year before the supposed website visit, and that the "name does n[ot] match." (Hoy Dep. 86:2–6; Hoy Decl. ¶¶ 21–23; Ex. 3 ¶ 6; APPX_102, APPX_005–06; Order at 13.) On December 5, 2024, Mr. Hoy told MHA to take his number off its list. Only then does MHA's log reflect a "DO NOT CALL" disposition. (APPX_122, APPX_124; Ex. 3 ¶ 7.) MHA's designee identified APPX_124 as MHA's call log for the number it called, and confirmed that the records of the earlier attempts to reach that number were deleted under DialedIn's twelve-month retention period. (30(b)(6) Dep. 17:18–18:8, 27:19–28:6, 29:3–12.)

*D. MHA's call records and the expert analysis.*

MHA produced call detail records in 96 files reflecting approximately 13,656,257 calls to 1,744,246 distinct telephone numbers between August 1 and September 30, 2025, a production that appears to be a sample of MHA's data. (Woolfson Decl. ¶¶ 3, 17 n.9, 30.) Plaintiff's expert, Aaron Woolfson, has more than twenty-five years of experience building and analyzing telephone-system databases and has been qualified as an expert in federal and state courts. (*Id.*, Qualifications ¶¶ 1–2, 9.) The result is 3,370,704 calls to 327,417 distinct numbers that had been on the Registry for more than thirty days and were called at least twice within 365 days. (*Id.* ¶¶ 35, 53 & Ex. 8.) Filtering the same data for Florida area codes, he identified 709,208 calls to 120,429 distinct numbers. (*Id.* ¶¶ 36–41, 54 & Ex. 9.) MHA's designee identified the call detail records as MHA's: DialedIn exported them and creates them automatically when a call is dialed, and no other MHA system holds call records. (30(b)(6) Dep. 16:4–6, 19:4–20:2.) He had no reason to disagree that the lists in Woolfson Exhibits 8 and 9 are Mr. Woolfson's output from MHA's August–September 2025 call data. (Id. at 50:4–10.)

## LEGAL STANDARD

A class may be certified if the plaintiff shows that the four prerequisites of Rule 23(a), numerosity, commonality, typicality, and adequacy, are met and that the class fits Rule 23(b)(3) because common questions predominate and a class action is superior. Fed. R. Civ. P. 23(a), (b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 623 (1997). The Eighth Circuit "has not addressed ascertainability as a separate, preliminary requirement" but instead conducts a rigorous analysis of the Rule 23 requirements. *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016). TCPA claims are especially suited to that analysis. "Given the

remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019).

## ARGUMENT

### I. The DNC Class should be certified.

The TCPA's private right of action for Registry violations "requires a plaintiff to initially show two things: a number on the Do-Not-Call registry, and two calls made to that number in a year." *Krakauer,* 925 F.3d at 655; 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). That showing is made from MHA's call records and the Registry's own data. Courts routinely certify classes on that basis. *See id.* at 655–59; *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 390–400 (M.D.N.C. 2015); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 400 (D. Mass. 2024); *Hand v. Beach Entm't KC, LLC*, 456 F. Supp. 3d 1099, 1137–53 (W.D. Mo. 2020).

#### *A. The Rule 23(a) requirements are met.*

**Numerosity.** Joinder of 327,417 telephone numbers is impracticable on any view. (Woolfson Decl. ¶¶ 35, 53.) That figure comes from two months of records that MHA appears to have produced as a sample, from a company that began operations in January 2023. (*Id.* ¶ 17 n.9; SOF ¶ 3.) Courts certify Registry classes far smaller. *Mantha*, 347 F.R.D. at 390–91 (66,693 members); *Krakauer*, 311 F.R.D. at 390–91 (20,450 members). In *Hand*, a sample of 11,562 numbers yielded 4,860 class members, and the court held that requiring a plaintiff to show that the defendant's defenses do not apply to any class member "would be an unreasonably high standard at class certification." 456 F. Supp. 3d at 1139–40.

