IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

CASE NO: 4:25-cv-00207-RGE-HCA

TOBY HOY, individually and on behalf of all others similarly situated, ,

Plaintiff(s),

vs.

MEDICARE HEALTH ADVISORS LLC,

Defendant(s).
_______________________________________/

DEPOSITION OF: Max Jaffy

DATE TAKEN: October 27, 2026

TIME: 10:00 a.m. - 1:38 p.m.

TAKEN BY: Plaintiff

PLACE: All Parties Appeared Via Zoom Videoconference

REPORTED BY: ANNE STAHL, CVR, NOTARY PUBLIC, STATE OF FLORIDA

MHA store the lead information that it receives from vendors? Is it in like a CRM? In a spreadsheet?
A. It's in DialedIn.
MR. PETERSON: Object to form.
Q. It's in DialedIn. Okay.
Can you tell me what retreaver is; spelled R-E-T-R-E-A-V-E-R?
A. We don't use the platform.
Q. Okay. Sorry. Excuse me. Go ahead.
A. I know what it is, but, I mean, we don't use the platform.
Q. Okay. So MHA does not hold records there?
A. No.
Q. Okay. When MHA discusses, like, leads or vendors or complaints about, I guess, bad leads, does MHA discuss them using Microsoft Teams or E-mail or text? Or how is that done? Like, what method of communication is that done through?
MR. PETERSON: Object to form.
A. E-mail.
BY MR. JILIZIAN:
Q. Okay.
A. Primary.
Q. Does MHA keep any records of customers who enrolled?

A. Yes.
Q. And would that be in DialedIn?
A. Yes.
Q. Okay. So does any system other than DialedIn contain call records at MHA?
A. No.
Q. Has MHA data ever been migrated from one system to another? Meaning, like, has it always been on DialedIn? Or?
A. Sorry. Can you rephrase that?
Q. Yeah. So have you ever migrated the data from another platform to DialedIn? Before, so you were previously using maybe another and now are using DialedIn.
A. Previously? No.
Q. Okay. All right. I'm going to introduce just a few exhibits here, kind of back-to-back, and then we'll kind of just reference all of them in the next questions here. Do you see this document in front here?
A. Yes.
Q. Before I scroll through, it's quite -- it's 160 pages here with several exhibits. But you'll see if I just look at the title page, as you'll see, it's captioned with this action's caption and case number, and it's titled, "The Declaration of Expert Aaron

Wolfson."

So do you have any reason to disagree here that this is expert -- plaintiff's expert, Aaron Wolfson's declaration submitted in this act -- sorry. I'll strike that.

Let me -- let me rephrase.

Do you have any reason to disagree if I represent to you that this is the declaration of expert Aaron Wolfson in this action?

MR. PETERSON: Object to form.

A. No.

BY MR. PETERSON:

Q. Okay. And next is exhibit, here. And that will be marked as Exhibit 3, right there. So next exhibit here, you'll see. Sorry, excuse me. Sorry.

Next exhibit here you'll see has been Bates numbered in the right -- the bottom here, APPX_124. Do you see this document here in front of you?

A. Yes, I do.

(Exhibit No. 3 was marked for identification.)

Q. Do you recognize what this document is?

A. Yes.

Q. What is it?

A. Call logs.

(Exhibit No. 4 was marked for identification.)

BY MR. JILIZIAN:

Q. Yeah, this is a call log. Would you -- so I'll represent to you that this is MHA's call log for five -- for -- sorry, the phone number (515)808-0280, which has been filed at ECF46-3 already as in the record. Would you have any reason to disagree with me there?

A. No.

Q. Okay. And then last of the few exhibits I want to introduce here. I'll just scroll through this a very short document, and you'll see it's signed by yourself, dated June 29th. It's got the case caption here of this action, and it's titled, "Supplemental Declaration of Max Jaffy in Support of Defendant's Reply in Support of Motion for Summary Judgment."

So do you recognize this document, Mr. Jaffy?

A. Yes.

Q. Okay. So this is your declaration supported -- sorry, submitted in support of defendant's reply for motion for MSJ; is that correct?

A. Can you clarify MSJ?

Q. Yeah. MSJ is motion for summary judgment.

A. Yes. Sorry.

Q. No problem. I'm going to scroll down here to -- sorry, excuse me -- to Exhibit 7 of the -- it's

not -- we have -- we don't have a deposition exhibit 7, but Exhibit 7 of Exhibit 3 in the Wolfson report. Sorry. It's going to be a little bit confusing.

So, Mr. Jaffy, are you familiar with the call detail records that MHA produced for August 1st of 2025, through September 30th of 2025?