**Commonality.** Commonality requires a contention "capable of classwide resolution," meaning one whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The

DNC Class presents several such questions: (1) whether MHA called Registry numbers more than once in twelve months, which the Court has noted MHA does not dispute (Order at 7); (2) whether those calls were "telephone solicitations" or, as MHA contends, merely "informational" (Interrog. Resp. 10), a question answered by the common script and the common campaign; (3) whether MHA can establish the regulatory safe harbor, which depends on MHA's own written procedures, training, and Registry scrubbing (Order at 7–11; 30(b)(6) Dep. 65:16–19, 74:2–75:10); (4) whether MHA's lead-vendor paperwork supplies the "prior express invitation or permission" that the regulation requires, 47 C.F.R. § 64.1200(c)(2)(ii), which MHA asserts for every number it called (30(b)(6) Dep. 54:1–8); (5) whether MHA is liable for calls its vendor placed "on [its] behalf," 47 U.S.C. § 227(c)(5) (see Part I.C.2 below); and (6) whether MHA's conduct was willful or knowing, which supports trebled damages, *id.*, a question that turns on MHA's own compliance practices, including its vendor's admitted failure to take the Do Not Call policy "seriously" (APPX_125). Courts find commonality on these very questions. *Mantha*, 347 F.R.D. at 393; *Hand*, 456 F. Supp. 3d at 1140–41; *Sandusky*, 821 F.3d at 998; *Krakauer*, 925 F.3d at 655–56; *Krakauer*, 311 F.R.D. at 395–96.

**Typicality.** Mr. Hoy's claim is the DNC Class's claim. His number was on the Registry, and MHA called it repeatedly, through the same dialer, vendor, and scripts, with no Registry scrubbing and on the strength of the same kind of purchased lead. (Facts §§ A–C; 30(b)(6) Dep. 65:16–19; Ex. 3 ¶¶ 3–7.) His number is his personal cellular number, used for personal and household purposes and not for business. (Compl. ¶¶ 35–39; Ex. 3 ¶ 3.) He seeks the same statutory relief as every class member. MHA's only answer is that Mr. Hoy supposedly consented through a website, which he denies. That is not a unique defense. MHA asserts the same defense against every class member (Interrog. Resp. 10; 30(b)(6) Dep. 52:19–54:8), and

the Court has already found that the lead MHA relies on for Mr. Hoy is facially irregular and names other sellers but not MHA. (Order at 12–14.) A plaintiff is atypical only if "subject to a unique defense that threatens to play a major role in the litigation." *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 821 (8th Cir. 2015). The *Golan* plaintiffs' limited experience of the call did not qualify, because the purpose of the call was the critical issue for the whole class. *Id.* So too here. *See also Hand*, 456 F. Supp. 3d at 1141–42 (plaintiff typical although he disputed information in defendant's records); *Mantha*, 347 F.R.D. at 393–95.

**Adequacy.** Mr. Hoy has no interest antagonistic to the class. He has prosecuted this case through discovery and summary judgment and sat for a deposition. (Hoy Dep.; Hoy Decl., ECF No. 52-1.) He understands his duties as class representative, has no interests antagonistic to the class, and is committed to prosecuting the case on the class's behalf. (Ex. 3 ¶¶ 8–11.) Attacks on a representative's credibility do not make him inadequate absent a unique defense that would dominate the case. *Hand*, 456 F. Supp. 3d at 1142–45. Proposed counsel are experienced in TCPA class litigation and have the resources to litigate this case. (Paronich Decl. (Ex. 1) ¶¶ 3–5; Jilizian Decl. (Ex. 2) ¶¶ 3–6.)