A. Yes.

Q. Okay. And who exported those call detail records? Like, who personally; do you know?

A. DialedIn.

Q. Okay. Do you know what individual from DialedIn would have been responsible for that?

A. Jonathan.

Q. Do you know his full name?

A. I can't pronounce his last name.

Q. Do you know how you would spell it, approximately?

A. No.

Q. Do you know what it starts with, his last name?

A. Starts with a G.

Q. Okay. And so, you'll see that it lists here -- sorry. Excuse me. Sorry, excuse me a minute.

So are the records produced for the August 1st through September 30th, 2025, are they created

automatically by DialedIn when a call is dialed?
A. Yes.
Q. Do MHA agents or managers edit the records after the fact?
A. They can, but agents are not able to. So, no.
Q. Okay. So they -- let me just clarify there. So individuals at MHA can edit the DialedIn records, but call agents are not permitted to; is that correct?
A. Agents, no. Managers, yes.
Q. Okay. And what -- so we have a list of fields right here, if you see. Like this is -- I'll represent to you that in Mr. Wolfson's report, he pulled field names from the data that was produced to us, and you'll see a list right here. File name, counter rep phone, original state attempt, caller ID, to show several categories of information associated with each call. So I'll ask what sorts of, you know, from this list, what sorts of things are managers able to change from the DialedIn call records?
MR. PETERSON: Object to form.
BY MR. JILIZIAN:
Q. I'll keep this highlighted right here.
A. To my understanding, it would be call status.
Q. Call status. And what does that represent, call status?

Q. Okay. Could you identify it for me.
A. E-mails from me to DialedIn.
Q. Okay. And you'll see that I'm just going to go -- so here at the bottom will be the start of the thread.
So on Tuesday, September 30th, 2025, 10:55, you -- I'll just -- I'll first ask, sorry. Is this your E-mail right here? Max Jaffy and then Admin@mapdcenter.com?
A. Yes.
Q. Okay. So on this date listed right here, I just read out in time from your E-mail, you had sent a message to DialedIn saying, "I need a call logs for Toby Hoy," with his number, "I only see call logs from 17-31. If you can please pull it for me today, that would be great."
So do you see that? And do you have any reason to deny that you sent that E-mail?
A. No.
Q. Okay. And then, so ChaseData -- so Andrew from DialedIn here responds with all the call data in the system for his number. He represents that this is all the call data in the system -- excuse me -- for his number.
And you reply that same day saying, "Yes, but I need the records for attempts 1-16. Can you provide

these to me?" And he replies saying, "Unfortunately, I -- I can do provide that information" -- it looks like a typo, but it says, "I can do provide that information as you have a storage depth of 12 months, and those records were removed from the system since they were outside the 12-month retention period."

So do you have any reason to deny that conversation between yourself and Andrew Difiore at DialedIn took place over E-mail?

A. No.

Q. Okay. So is this information here -- sorry, it's kind of hard to understand with the typo, but is what he's trying to convey correct? That the DialedIn system only has a 12 month retention period for calling data?

MR. PETERSON: Object to form.

A. Sorry, what's your question?

BY MR. JILIZIAN:

Q. So I was just saying it is a little hard, because it looks like Andrew had a typo here, but is what he's trying to convey through this email that DialedIn only has a 12 month retention period for its call data? Is that what he's trying to convey in this email?

MR. PETERSON: Object to form.

A. Yes.
BY MR. JILIZIAN:
Q. Okay. And is that accurate to your knowledge that DialedIn only has a 12 month retention period?
A. From this email, yes.
Q. Okay. So -- so -- so, sorry. So based on this timeline, that means that MHA -- but as of September 30th, 2025, this date right here that you're having the conversation, that means that all call records from DialedIn would have been deleted from approximately October 2024 and before; is that correct?
A. Correct. Okay.
Q. And this lawsuit was filed June 16th of 2025; is that correct? And if you need to, I can get the complaint.
A. I don't know the exact date, but sounds close to me. Correct.
Q. If I represented to you that it was filed on June 16th of '25, would that --
A. I would say I trust you on that one. So --
Q. Okay.
A. Yeah, so.
Q. Do you remember when MHA first learned of the lawsuit of this action?
A. No.