*B. The DNC Class is defined by objective criteria and is not fail-safe.*

The DNC Class is defined by objective facts: whether a number was on the Registry for thirty-one days (a fact the FTC's own data answers), and how many times, and when, MHA called it (facts MHA's own records answer; those records are generated automatically by one system, DialedIn, and no other MHA system holds call records. 30(b)(6) Dep. 16:4–6, 19:25–20:2). The definition contains no "without consent" or similar term, and the words "residential" and "telemarketing" simply track the regulation. Registered numbers are presumed residential, *Adam v. CHW Grp., Inc.*, No. 21-CV-19-LRR, 2021 WL 7285905, at *12 (N.D. Iowa Sept. 9,

2021), and whether MHA's calls were solicitations is a common question, not a precondition to identifying who was called. A DNC class so defined is not fail-safe, because its members would not prevail if the Court found the calls were not telephone solicitations or that MHA had permission. *Id.* (quoting *Panacci v. A1 Solar Power, Inc.*, No. 15-cv-00532-JCS, 2015 WL 3750112 (N.D. Cal. June 15, 2015)). In *Adam*, a court in this Circuit declined to strike DNC classes as fail-safe, noting that courts are divided. *Id.* at *11–12. *See also Hand*, 456 F. Supp. 3d at 1138–39. And if the Court has any concern, the remedy is to refine the definition, not deny certification. *Id.* at *12 (allowing amendment of fail-safe definition); *Mantha*, 347 F.R.D. at 391–92 (refining class definition by removing "residential").

*C. Common questions predominate.*

**1. Liability is proven with common evidence.** The elements of a § 227(c)(5) claim "involve no questions of individual reliance … no complicated contractual obligations … and no theories of probabilistic injury." *Krakauer*, 925 F.3d at 655–56. Each class member's claim rises or falls on the same two facts, Registry status and call count, and both are established by Mr. Woolfson's aggregate analysis of MHA's own records. (Woolfson Decl. ¶¶ 26–35.) Whether MHA answers for the calls its vendor placed is likewise a common question, addressed next.

**2. Vicarious liability is a common question.** MHA's fronters worked for Virtual Buddy, which the Court has described as a contractor "responsible for making telemarketing calls on [MHA's] behalf." (Order at 8; SOF ¶¶ 24–27.) The statute reaches calls made "by or on behalf of the same entity," 47 U.S.C. § 227(c)(5), and federal statutes are presumed to be written "with familiar common law agency principles in mind," so a seller is liable for calls its agent makes within the scope of the agent's authority, and "parties cannot avoid the legal obligations of agency by simply contracting out of them." *Krakauer*, 925 F.3d at 659–60. In affirming

certification of a Registry class, the Fourth Circuit held that whether the telemarketer was the seller's agent was "a question that in all likelihood was common to the class." *Id.* at 659. The district court explained why: actual authority "depends only on the relationship and conduct between" the seller and the telemarketer, not on any fact about a class member. *Krakauer*, 311 F.R.D. at 396. It certified the class even though the seller disputed whether apparent authority and ratification could be shown classwide, because the central issue, "whether the calls were made by [the seller's] agent," predominated. *Id.* at 395–96, 399. Other courts agree. *Hand*, 456 F. Supp. 3d at 1140–41 (liability of the companies behind a venue's text messages was "a question capable of classwide resolution"); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 294–95 (N.D. Cal. 2013) (certifying class; whether the insurer could avoid liability because third-party contractors sent the messages "does not turn on any issues specific to individual class members"). The same is true here. MHA's relationship with Virtual Buddy is the same for every call: Virtual Buddy was given the numbers to call, used a script prepared with MHA, recorded call dispositions in the same dialing system as MHA's own agents, and was audited weekly by MHA. (SOF ¶¶ 24–27, 38, 41–44; Order at 9.) Nothing about that relationship varies by call recipient. That distinguishes *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 131–33 (N.D. Tex. 2020), which denied certification where the calls came from more than 20,000 independent agents, each with a different relationship to the defendant, so that agency required "individualized evidence of each potential agency relationship." Here there is one vendor, one script, one dialer, and one relationship.

**3. MHA's defenses will be resolved on common proof.** Affirmative defenses do not defeat predominance unless they require individualized proof that overwhelms the common questions, and "the mere mention of a defense is not enough." *Hand*, 456 F. Supp. 3d at 1151

(quotation omitted); *Krakauer*, 311 F.R.D. at 397 (affirmative defenses are factored into the predominance calculus but do not "automatically" defeat certification). MHA's two defenses are common ones.