here? I'll highlight the whole.
So do you -- do you have any idea, like, what would like -- here, let me just ask you first. Have you reviewed this declaration of expert Aaron Wolfson?
A. No.
Q. Okay. So if I were to ask you, you know, what you thought -- because, again, this is a -- I mean, this is quite a large discrepancy; right? I mean, he's submitting expert testimony saying 13 -- over 13,000,000 calls just between, I mean, just in a two-month period; right? And you had estimated 7 million around in a period spanning several years.
But because you haven't read the data, would it be fair to say that you wouldn't be able to explain that discrepancy between his data and your own?
A. Correct.
Q. Okay. So is MHA's DialedIn account still active?
A. No.
Q. When was the last -- when did you stop? When did MHA stop -- excuse me. Sorry, I'll strike that.
When did MHA stop working with DialedIn or contracting with DialedIn?
A. October of '25.
Q. Okay. What was the reason for ceasing to work

with them?
A. A new dialer system with better technology, you know.
Q. In what way?
Well, let me first ask you what new dialing system you switched to?
A. EnrollHere.
Q. Or the MHA switched to, I should say.
In what ways or way or ways would you say EnrollHere is superior to the DialedIn system?
A. Analytics, the call recording and call log system, along with access to better inbound calls and more information from an agency perspective.
Q. Is there anything having to do with any reason that you would have switched to enter -- the -- I'm sorry. It's called Enroll Now?
A. EnrollHere.
Q. EnrollHere, sorry. So is there any reason that you believe EnrollHere is superior to DialedIn that has to do with favorability related to TCPA or federal, any sort of communications, laws, or regulation?
MR. PETERSON: Object to form.
A. No.
BY MR. JILIZIAN:
Q. I'm going to introduce the next exhibit here,

voluminous list here, and it goes to row 120,000/120,000; do you see that?
A. Yes.
Q. So can you tell -- so, again, this -- if I represented to you that the -- sorry -- so that these are both expert Wolfson's output lists from the August 1st to September 30th, 2025, call data provided, would you have any reason to disagree with that here?
MR. PETERSON: Object to form.
A. No.
BY MR. JILIZIAN:
Q. Okay. So here, so Exhibit 10 here -- sorry. I'll have to keep switching between. But Exhibit 10 here is, he warrants are the numbers on the national DNC registry for more than 30 days that received two or more calls within 365 days, which you -- just 327,417 numbers, which received 3,370,704 calls in total.
And then for Exhibit 9, which represents what plaintiff's warrant is the DNC class population. Exhibit 9 is 120,429 numbers with Florida area codes who received 709,208 calls in total, which plaintiffs' warrant represents the FTSA class population. So having seen all this data now that Wolfson derived from the August 1st to September 30th call data provided, my question to you is, where did that call data come from

exactly?
MR. PETERSON: Object to form.
A. Can you clarify what you mean by call data.
BY MR. JILIZIAN:
Q. Yeah. So the call data, meaning like the -- basically the data that Wolfson is using here, the phone numbers called by MHA and number of calls and dates that they were called in this August and September data dump. Where exactly did that data come from?
A. It came from our lead vendors.
Q. Okay. And so what -- would those be -- would they have come from all four of the lead vendors that we had talked about; WeGenerate, Inbounds, Unity Senior Health, and Connecting The Dots?
A. These are Inbounds', from the files we send.
Q. Okay. So these are only Inbounds.com leads; correct?
A. Correct.
Q. Okay. I've got another exhibit. This is going to be marked as Exhibit 12.
(Exhibit No. 12 marked for identification.)
BY MR. JILIZIAN:
Q. Okay. So, again, you'll see the case caption and it's titled, "Defendant's Amended Answers, Responses, and Objections to Plaintiff's First Set of

Interrogatories." And if I scroll through, you'll see that these are MHA's responses to the interrogatories, plaintiffs propounded with your signature on it. Do you recognize this document, Mr. Jaffy?

A. Yes.

Q. Okay. And then along with that, I'll also introduce Exhibit 13, as well.

(Exhibit No. 13 was marked for identification.)

BY MR. JILIZIAN:

Q. The same caption titled, "Defendant's Response to Plaintiff's Statement of Additional Material Facts," which provides admissions and denials and other responses to plaintiff's -- sorry, excuse me -- to plaintiff's statement of additional material facts with your signature on it. Do you recognize this document, as well?

A. Yes.

Q. Okay. So in No. 20, here, in Exhibit 13, you admit -- MHA admits, but it says that, "MHA obtains prior express written consent from every person it contacts."

So is that your position into -- is that your position for all of the numbers contacted in Exhibits 10 and 11, the Excel sheets that were shown to you?

MR. PETERSON: Object to form.
A. Yes.
BY MR. JILIZIAN:
Q. Okay. And where does MHA contend that consent was obtained from those consumers?
MR. PETERSON: Object to form.
BY MR. PETERSON:
Q. And when I say where, like, I mean like what platform? So was it through your -- like, MHA's platform? Was it through the lead vendor? Was it a mix?
A. A mix of -- from the lead vendor, and then, you know, from our own due diligence.
Q. Okay. What do you mean by your own due diligence? Like, what I'm asking -- let me clarify if it was clear.
What I'm asking is, where do -- you said that consumer -- you've testified that consumers, every consumer that you've called provides prior express written consent. What I'm asking is where exactly, on what platform do consumers provide that consent? Is it on the lead vendor platforms? Is it on MHA's platforms? Or is it on a mix of things?
A. I'm sorry. It's on the lead vendor's platform.