*Safe harbor.* The safe harbor excuses a violation only if the seller shows that it resulted from error despite five routine practices: written procedures, training, a maintained do-not-call list, a current Registry scrub, and limits on use of the Registry data. 47 C.F.R. § 64.1200(c)(2)(i); Order at 7–8. Every element concerns what MHA did as a company, not what any consumer did. The Court has already found genuine disputes on the written-procedures element as applied to Virtual Buddy's callers and on whether MHA ever accessed the Registry at all, and it noted MHA's own memorandum describing repeated instances of fronters not taking Do Not Call policy "seriously." (Order at 8–11.) MHA's Rule 30(b)(6) testimony confirms that these are company-wide facts. MHA has never accessed the Registry, and its only explanation is that "we have consent," so the safe harbor rises or falls with the same common consent question. (30(b)(6) Dep. 65:16–66:3.) Its internal do-not-call list is just a "do not call" disposition in the same DialedIn database that stops MHA from dialing out. (Id. at 69:11–17, 70:15–71:2, 71:18–23.) And the deck it calls the source of "all training" is undated, with no known record of any training session. (Id. at 74:2–10, 75:1–10.) These issues will be answered once, for all class members.

*Consent and established business relationship.* MHA's consent defense rests on a single mechanism: leads bought from vendors under a standard insertion order, supported by the vendor's blanket warranty and MHA's admitted practice of verifying nothing. (SOF ¶¶ 13–19, 45; Jaffy Dep. 28:23–29:5, 30:3–22.) The Court has already identified the flaw in that mechanism. The consent language MHA invokes authorizes contact by a list of named companies that does not include MHA, and "[c]onsent to be contacted by one seller is not

consent to be contacted by all sellers." (Order at 12–13 (citing *Mantha*, 347 F.R.D. at 397).) If the consent language that MHA's vendors collected does not authorize calls by MHA, no class member consented. Either way, the defense "can be resolved through a single ruling." *Mantha*, 347 F.R.D. at 397; *see also Hand*, 456 F. Supp. 3d at 1149–51 (consent and established-business-relationship defenses did not predominate where records could be cross-referenced objectively). MHA's Rule 30(b)(6) testimony confirms how uniform that mechanism is. MHA's position is that every person it called consented (30(b)(6) Dep. 52:19–53:2); the consents were collected on lead vendors' platforms, not MHA's (id. at 53:4–25); the August–September 2025 numbers are all Inbounds leads (id. at 51:3–18); and MHA's designee said that every number in the expert's lists consented, "[b]ased on our contracts and communication with Inbounds" (id. at 54:1–8). The "due diligence" he described is likewise one program applied to all vendors, not a check of any class member's consent: collecting vendors' marketing materials and responding to carriers' monthly audits, which sample random numbers. (Id. at 54:19–55:3, 61:12–18, 65:12–15.) That is common proof. Nor can MHA manufacture individual issues through gaps in its own records. A defendant that keeps poor records of consent cannot defeat certification by pointing to them. *Hand*, 456 F. Supp. 3d at 1149–50. An established business relationship is MHA's burden to prove, and whether a caller had one "should be a simple and objectively verifiable task, requiring little more than reference to [the defendant's] own records." *Krakauer*, 311 F.R.D. at 397–99. The defense is narrow on MHA's own account: its designee defined an established relationship as an existing client who calls in for help, and testified that MHA made no telemarketing calls to its existing client book before January 2026, after the period Mr. Woolfson analyzed. (30(b)(6) Dep. 80:5–8, 81:9–19, 83:16–84:5.)