Q. Okay. So it's your testimony that for every single number in those two excel sheets in Exhibits 10 and 11 we've shown, that every single one of those numbers provided prior express written consent through a lead vendor?

MR. PETERSON: Object to form.

A. Based on our contracts and communication with Inbounds, yes.

BY MR. JILIZIAN:

Q. And what is that contention? What sort of evidence have you looked at to come to that conclusion? And I'll name some examples. Like, so for example, like vendor warranties and lead records of vendors, consents themselves, the consents themselves displayed on lead vendors. Like, what kind of things have you looked at to come to the conclusion that all those millions of numbers that we've shown provided prior express written consent?

A. Yeah. So three steps. One, you know, requesting marketing materials that the vendors use. Two, would be the carriers require monthly audits to be done, including call recording and lead vendor permission to contact. So, you know, randomly going through and making sure that those leads have permission to contact would be the -- the two main areas.

Q. Okay. You would said there were three, as well. So just those two?
A. Yeah. Sorry, just those two.
Q. Okay. Got it, got it. And so all these -- sorry. Strike that.
So but MHA and the lead vendors, do they -- I mean, they wouldn't keep consent records for every single consumer called in the class period; correct? Like, because of MHA's own and the lead vendor's own document disposal policies, like, whether it's after a certain period of months or a year or however much it is, would mean that MHA, or those lead vendors wouldn't necessarily have every single consent from every single person they've called in a class period; is that correct?
MR. PETERSON: Object to form.
A. Sorry. I'm confused on what you're asking.
BY MR. JILIZIAN:
Q. Sorry. I worded it --
Basically, because MHA and the lead vendors assumedly don't hold on to all their data forever, is it fair to say that MHA and the four lead vendors don't have every single consent from every single person that they've called in the class period?
MR. PETERSON: Object to form.

A. I mean, I don't think that's something I can answer.

BY MR. JILIZIAN:

Q. Okay. Do you know if -- do you know what -- so for the four vendors that you work with; WeGenerate, Inbounds, and Connecting The Dots, do you know what their consent retention policies are, their respective one? So how long did they hold onto consent records?

A. No. I know WeGenerate only inbound calls. So, you know, the permission to contact is they're initiating the call into us. Unity is the same, as well. As for Connecting The Dots and Inbounds, I wouldn't know that, no. That's their policy.

Q. Can you just go over for the four; WeGenerate, Inbounds, Unity Senior, and Connecting The Dots, can you tell me -- okay. Let's just go through each, one-by-one.

WeGenerate, have they ever provided you leads rather than just inbound calls?

A. No.

Q. Okay. So they've always just been inbound calls only?

A. Yes.

Q. Okay. Inbounds.com, we've already gone over that they used to provide you leads and inbound calls,

Senior Health only ever did inbound calls, and Inbounds.com is now only inbound calls?
A. Correct.
Q. Okay. So what is Data Prosper?
A. Previously Inbounds.
Q. Okay. Gotcha. So Inbounds.com is now branded as or identified as Data Prosper; is that correct?
A. Somehow merged or transitioned to Inbounds. I don't -- I mean --
Q. Okay. But they're the same entity; right? Whether it was an acquisition or a merger or a rebrand, it's the same entity; right?
A. Correct.
Q. Okay.
MR. PETERSON: Now, should we talk about lunch or what are your thoughts?
MR. JILIZIAN: Yeah, we -- you know, I just have a few questions left on this. Just take a couple minutes, and then -- and then we can talk about our break. I won't have too much longer left. It might just be like one full session after lunch and then like -- like as long as we've been going --
MR. PETERSON: So, just want to make sure I heard that right. So you want to -- you want to do

a few more questions and then -- and then figure out if we're doing just a regular break or a lunch break? Is that what...

MR. JILIZIAN: Yeah, yeah. I'll just get through this and then we can talk about the.

MR. PETERSON: Sounds good.

MR. JILIZIAN: Yeah, just a couple more here.

MR. PETERSON: Okay.

BY MR. JILIZIAN:

Q. So. Data Prosper warrants that they rely on publishers, meaning the websites that collected the forms; is that correct?

A. To my knowledge, yes.

(Reporter clarification.)

BY MR. JILIZIAN:

Q. Okay. Sorry. So data -- so what you're saying is data -- people don't actually provide consent on the Data Prosper website or Data Prosper or Inbounds.com website? They provide -- consumers provide consent on publisher websites, who then, in turn, provide those to Data Prosper/Inbounds.com; is that correct?