**4. MHA's "informational" defense is common to the class.** MHA says its calls "are informational in nature" and are not telemarketing. (Interrog. Resp. 10.) Those same sworn answers acknowledge that MHA makes "marketing outbound calls to promote goods and services" when it has consent or an established relationship, even as they call its calls "purely informational." (Interrog. Resp. 2–3, ECF No. 64-2, SUPPAPPX_010–11; 30(b)(6) Dep. 79:5–20.) Whether MHA's calls were telephone solicitations does not vary by call recipient. MHA's own description is that it "reaches potential consumers by telephone or telesales" to market Medicare Part C plans (SOF ¶ 10; Order at 2), through one dialing platform, one vendor, and one script prepared with MHA. (SOF ¶¶ 24–27.) The calls to Mr. Hoy, a 57-year-old who cannot enroll in Medicare, were part of the same campaign, and the Court has treated them as telemarketing calls. (Order at 1–3.) The question has one answer for the class.

**5. Residential status is a common question with a common answer.** Section 64.1200(c)(2) protects "residential" subscribers, and wireless numbers are covered. 47 C.F.R. § 64.1200(e); Order at 7. A cell-phone user can be a residential subscriber, *Hand*, 456 F. Supp. 3d at 1119–21, and numbers on the Registry are presumed residential. *Adam*, 2021 WL 7285905, at *12; *Mantha*, 347 F.R.D. at 388. In *Mantha*, that presumption, together with the defendant's own aim of reaching consumers, meant there was "no likelihood or reasonable possibility of mini-trials on the residential issue," even if a handful of numbers turned out to be businesses. 347 F.R.D. at 397–98. The same is true here. MHA sells Medicare Part C plans to individual Medicare beneficiaries, not businesses. (SOF ¶¶ 1–2; Jaffy Dep. 12:13–25.) MHA's designee confirmed that its customers are individuals on Medicare, identified no number that MHA contends is non-residential (saying only that the people MHA calls "are filling out a form and opting in"), and testified that MHA does not classify its numbers by line type. (30(b)(6) Dep.

76:10–77:2, 77:11–17, 78:5–18.) A defendant that merely mentions business use, without evidence, does not create an individual issue. *Hand*, 456 F. Supp. 3d at 1151 (defendants offered no estimate or example of business numbers); *Krakauer*, 311 F.R.D. at 396–97 (a few dozen possible business numbers, and only counsel's unsworn assertion of "hundreds," left questions "few in number, straightforward, and peripheral"). Even if Plaintiff retains the ultimate burden on this element, *see id.* at 397, it is carried by the presumption and by classwide line-type and subscriber data. (Woolfson Decl. ¶¶ 42–55.) MHA has been asked to identify any numbers it contends are not residential. (Ex. 6, Interrog. 2 & RFP 4.) *Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 227–28 (N.D. Cal. 2024), is not to the contrary. There the court denied certification because the plaintiff offered no generalized proof of residential status for a defendant that targeted trucking businesses. MHA's product is sold to individual seniors.

**6. Absent class members have standing.** Every class member received more than one call on a number registered to avoid them. That is "nothing ethereal or abstract." *Krakauer*, 925 F.3d at 653–54. The standing concern in *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271–72 (11th Cir. 2019), arose for an internal do-not-call class; the court found no traceability problem for the class of people whose numbers were on the National Registry and who were called anyway. *See also Hand*, 456 F. Supp. 3d at 1137–38; *Mantha*, 347 F.R.D. at 397.

**7. Damages are mechanical.** Statutory damages are $500 per call, trebled if willful, 47 U.S.C. § 227(c)(5), and Woolfson Exhibit 8 lists the number of qualifying calls to each number. Statutory damages foreclose individualized damages issues. *Krakauer*, 925 F.3d at 659.

*D. The class can be identified and notified.*

Woolfson Exhibit 8 lists each qualifying number, the number of calls, and the first and last call dates. Carrier records, which carriers maintain for their own billing and compliance

purposes and produce in response to subpoenas, then identify the subscriber and line type for each number, and MHA's own lead and customer records contain additional names and addresses. (*Id.* ¶¶ 42–55; APPX_102; 30(b)(6) Dep. 15:1–5.) That is the same two-step process courts have accepted in certifying DNC classes. *Krakauer*, 925 F.3d at 659; *Mantha*, 347 F.R.D. at 392–93. Identification of individual members is an administrative task that follows certification, not a precondition to it.