MR. PETERSON: Object to form.

A. Correct.

BY MR. JILIZIAN:

Q. Okay. So and the Data Prosper provides that consent information to MHA; is that correct?
A. Yes.
Q. Okay. So the chain is the publishers, the consumer provides the consent to the publisher, publisher provides the consents to Data Prosper/Inbounds.com, who then provides the consents to MHA? Is that a correct description of the chain?
A. Yes.
Q. Okay. So has MHA ever reviewed any of the publishers? And so, first, can I -- let's just say what -- when we say "publisher," does that refer to the initial -- I guess, like, what would a publisher look like?
A. I mean, I feel like that's up to your interpretation to define, you know, what a publisher is.
Q. Are you aware of, like, what types of entities these publishers are? Like, are they medical companies or other sorts of similar businesses?
A. What do you mean by medical companies?
Q. Like, are -- okay. Let me ask, are the publishers, are they similar entities to MHA? Or what -- do you know what types of entities these publishers are?
A. I guess this is getting opinionated into what

I think publishers are, but they would be more similar to Inbounds than to MHA, marketing, you know, lead generation.

Q. Got it. Okay. So what I just want to ask my final couple questions are, does MHA, yourself or anyone in MHA, do you -- do they review the consent forms or the websites or any of the other terms of those initial publishers --

MR. PETERSON: Object to form.

MR. JILIZIAN: -- in the chain?

MR. PETERSON: Object to form.

A. We collect marketing materials from Inbounds. You know, when we started our Data Prosper, and review that information along with during our call audits, our monthly audits with the carrier. If they identify, you know, publishers or sites that, you know, they don't, you know, see as an issue, we'll end up moving away from them.

BY MR. JILIZIAN:

Q. Okay. But let me ask this specific question. So you answered by saying that you review data from Inbounds. I understand, but what I wanted to say, do you ever look separately from Inbounds? Does MHA or yourself or anyone at MHA look at publisher consent forms or their websites or other data to, you know,

check the validity of their consents or lead collection process?

MR. PETERSON: Object to form.

A. So before we start with any vendors, we collect the marketing materials and the information from the publishers before we go ahead and start using them.

BY MR. JILIZIAN:

Q. So it's your testimony that you, before working with any of the lead generators here, including the four that we've talked about that you reviewed the initial publisher consents and I guess other information related to them to see whether their consents and lead generation process were valid; is that fair to say?

MR. PETERSON: Object to form.

A. Yes.

BY MR. JILIZIAN:

Q. Okay. Do you have -- does MHA have any documents or data? So like, for example, like consent forms from those initial publishers in their possession?

A. I would have to check. On the top of my head, I -- I -- I would need to check.

Q. And just final question here.

Do you know if for every publisher, right -- so in the chain, right, we've said it goes from initial publisher to Data Prosper to MHA. Do you know if within

looking at like, a sample of consents? Are they -- do they have an automated system going through every -- like, can you walk me through what that looks like?

A. Can you clarify your question?

Q. Yeah, so -- so, again, you had testified that MHA reviews -- consents by Inbounds.com and the Publishers; right. When reviewing this data, I'm just trying to understand what that looks like. So are you -- let me ask this, are you manually going through or is there some sort of automated system used by MHA to peruse the data?

A. It stems from our upline in the carriers doing monthly audits. They'll pick random numbers for us to submit call -- or recordings along with permission to contact verification forms and that's how we go about.

Q. Okay. Has MHA ever accessed the national Do Not Call registry?

MR. PETERSON: Object to form.

A. No, because we have consent.

BY MR. PETERSON:

Q. Okay. Are you familiar, personally familiar with what the National Do Not Call Registry is?

A. I know of it, yes.

Q. So it's your testimony that MHA has never had to access it because they -- sorry -- get prior express

written consent from the people they call?
MR. PETERSON: Object to form.
A. Yes.
BY MR. JILIZIAN:
Q. Okay. So has MHA or any vendor acting on your behalf, do you know if they've scrubbed numbers against the DNC?
A. I don't know the answer to that question.
Q. Okay. And when I say scrubbed numbers, like, I mean, like, they've taken their list of people that they call, either MHA or the lead vendors you work with or Inbounds.
So are you aware if they take their lead list and look if those numbers are on the DNC to remove numbers? Are you aware if MHA or any of the vendors you work with take part in that practice?
A. I would say, yes, but to my knowledge, no. Firsthand, I don't know.
Q. So you would assume that they do, but you don't have firsthand knowledge that they do so?
A. Correct.
Q. Okay. But also, it was your testimony that it wouldn't necessarily -- that the DNC, right -- I mean, that you don't need to access -- the MHA doesn't need to access the DNC because you receive consent from all

consumers who MHA calls? So wouldn't it flow logically then that you wouldn't need to scrub numbers against the DNC since, you know, you purport that all consumers called by MHA have provided consent?