*E. A class action is the superior method.*

Few people will sue over a handful of unwanted calls worth $500 apiece. "Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications." *Krakauer*, 925 F.3d at 656. Courts therefore find superiority in DNC cases. *Krakauer*, 311 F.R.D. at 399–400; *Mantha*, 347 F.R.D. at 399; *Hand*, 456 F. Supp. 3d at 1152–53 (concern about disproportionate statutory damages is premature at certification). The remaining Rule 23(b)(3) factors point the same way. The record reflects no litigation begun by class members against MHA over these calls; concentrating the claims in this forum, where Mr. Hoy lives and the Court has already ruled on the dispositive motion, avoids duplicative proceedings; and because MHA's records and the Registry data identify the class, the case is manageable. (See Fed. R. Civ. P. 23(b)(3)(A)–(D); Woolfson Decl. ¶¶ 18–55.)

**II. The FTSA Class should be certified.**

The FTSA provides that "[a] person may not make or knowingly allow to be made an unsolicited telephonic sales call if such call involves an automated system for the selection and dialing of telephone numbers . . . without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a); *see* Order at 15. A violation carries actual damages or $500,

whichever is greater, and up to treble damages if willful or knowing. Fla. Stat. § 501.059(10). Federal courts have certified FTSA classes on call records and expert analysis. *Morris v. Lincare, Inc.*, No. 8:22-CV-2048-CEH-AAS, 2025 WL 605616, at *1, *5–9 (M.D. Fla. Feb. 25, 2025) (certifying FTSA class of persons with Florida area codes); *Weaver v. Green Sols. of Fla. LLC*, No. 6:23-CV-2059-CEM-LHP, 2025 WL 1811564, at *4–11 (M.D. Fla. May 5, 2025) (report and recommendation) (recommending certification of FTSA class of persons with Florida area codes called using a ChaseData dialer).

*A. The Rule 23(a) requirements are met.*

**Numerosity.** MHA's own records show 709,208 calls to 120,429 distinct numbers with Florida area codes in two months alone. (Woolfson Decl. ¶¶ 41, 54 & Ex. 9.) Joinder is impracticable. *See Morris*, 2025 WL 605616, at *6 (approximately 1,703 FTSA class members); *Weaver*, 2025 WL 1811564, at *5 (1,702).

**Commonality.** The FTSA Class turns on questions common to every member: (1) whether DialedIn is an "automated system for the selection and dialing of telephone numbers"; (2) whether MHA's calls were "telephonic sales calls," Fla. Stat. § 501.059(1)(j); (3) whether MHA "knowingly allow[ed]" its vendor's calls; (4) whether MHA can show prior express written consent, § 501.059(1)(g), or that its calls fall within the exclusions from "unsolicited," § 501.059(1)(k); and (5) whether the calls were made from or into Florida. The Court has already held that a reasonable jury could find, on the manufacturer's own description and MHA's failure to identify any contrary use, that MHA's use of DialedIn is use of an automated system for selection and dialing. (Order at 15–16.) That question has one answer for every call placed through DialedIn. *See Weaver*, 2025 WL 1811564, at *5–6 (commonality satisfied where

questions included whether calls were telephonic sales calls and whether an automated system was used).

**Typicality and adequacy.** Mr. Hoy was called by MHA through DialedIn, in the same campaigns and by the same vendor's fronters, and he asserts the same FTSA claim as every class member. MHA is a Florida company, and the class reaches calls "made from or into Florida." (Answer ¶ 10; Compl. ¶ 66.) The consent and credibility points addressed above apply here with the same force, and Mr. Hoy's calls came through the same DialedIn dialer. (Ex. 3 ¶ 5; APPX_124; 30(b)(6) Dep. 16:4–6.) *See Golan*, 788 F.3d at 821; *Hand*, 456 F. Supp. 3d at 1141–45; *Morris*, 2025 WL 605616, at *7 (typicality satisfied where plaintiff's theory was the same as the class's). Adequacy is satisfied for the reasons given above.