A. Yes. But you're asking if the lead vendors do, and I'm saying I don't -- I don't know.

Q. That's fair. So do you know, like, approximately of all the consumers called by MHA, I mean, Wolfson has identified several more millions, you've identified in the millions, but less than him. Of the users that you understand, of the consumers that you understand MHA calls, do you know what percent of those or what amount of them are on the National Do Not Call Registry?

A. No.

Q. Do you collect any data about which of those users are on the Do Not Call registry from any source?

A. No.

MR. JILIZIAN: Okay. I'm just going to introduce two more exhibits here. So this is going to be marked Exhibit 14 -- sorry. This is going to be marked Exhibit 14. This is -- I'm trying to share my screen here. So this is a document labeled as beginning Bates number APPX_042. It was filed along with Document 463 in the public record.

And as you'll see, it's a slide deck titled, "Medicare Health Advisors." And if I scroll through it, it's just a long slide deck, about a 60-page slide deck about the defendant's practices.

(Exhibit No. 14 was marked for identification.)

BY MR. JILIZIAN:

Q. Do you see this document here? Do you recognize this document, Mr. Jaffy?

A. Yes.

MR. JILIZIAN: Okay. I'm going to also just introduce the next exhibit here. So this is going to be number 15, Exhibit No. 15.

This is the Virtual Buddy 24/7 campaign memorandum document titled -- and it's Bates numbered APPX_125. Just one page here.

(Exhibit No. 15 was marked for identification.)

BY MR. JILIZIAN:

Q. Do you recognize this document, Mr. Jaffy?

A. Yes.

Q. Do you know if MHA still contends it's entitled to the safe harbor codified in 47 CFR section 64.1200 C 21 regarding training procedures.

MR. PETERSON: Object to form.

A. Sorry. Can you repeat that.
BY MR. PETERSON:
Q. It's okay. So do you know if MHA still actually -- strike that. It's all right. I don't even need to ask.
Okay. So can you just generally describe the training and risk management procedures in place to train employees and agents of MHA to not violate the TCPA or contact individuals who haven't provided consent or on the Do Not Call Registry.
A. Yeah. So first and foremost is, you know, our number one rule is if someone asks to be taken off or stop calling me or removed, we take them off, and then it marks them as do not call on our dialer or any disposition similar to that; wrong number, do not call. We'll remove them from our system and not allow them to be dialed again. You know, also we do an extensive training of about one to two weeks, depending on their level of expertise coming to our company, if they have experience or not. You know, we go from start to finish on, you know, how to handle consumers and beneficiaries in the medicare space.
Q. Gotcha. Anything else you want to include?
A. What is the question again, then?
Q. Just any sort of TCPA compliance policies and

procedures that you have at MHA to either, you know, train employees and agents to help them comply or, you know, audit noncompliance, just any procedures you want to describe to me at all.
A. You know, we have call recordings, we call recordings and a compliance team as well, listening and monitoring calls as well. But that's it.
Q. Okay. You see here a APPX_056, page of -- exhibit, sorry. This Exhibit 14, slide deck. And it's titled, "Do Not Call Requests." And it has instructions here on how to handle someone requesting not to be called or to be placed on the internal DNC. Do you see that here?
A. Yes.
Q. Okay. If the agent sets a disposition to do not call, where exactly does that record go? Like, where would that be kept that this number requested not to be called by MHA? As in, like, what database or what repository?
A. It would still stay in the same database. It just wouldn't allow MHA to call them again.
Q. Okay. So you don't -- MHA doesn't maintain some sort of separate repository of numbers on their internal DNC in a separate -- it would just indicate in the same database not to call that number; is that

correct?
A. Correct.
Q. Okay. And I see this bottom portion. Do you see this where it says, "If a caller continues to reach out after being placed on the Do Not Call list, escalate the issue to management so they can adjust the dialer's back end settings accordingly."
So I mean, the question here is, you know, if the system is purported to, you know, when a person -- sorry -- when a person indicates they don't want to be called anymore, you've testified that it just is changed in the system and then the person is no longer called. Why would a caller continue to reach out with the issue if -- like, why would this even happen in the first place if this, like -- wouldn't the system prevent against this scenario of a caller reaching out after requesting to be placed on the internal DNC?
A. It only stops us -- I'm sorry. It only stops us from reaching out, not from them calling back in. So we have those issues escalate to management so we can, you know, on a specific case and place them, you know, on our internal DNC list to make sure we don't get, you know, anything further from that client.
Q. Gotcha. Okay.
Oh, I see. So it says, "If a caller continues to