*B. Common questions predominate and a class action is superior.*

Whether the calls involved an automated system is the heart of the FTSA claim, and it is a classwide question with classwide proof. MHA identifies DialedIn as its dialer (Interrog. Resp. 9), Mr. Jaffy testified that Virtual Buddy used DialedIn to make the calls (Jaffy Dep. 38:19–23), MHA's designee described DialedIn's replacement as "[a] new dialer system with better technology" (30(b)(6) Dep. 42:17–43:3), and the platform's manufacturer describes it as software that automates dialing and dials several numbers at once. (ECF No. 52-4 ¶ 16.) MHA has pointed to no evidence that it used DialedIn differently for any subset of calls. (Order at 15–16.) The Florida connection is likewise provable from the records. Mr. Woolfson identified every call to a Florida area code (Woolfson Decl. ¶¶ 29, 36–41), and the statute provides that "[t]here is a rebuttable presumption that a telephonic sales call made to any area code in this state is made to a Florida resident or to a person in this state at the time of the call." Fla. Stat. § 501.059(8)(d). Courts rely on that presumption to avoid individualized residency inquiries. *Jackson v. Athena*

*Bitcoin, Inc.*, No. 4:24CV331-MW/MJF, 2025 WL 2237453, at *9 (N.D. Fla. June 18, 2025) (defendant offered no evidence to rebut presumption, so argument that residency would predominate was "pure speculation"); *Morris*, 2025 WL 605616, at *6 (rejecting argument that Florida-area-code class was overinclusive). Whether MHA "knowingly allow[ed]" its vendor's calls, Fla. Stat. § 501.059(8)(a), likewise turns on MHA's relationship with Virtual Buddy, which is the same for every call. (See Part I.C.2.) MHA's consent defense is the same one addressed above: the disclosure it relies on does not name MHA, so any consent defense is resolved by a single ruling for every class member. (Order at 12–13.) *See Morris*, 2025 WL 605616, at *8 (consent defense could be resolved on a classwide basis where defendant failed to show it required individualized inquiry). And the superiority analysis is the same. Statutory damages of $500 per call give no individual class member a reason to sue, and the class can be identified from MHA's own records. *Id.* at *8–9.

## III. The Court should appoint Mr. Hoy as class representative and his counsel as class counsel.

Rule 23(g)(1) directs the Court to consider counsel's work investigating the claims, experience with class actions and the types of claims asserted, knowledge of the applicable law, and resources. Proposed class counsel has investigated and litigated this case through summary judgment, retained and presented a qualified expert, and conducted discovery into MHA's calling and compliance practices, and has substantial experience litigating TCPA class actions. (Paronich Decl. (Ex. 1) ¶¶ 3–5; Jilizian Decl. (Ex. 2) ¶¶ 3–6.) Anthony I. Paronich of Paronich Law, P.C. should be appointed class counsel, and Mr. Hoy should be appointed class representative.

## CONCLUSION

MHA called hundreds of thousands of Registry-listed numbers with a predictive dialer, and its defenses depend on its own practices and its own lead paperwork. The Court should certify the DNC Class and the FTSA Class, appoint Mr. Hoy as class representative and Anthony I. Paronich of Paronich Law, P.C. as class counsel, and direct the parties to submit a proposed notice plan within thirty days of its order.

RESPECTFULLY SUBMITTED AND DATED this 16th day of November, 2026.

/s/ Anthony I. Paronich
Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com
Counsel for the Plaintiff

/s/ Alex N. Jilizian
Alex N. Jilizian
2629 Manhattan Ave #1002
Hermosa Beach, CA 90254
PARONICH LAW, P.C.
Phone: (213) 866-5293
Fax: (508) 318-8100
alex@paronichlaw.com
Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2026, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all attorneys registered with the CM/ECF system.

/s/ Alex N. Jilizian
Alex N. Jilizian