A. Yes.
Q. Okay. And so does this serve as the primary TCPA related do not call policies and procedures source of training?
A. Yes, this encompasses all training.
Q. Okay. So this is it right here. And when is the -- or so this is it right here; correct?
A. Yes.
Q. Okay. When was this last updated?
A. I don't have an accurate date of that.
Q. Do you have an estimate of, like, would it have been in the last year? Six months?
A. Yeah. I don't have a timeline, I mean --
Q. Do you know if it would have been updated since this litigation was initiated on June 16th, 2025?
MR. PETERSON: Object to form.
A. The most recent update, probably would have been before October of this year. I just don't have an exact date. But you know, when the new year comes around, there's new benefits, new plans, and new laws and regulations with medicare. But those would be, you know, majority of the changes if there were any. But I don't have a timeline for you.
BY MR. JILIZIAN:
Q. Okay. Can you just -- sorry. Does MHA

maintain records of training sessions? Like, would there be any document or any sort of -- even if it's just like Google calendar invites where people are checking accept, you know, to attend a meeting? Would there be any sort of written records of when training sessions occurred and who attended them? And when I say training sessions, I mean training sessions for DNC policies, TCPA, things like that?
A. I don't know if we store any records of that. To my knowledge, no.
Q. Okay. Could you testify to me today, like, what those trainings look like? Like, let's say in the last two years? Like, could you tell me how many total hours have been spent training agents, or how much total time has been spent training agents on DNC and TCPA and communications law-related policies in the past two years, I'd say.
A. No. Because that's done, you know, not by myself. But I can tell you, we do weekly meetings once a week to go over compliance, rules, regulations, and just updates that we see.
Q. So there are weekly meetings, though related? And are these meetings entirely about DNC procedures, TCP --
A. No.

Q. Okay, okay. So in these weekly meetings, how often would you say do you touch on TCPA, DNC, other communications regulations?
A. I mean, again, I'm not primarily on these meetings.
Q. Okay.
A. So I can't testify to that.
Q. Okay. Just kind of a few finishing matters here, but we don't have too much left to go.
Who exactly are MHA's -- so I'll ask, you had previously testified in your depo, your first depo, that MHA's customers are primarily individuals who are seeking medicare coverage; is that accurate?
A. That's our clients, medicare specific.
Q. Okay. Could you break that down. Like, when I say "customers" and "clients," could you explain that, I guess.
A. In terms of what?
Q. Like, okay. Could you just explain to me, I guess I'll just ask, who are MHA's customers? Like, who do they primarily consist of?
A. People who are on Medicare parts A and B.
Q. Okay. And so, MHA, would you say that those people, they would primarily be like individuals; right? Rather than like businesses and employers?

A. It's only individual.
Q. Only individuals, okay.
Does MHA's lead -- so either MHA's, like, lead or intake form or any lead vendor that you work with, that you know of, do you know if they ask, like, when they ask for a phone number, if they ask for a personal cell phone line or a home phone? Or do you know if any your -- MHA or any of the vendors it works with, if they ask specifically for personal or home line?
A. Yeah, I don't know.
Q. Okay. Does MHA, in its records, do they classify numbers as like residential lines or cell lines or mobile or anything like that?
A. No.
Q. Okay. Or any vendor you work with, do you know if they do that?
A. Not that I'm aware of, no.
Q. Okay. Does MHA contend that any of the numbers in the Wolfson exhibit here in -- sorry. I can pull back up the Excel sheets, but I figured it's not. I can pull -- but like any Excel in the complete repositories that Wolfson compiled from the August and September data, do you contend -- does you or MHA contend that any of those numbers were not residential phone numbers?

MR. PETERSON: Object to form.
A. Can you explain your question?
BY MR. JILIZIAN:
Q. Yeah, so I'll restate it simpler.
So of all the numbers MHA calls, does MHA contend that any of those numbers are not residential phone lines?
MR. PETERSON: Object to form.
A. But so, what would another line be if it's not residential? A business line, you're saying? Can you clarify.
BY MR. JILIZIAN:
Q. Yeah. Or some other type of non-residential phone line. So, yeah. Like for example, a business line or --
A. Well, so again, the clients that we're calling are filling out a form and opting in, so we're going off based on that information.
Q. Okay. So even -- and sorry, I know I asked a very similar question. Even if MHA or the vendors, they don't record, like in their repository, if it's like a residential line or cell phone or mobile number, do you know if that data is available to MHA or their vendors? Like, if they can see if they're being called from a landline or resident, versus like a mobile phone?

A. For MHA, no. I can't speak on the vendors.
Q. Okay.
A. But they --
Q. That's all right. I'm going to go back to Exhibit 12. This was the interrogatory answers. You'll see that as a part of, sorry -- excuse me.
Okay. You'll see -- so Interrogatory No. 2, it asked: "Identify all employees or vendors involved in making outbound calls as a part of the campaign that contacted the plaintiff." And it specifies a bunch of other categories, but that's the gist of it.
Here's your response, MHA's response. And down here, I just want to go down to this point and just focus on this: "Subject to and without waiving these... Medicare states -- Medicare Health states that no employee, agent, or vendor of Medicare Health makes marketing outbound calls to promote goods and services unless... there is already an established relationship with Medicare Health or until an opt-in and/or prior express written consent."
So we've already talked about opt-in or prior express written consent, how MHA contends that everybody that they call has given him prior express written consent. I want to focus here on this established relationship here. So can you describe to me what this

exactly means by "established relationship" with Medicare Health, for a consumer to have an established relationship with them.

MR. PETERSON: Object to form.

A. So say you're a client of ours, Alex, and we sold you last year. If you call in and request assistance and an agent helps you, that would be an established relationship -- clients.

BY MR. JILIZIAN:

Q. Sure. So that could be -- what you're saying is that could be different, though, than prior express written consent; right? So for example, like, we're kind of talking about a couple categories here; right? You've talked about how people have provided prior express written consent from signing a lead form or something like that. We've also talked about that, you know, you have actual clients who you provide services to, medical services and, you know, you contend establishes a business relationship; right? For this second group of people you just testified to, do you know if they specifically consented to provide call -- or to receive calls, marketing communications from MHA?

MR. PETERSON: Object to form.

A. On which -- you're asking.

BY MR. JILIZIAN:

Q. Yeah. So I'm saying of this group of people you say have an established relationship with, people you found from, like, necessarily from, like, leads or anything like that, like lead vendors. But these groups of people you say have an established relationship through getting a service from MHA. Did they, at any point while contracting with MHA, give written consent to receive telemarketing calls?

A. So we don't -- we don't do any telemarketing calls to our existing book. It's more of a service that we provide --

Q. Okay.

A. -- to make sure that they're set, because every year the benefits update. We don't -- we don't work on the medical side; we're doing the insurance, but we're just servicing the book to make sure that they're happy and satisfied. There's no telemarketing calls made to them. If they call in, we just help them. So we're not trying to turn our book or resell it.

Q. Okay. So explain to me if I -- if I -- just verify for me if I have this correct. If I come in and receive a service from MHA that I don't -- I'm not consenting to receive, like, telemarketing calls in the same way if I, like, filled out the lead form and filled out the consent that I'd receive telemarketing calls.

had an established business relationship?
A. Yes, correct.
Q. Okay. Because here's the reason I asked, right, and why. Because it says, Medicare Health makes marketing outbound calls to promote goods and services unless there is already an established business relationship or opt-in, in prior express written consent; right?
But it sounds like from your answer, you're saying, No, we only make marketing outbound calls to promote goods and services with prior express written consent. Not -- you're saying the established business relationship would not allow you to make marketing outbound calls; is that correct?
MR. PETERSON: Object to form.
A. So I don't know the rule on that. I'm -- I mean, to my knowledge, if they're an established client, you're able to, but we do not.
BY MR. JILIZIAN:
Q. Okay. So it's your testimony today that if a client never filled out a prior express written consent from like a lead site or your own site, but they in some way received a service from MHA, that they would -- they would not receive outbound telemarketing calls?
MR. PETERSON: Object to form.

A. So I would say, as of now, we've updated the CRM and do outbound calls, but prior to January of this year, we do not. So there's -- there's been a change. We updated our CRM, but they do not get any outbound calls.
BY MR. JILIZIAN:
Q. Okay. Okay. Just a couple more questions here regarding inbound/outbound calls. If a different company -- so let's say like a lead or something, if they transfer a caller to you, so the caller doesn't call MHA directly. Let's say, a caller calls a lead, a vendor, or a connected entity who transfers the call to MHA. Would that be recorded as an inbound call?
A. No.
Q. Okay. Would that be recorded, like, uniquely? Like, as a transfer, or?
A. Yes.
Q. Okay. Inbound calls would only be those people who call directly to MHA inbound, not to a lead vendor that transferred to MHA?
A. Correct.
MR. JILIZIAN: Okay. Okay. All right. Well, that's all I have today. Mr. Jaffy, thank you very much for bearing with me.
And thank you, Mr. Peterson.

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ST. LUCIE

I, ANNE STAHL, Court Reporter and Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of MAX JAFFY; that a review of the transcript was requested; and the foregoing transcript, pages 4 through page 93 is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 11th day of November, 2026.

______________________________
Anne Stahl, Notary Public, State of Florida