# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA

**TOBY HOY,** individually and on behalf of all others similarly situated,

*Plaintiff,*

*v.*

**MEDICARE HEALTH ADVISORS LLC**,

*Defendant.*

Case No. **4:25-cv-00207-RGE-HCA**

Presiding:
**Hon. REBECCA GOODGAME EBINGER**

Referral:
**Hon. HELEN C. ADAMS**

## DECLARATION OF EXPERT AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by the Plaintiffs to determine whether there is a reliable methodology for analyzing the call records in this lawsuit reflecting the calling done by or on behalf of the Defendant Medicare Health Advisors LLC ("Medicare Health Advisors" or "Defendant" as captioned).

2. I had previously proffered a declaration on September 21, 2026. In the September 21, 2026, I outlined a methodology that I had used in previous matters to reliably identify those calls or texts within Call Detail Records ("CDRs") that were made to telephone numbers that were called and/or sent messages on two (2) or more occurrences within a twelve (12) month period to telephone numbers that were registered on the National Do Not Call Registry ("DNC") for more than thirty days (30) before the date of each of the calls and/or texts, and other criteria.

3. On approximately October 9, 2026, I was provided with ninety-six (96) files containing calling that had been conducted by or on behalf of the Defendant. The ninety-six (96) files contained approximately 13,656,257 calls that were placed to

1,744,246 distinct telephone numbers between 08/01/2025 and 09/30/2025. I have now been asked to apply the methodology that I had outlined in my September 21, 2026 report, toward the CDR's that I received on approximately October 9, 2026, and to identify:

(a) The quantity of calls, and the unique telephone numbers to which those calls had been placed, where the number had been called on two (2) or more occurrences within twelve (12) months while the number had been on the national Do-Not-Call ("DNC") list for more than thirty (30) days; and,

(b) The quantity of calls, and the unique telephone numbers to which those calls had been placed, where the number was associated with a Florida area code.

4. It is my opinion that there is a reliable method to identify calls with other particular criteria based on the additional types of information included in the CDRs and/or other records maintained by or on behalf of Defendant or in any available database.

5. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

6. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

1. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving

as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

2. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[1] My testimony has been relied upon by courts in both individual and class actions,[2] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including TCPA claims.

3. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including

---

[1] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)).* (Exhibit 3).

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

predictive elements of enhanced call processing, and the precise timings of these events.

4. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services. [5]

5. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

6. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

---

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

7. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

8. I held a CPCN[6] ("Certificate of Public Convenience and Necessity") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a reissue of my initial CPCN granted to TelSwitch on June 10, 1994, which I held for approximately 18 years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built, and programmed with the phone network for the purpose of providing wholesale and retail telecommunications services.

9. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls.

10. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of the defendant in a case in which the Court certified a class of consumers who received pre-recorded calls to their cellular telephone numbers.

**Expertise Specifically Related to Database work.**

11. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

12. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc.* established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context.

13. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

14. I have applied similar methods to structure large amounts of unstructured data on behalf of defendant *Verizon Wireless* and *Collecto* in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the district court of the Northern District of California to reconstruct a database from information that was in defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 4.

15. I engaged on behalf of plaintiff Michael Anthony in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Ill.) in which I undertook a comprehensive analysis of the Defendants records in support of class certification. The order granting class certification is attached as Exhibit 5.[7],[8]

16. I was also engaged on behalf of plaintiff Robert Mason in *Robert Mason et al v. Spring EQ, LLC* (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca). In the court's order denying defendant's motion to decertify the class, the course stated that the plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers and that "The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result" (ECF 166, page 12 of 14). The court's order is attached as Exhibit 6.

**Materials and Documents Reviewed and Relied Upon.**

17. In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

**I. Materials that I relied upon:**

(a) The Complaint, ECF 1.

**II. Call Detail Records contained within 96 files[9]:**

*"Medicare Health - call logs 9-30-25_10-1-25 (CONFIDENTIAL).csv"*

---

[7] The court presiding over *Federal Savings* is currently considering a motion for de-certification.

[8] It is my understanding that the calls at issue this matter are analogous to those placed by defendant *Federal Savings* in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC*. In that matter, the calls were placed by a third party, FDE Marketing, and then transferred *to* defendant *Federal Savings.*

[9] It appears that the Defendants produced a sample of the data.

*"Medicare Health - call logs 9-30-25_9-30-25 (CONFIDENTIAL).csv"*
*"Medicare Health - Call Logs 9-30-25_9-30-25 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - Call logs_09-29-2025_09-30-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-01-2025_08-01-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-01-2025_08-01-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-02-2025_08-03-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-04-2025_08-04-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-04-2025_08-04-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-04-2025_08-05-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-05-2025_08-05-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-05-2025_08-06-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-06-2025_08-06-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-06-2025_08-07-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-07-2025_08-07-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-07-2025_08-08-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-08-2025_08-08-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-08-2025_08-09-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-09-2025_08-11-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-11-2025_08-11-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-11-2025_08-12-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-12-2025_08-12-2025 (CONFIDENTIAL).csv"*

*"Medicare Health - CallDetails_08-12-2025_08-13-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-13-2025_08-13-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-13-2025_08-14-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-14-2025_08-14-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-14-2025_08-15-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-15-2025_08-15-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-15-2025_08-16-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-16-2025_08-18-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-18-2025_08-19-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-19-2025_08-19-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-19-2025_08-20-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-20-2025_08-20-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-20-2025_08-21-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-21-2025_08-21-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-21-2025_08-22-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-22-2025_08-22-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-22-2025_08-23-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-23-2025_08-25-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-25-2025_08-25-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-26-2025_08-26-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-26-2025_08-27-2025 (CONFIDENTIAL).csv"*

*"Medicare Health - CallDetails_08-27-2025_08-27-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-27-2025_08-28-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-28-2025_08-28-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-28-2025_08-29-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-29-2025_08-29-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-29-2025_08-30-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_08-30-2025_09-01-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-02-2025_09-02-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-02-2025_09-03-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-03-2025_09-03-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-03-2025_09-04-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-04-2025_09-04-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-04-2025_09-05-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-05-2025_09-05-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-06-2025_09-08-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-08-2025_09-08-2025 (3) (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-08-2025_09-09-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-09-2025_09-09-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-09-2025_09-10-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-10-2025_09-10-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-10-2025_09-10-2025 part 2 (CONFIDENTIAL).csv"*

*"Medicare Health - CallDetails_09-10-2025_09-11-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-11-2025_09-11-2025 (3) (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-11-2025_09-12-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-12-2025_09-12-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-12-2025_09-13-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-13-2025_09-15-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-15-2025_09-15-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-15-2025_09-15-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-16-2025_09-16-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-16-2025_09-16-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-17-2025_09-17-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-17-2025_09-17-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-18-2025_09-18-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-18-2025_09-18-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-19-2025_09-20-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-20-2025_09-21-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-22-2025_09-22-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-22-2025_09-22-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-22-2025_09-23-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-23-2025_09-23-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-23-2025_09-23-2025 part 2 (CONFIDENTIAL).csv"*

*"Medicare Health - CallDetails_09-23-2025_09-24-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-24-2025_09-24-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-24-2025_09-25-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-25-2025_09-25-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-25-2025_09-25-2025 part 2 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-25-2025_09-26-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-26-2025_09-26-2025 (2) (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-26-2025_09-27-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-27-2025_09-28-2025 (CONFIDENTIAL).csv"*
*"Medicare Health - CallDetails_09-29-2025_09-29-2025 part (CONFIDENTIAL).csv"*
*"Medicare Health - Calllogs _09-29-2025_09-29-2025 part 2 (CONFIDENTIAL).csv"*

## III. Electronic database resources that are available:

(a) Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC.[10], [11]

(b) Index of the North American Numbering Administrator's Numbering Plan Area Codes that are TCPA-eligible, sorted by location ("Numbering Plan, Appendix A").

---

[10] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10418065-518065-26.

[11] TelSwitch, Inc. is registered as an "exempt organization" – an organization that "does not make calls". This is consistent with the FCC's order stating "This approach is consistent with how the Commission approached the National Do-Not-Call Registry, which contains phone numbers that should be used only for compliance with the Commission's do-not-call requirements." (FCC 18-177, para 26)

(c) The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.

(d) Various databases evidencing number assignment, including the Local Exchange Routing Guide (LERG), various line-type identification databases[12,13], and Central Office Code Assignment Records from the North American Numbering Plan Administrator (NANPA)

**Methods and Tools Used to analyze Records.**

18. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT,

---

[12] The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books.

[13] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3). ). I was not the expert in *Perrong v Caller Identified as Connor*, nor did I provide the data.

WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

19. When analyzing call records, I start by creating a database to serve as a repository for the call records and any other related records. I then create database tables to accumulate the results of the associated DNC queries that I run against the FTC's national DNC database – queries that tag each call with a "*yes*" in the field indicating that the telephone number been on the DNC registry for more than thirty (30) days. I also create database tables to accumulate the results of the associated RND queries that I can run against the FCC's Reassigned Number Database – queries that tag each call with a "*disconnected*" for reassigned or disconnected, "*active*" for active (e.g. not reassigned nor disconnected).

20. I also tag the telephone numbers as to whether there was a 'stop' style of request, on which date the request was made, and whether there were calls or texts more than ten (10) days after that date.

21. Finally, if asked, I create a set of tables to accumulate the results of the other identifiers related to the telephone numbers, such as *isPorted*, *isWireless*, *mostRecentPortDate*, *state*, and *operating (telephone) company*[14],[15] that can be used to identify whether a number was wireless, or wireline, and if ported, the date when the number had moved, or transitioned from one carrier to another.

22. By using a set of standardized SQL queries, I am able to tag each record

---

[14] This full information is available by sending a subpoena to the current successor Local Number Portability Administrator ("LNPA").

[15] "someone could subpoena iconectiv for that information, but it wouldn't be part of his subscription to the service." (PMQ testimony of iConectiv taken 11/13/2025, in *Michael Smith et al. v Examworks et al*, Case No. 1:21-cv-02509, DC, Md., page 104, attached as ECF 228-1 to *Federal Michael Anthony et al v. The Federal Savings Bank et al*, Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

according to (a) any data field contained in the call records, including the telephone number called, the date of a telephone call and its' duration (and/or) the disposition of any call; and, (b) any data field contained in any associated leads records; and, (c) whether the telephone number to which the call had been placed was assigned to a cellular service.

23. This is precisely the task that I outlined in my September 21, 2026 declaration, which I have now applied toward on behalf of the Plaintiff in this matter, guided by my many years of experience with these precise tasks.

**Steps I have taken to Organize and Analyze the Call and Text Records.**

24. I started by opening each of the files that contain calls (collectively referred to as "Call Detail Records" or "CDRs") to identify the format that they were in. The files follow a similar format that I am familiar with, and the data is aligned with the types of information in the fields associated with that data type association.[16]

25. I then imported the CDRs file into SQL database tables using Microsoft SQL™ Enterprise Manager. I place the totality of the calls and text messages into a database called *dbo.calls*, upon which ran SQL statements to apply filters to capture those calls that:

a. were made either (a) to a number that contained precisely ten digits and started with a 2 through 9, or (b) to a number that contained precisely eleven digits and started with a 1 followed by a 2 through 9; and,

b. were contained within structurable data; and,

c. had an associated date; and,

d. contain a disposition and duration indicating the transmission of a call.

[16] I did not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

26. To identify calls made to numbers on the national DNC, I tagged each of the calls and text messages within the database that I constructed with information from the national DNC files that I receive from the Federal Trade Commission.

27. I then excluded from the records any calls to telephone numbers that (a) that were not called two (2) or more times in a twelve (12) month period by or on behalf of the Defendant, and/or (b) that were not registered on the DNC for thirty days before the date of each of the calls and/or text messages. [17]

28. By applying these steps, I was be able to identify those calls that were made to telephone numbers (a) that were called on two (2) or more occurrences within a twelve (12) month period by or on behalf the Defendant, and (b) that were registered on the DNC for more than thirty (30) days before the date of each of the calls and/or text messages.

29. To identify calls made to telephone numbers that were associated with the Florida area codes, I applied a filter to each of the calls in the database that I constructed to exclude any calls that did not have an area code that was associated with Florida.

**Waterfall Analysis 1. Steps that I applied to determine the quantities of calls and texts that were placed to telephone numbers that had been on the national Do-Not-Call ("DNC") list for more than thirty (30) days, and were called on two (2) or more occurrences within 365 days, and the quantity of unique numbers to which those calls or texts were sent.**

30. I started with the set of data that was provided, which included 13,656,257 calls that were placed to 1,744,246 distinct telephone numbers between 08/01/2025 and 09/30/2025 that were contained within the source file listed in paragraph 17 (II).

---

[17] Though October 16, 2026, TelSwitch, Inc. has processed 3,966,069,172 call detail records against the national DNC list and reliably and accurately tagged which of those calls were to numbers that were on the national DNC list for more than thirty (30) days before the call.

31. I began by removing 126,220 calls to numbers not contained within the FTC's index of TCPA-eligible area codes, or where the number was malformed.[18]

32. I then removed 94,863 calls that appeared duplicative within the production.[19] And I removed 203,679 calls that were tagged *inbound* or *transfer inbound.* I then removed 2,617,498 calls that appeared to have been outbound but were under six (6) seconds. And I removed 6,402 calls that appeared to be equal-to-or-greater than six (6) seconds, but did not indicate "*CR_CNCT/CON_PAMD*", "*Ans. Machine*", "*DO NOT CALL*", "*Wrong Number DNC*", "*Already Has*", "*Not Eligible No Medicare*". This left 10,607,595 remaining calls.

33. From the 10,607,595 remaining calls, I removed 749,259 calls that had been placed *outbound* on or after the date of an *inbound* call had been received *from* that number. This left 9,858,336 remaining records.

34. From the remaining 9,858,336 records, I removed 6,279,040 calls that were placed to numbers that were either (a) not on the DNC list, or (b) were on the DNC list but the calls were placed before the number had been on the DNC list for more than thirty (30) days. I also removed 208,592 calls that had been placed to a number that was on the DNC, but there were not two (2) or more calls to that telephone number within 365 days.

| | |
|---|---|
| All items within "Defendant Call Records" files [callLogs]: | 13,656,257 |
| Removal of any calls to numbers that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. (also includes those numbers that appear to have been internal calls, or internal transfers within Cisco call manager. | (126,220) |

---

[18] This process removes any numbers made to Canada or other area codes that are dialable from the United States as part of the North American Numbering Plan, but are not part of the United States dial plan.

[19] This often occurs when the call records are stored in multiple archive locations, where overlap occurs between them. The various pieces of equipment involved will often store the call details in multiple archive locations.

| | |
|---|---|
| Removal of any duplicate call records (e.g. Removal of any records from the remaining call detail records ("CDR") where the call was recorded duplicatively. | (94,863) |
| Removal of those calls where the calltype is tagged as "Inbound" or "Transfer Inbound" | (203,679) |
| Removal of any calls that were not marked "outbound" with a duration of at least six (6) seconds. | (2,617,498) |
| Removal of any calls to numbers that do not have appeared to have been tagged with a duration >6 seconds **and** one of the following callStatus indicators, indicating that *"CR_CNCT/CON_PAMD", "Ans. Machine","DO NOT CALL", "Wrong Number DNC", "Already Has", "Not Eligible No Medicare"* | (6,402) |
| Removal of any calls outbound *on or after* the date that an inbound call had bee receied *from that* particular number: | (749,259) |
| Removal of any calls from the list where the number to which the calls were placed to numbers that were (a) not on the DNC list, or (b) were on the DNC list but the calls were not placed before the number had been on the DNC list for more than thirty (30) days. | (6,279,040) |
| Removal of any calls from the list where the number to which the calls or texts were placed to numbers that were on the NDNC list for more than thirty days, but there were not two (2) or more calls to that # within 365 days. | (208,592) |
| | 3,370,704 |
| | |
| Quantity of unique numbers to which the **3,370,704** calls , where the # was on the DNC list for more than thirty days and there were two (2) or more calls within 365 days. | 327,417 |

35. This resulted in 3,370,704 calls that had been placed to 327,417 distinct telephone numbers.[20]

**<u>Waterfall Analysis 2</u>. Steps that I applied to determine the quantity of calls to numbers that were associated with Florida area codes.**

36. I started with the set of data that was provided, which included 13,656,257 calls that were placed to 1,744,246 distinct telephone numbers between 08/01/2025 and 09/30/2025 that were contained within the source file listed in paragraph 17 (II).

37. I began by removing 126,220 calls to numbers not contained within the

[20] The SQL queries that I used to perform the analysis is attached as Exhibit 7.

FTC's index of TCPA-eligible area codes, or where the number was malformed.

38. I then removed 94,863 calls that appeared duplicative within the production.[21] And I removed 203,679 calls that were tagged *inbound* or *transfer inbound*. I then removed 2,617,498 calls that appeared to have been outbound but were under six (6) seconds. And I removed 6,402 calls that appeared to be equal-to-or-greater than six (6) seconds, but did not indicate "*CR_CNCT/CON_PAMD*", "*Ans. Machine*", "*DO NOT CALL*", "*Wrong Number DNC*", "*Already Has*", "*Not Eligible No Medicare*". This left 10,607,595 remaining calls.

39. From the 10,607,595 remaining calls, I removed 749,259 calls that had been placed *outbound* on or after the date of an *inbound* call had been received *from* that number. This left 9,858,336 remaining records.

40. From the remaining 9,858,336 records, I removed 9,149,128 calls that were placed to numbers that were not associated with Florida area codes.

| | |
|---|---|
| All items within "Defendant Call Records" files [callLogs]: | **13,656,257** |
| Removal of any calls to numbers that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. (also includes those numbers that appear to have been internal calls, or internal transfers within Cisco call manager. | **(126,220)** |
| Removal of any duplicate call records (e.g. Removal of any records from the remaining call detail records ("CDR") where the call was recorded duplicatively. | **(94,863)** |
| Removal of those calls where the calltype is tagged as "Inbound" or "Transfer Inbound" | **(203,679)** |
| Removal of any calls that were not marked "outbound" with a duration of at least six (6) seconds. | **(2,617,498)** |
| Removal of any calls to numbers that do not have appeared to have been tagged with a duration >6 seconds **and** one of the following callStatus indicators, indicating that "*CR_CNCT/CON_PAMD*", "*Ans. Machine*","*DO NOT CALL*", "*Wrong Number DNC*", "*Already Has*", "*Not Eligible No Medicare*" | **(6,402)** |
| Removal of any calls outbound *on or after* the date that an inbound call had bee receied *from that* particular number: | **(749,259)** |

[21] This often occurs when the call records are stored in multiple archive locations, where overlap occurs between them. The various pieces of equipment involved will often store the call details in multiple archive locations.

| | |
|---|---|
| Removal of any calls that were not placed to telephone numbers associated with Florida area codes. | (9,149,128) |
| | 709,208 |
| Quantity of unique numbers to which the 709,208 calls , where the assoicated with a Florida area code: | 120,429 |

41. This resulted in 709,208 calls that had been placed to 120,429 unique telephone numbers that were associated with Florida area codes.

**Identification of subscribers and Line-Classification by Telephone Number.**

42. As described previously, I use commercially available databases to identify those numbers that are (or were) wireless or wireline line classification type of telephone numbers when the call was made, along with other attributes such as the operating company number.

43. The line classification type processing engine allows a file containing phone calls (or texts) to be tagged with labels indicating whether the number called, or texted, was wireless (colloquially known as "isWireless") and the host Operating Company Number ("OCN").

44. Using the information from the Defendant's and/or Defendant's third-parties' own files, I am able to apply the return-results from various commercially available databases, including fields representing whether the number is wireless, is ported, the LRN itself, the date of the last LRN change, and Operating Company Number.[22]

45. By using the information contained within the CDRs, I am able to attribute the Carrier (Company) of Record and Operating Company Number of telephone numbers that were validly formatted and contained and were part of the

[22] The carrier-of-record and operating company number, in combination with the Telephone Number, colloquially called "MDN" or "ANI", provide the necessary fields for the creation of export files that are used by the various telephone companies in the Common-Language presentation-format expected by the Local Exchange Carriers or Wireless Exchange Carriers that host the telephone numbers, to provide subscriber information for each number, including through subpoena.

FTC's DNC-eligible area codes. I am also able to determine which calls are to numbers that were assigned to a phone carrier on the date that the number was called or texted, and whether the numbers were part of the United States portion of the North American Numbering Plan ("NANP") or the expanded area[23] on the date when contacted.

46. By using the *Operating Company Number* (e.g. carrier of record) from the data, I am able to build an Electronic Data Interchange ("EDI") record exchange database from the CDR records and organize it by carrier for the purpose of structuring the data into the correct EDI format that is in the expected layout that they are familiar with. The csv. files, organized by carrier, can, if necessary, be utilized in subpoenas to telephone carriers to determine contact information, and/or any other information desired from the carrier, by structuring the data into a format that the carriers already use for exchanging data between and amongst themselves will facilitate as much of a response as is possible.

**Telephone Companies databases maintain subscriber information in electronic format as part of their standard record keeping.**

47. Wireless and wireline carriers maintain historical records that can be used to identify the contact information associated with telephone numbers. As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain items that are responsive to subpoenas. They also use this information to for their own customer service purposes.

48. The line type and customer information attributes are maintained by telephone companies in a manner that allows the telephone companies to verify who are their customers. This is accomplished through shared implementation of the Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle

[23] Canada and some Caribbean islands that use the North American Numbering Plan but are not part of the United States Dialing Area.

such requests using a common set of data attributes.

49. I have become familiar with EDI and the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements. Both in my role in providing billing and customer service software to phone companies and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

50. As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which belonged to which subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls (and texts) for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

51. I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, and maintaining accurate customer information, because Tel-One was expected to work with the proper department, depending upon the type of the product being offered.

52. In sum, Telephone companies maintain the name and address and line classification type of the telephone numbers that they maintain. The following is an example of T-Mobile's responses to a subpoena request (properly redacted) in another matter:

| | A | B | C | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|
| 1 | RequestedStartDate | RequestedStopDate | PHONE_NUMBER | ACCT_HOLD_FIRST_NM | ACCT_HOLD_LST_NM | ACCT_TYP_DESC | ACCT_SUB_TYP_DESC | BILLG_ADDR_PRMRY_LN_TXT |
| 23279 | 2/7/2024 | 2/7/2024 | 4296 | | | Individual | MCSA | |
| 23280 | 4/10/2023 | 4/18/2023 | 4982 | | | Individual | Regular | |
| 23281 | 5/8/2023 | 5/18/2023 | 6413 | | | Individual | Regular | |
| 23282 | 6/13/2023 | 6/26/2023 | 2385 | | | Individual | MCSA | |
| 23283 | 5/18/2023 | 5/29/2023 | 6117 | | | Individual | MCSA | |
| 23284 | 9/26/2023 | 10/9/2023 | 8741 | | | Individual | MCSA | |
| 23285 | 5/10/2023 | 5/18/2023 | 1102 | | | Individual | Regular | |
| 23286 | 12/23/2021 | 2/21/2022 | 3212 | | | Individual | Regular | |
| 23287 | 3/10/2023 | 4/7/2023 | 5950 | | | Individual | Regular | |
| 23288 | 4/22/2022 | 5/12/2022 | 7004 | | | Business | Retail | |
| 23289 | 7/13/2022 | 7/13/2022 | 0518 | | | Individual | Regular | |
| 23290 | 12/20/2021 | 12/24/2021 | 0724 | | | Individual | Regular | |
| 23291 | 12/6/2022 | 12/19/2022 | 8443 | | | Individual | Regular | |
| 23292 | 3/13/2024 | 3/14/2024 | 4655 | | | Individual | Regular | |
| 23293 | 8/14/2023 | 8/15/2023 | 4710 | | | Individual | Regular | |
| 23294 | 6/27/2022 | 6/27/2022 | 2872 | | | Individual | Regular | |
| 23295 | 1/9/2023 | 1/16/2023 | 2771 | | | Business | Corporate | |
| 23296 | 5/23/2023 | 6/5/2023 | 7050 | | | Individual | Regular | |
| 23297 | 3/7/2022 | 3/28/2022 | 1385 | | | Individual | MCSA | |
| 23298 | 3/22/2023 | 3/23/2023 | 0226 | | | Individual | MCSA | |
| 23299 | 6/30/2022 | 6/30/2022 | 9861 | | | Individual | Regular | |

**Conclusion 1: I was able to determine that there were 3,370,704 calls that were placed to 327,417 distinct telephone numbers that were on the national DNC for more than thirty days and received two or more calls within 365 days.**

53. By using SQL database queries, I was able to determine that, out of the 13,656,257 calls that were placed to 1,744,246 distinct telephone numbers between 08/01/2025 and 09/30/2025, there were 3,370,704 telephone calls that had been placed to 327,417 numbers that were on the national DNC list or more than thirty (30) days, and had received two (2) or more calls within 365 days. (*See,* Exhibit 8)

**Conclusion 2: I was able to determine that there were 709,208 calls that were placed to 120,429 distinct telephone numbers that were associated with Florida area codes.**

54. By using SQL database queries, I was able to determine that, out of the 13,656,257 calls that were placed to 1,744,246 distinct telephone numbers between 08/01/2025 and 09/30/2025, there were 709,208 telephone calls that had been placed to 120,429 numbers were associated with Florida Area codes. (*See,* Exhibit 9)

~~~

55. Finally, I understand that there is a reliable method to identify the individuals to whom telephone numbers belong. This is because wireless and wireline carriers maintain historical records that can be used to identify the residential or business classification for any particular phone number, as well as contact information, which can be obtained from a number of sources[24], including the

---

[24] I understand that Carla Peak, expert for Saggio in *Jason Saggio et al v. Medicredit, Inc.* (Case No. 4:22-cv-
(footnote continued)
~~~

carriers themselves by querying the FCC's databases maintained by the North American Numbering Plan Administrator and the Local Number Portability Administrator.[25]

56. I reserve the right to amend this report when more data comes available.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed October 16, 2026 in West Branch, Iowa.



Aaron Woolfson

01005-JAR, ED, Mo, Eastern Div.) described a method that could be reliably applied to further identify those proposed putative class members, using data from PacificEast, Nexxa, or Lexis Nexis" to identify residential class members. *See* decl. Peak, doc. 108-1 at 2-13 (*Jason Saggio et al v. Medicredit, Inc.*) and depo. Peak, doc. 108-2 (*Jason Saggio et al v. Medicredit, Inc.*) The court's order (ECF 126) is attached as Exhibit 10.

[25] TelSwitch, Inc. reply comments to FCC Notice of Proposed Rulemaking "Combatting Illegal Robocalls Through FCC Numbering Policies, WC Docket 26-49" (Exhibit 11) (https://www.fcc.gov/ecfs/document/26109987506/1 last visited 10/09/2026)

# EXHIBIT 1

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

## Career Summary

25 Years of Experience developing extremely large scale, highly efficient and accurate Database Applications, for commercial, government, aerospace, telecommunications and payroll industry, with special emphasis in IVR systems.

- Database transition planning and disaster recovery experience
- Client-Server Database Application Design and Development
- Developed extremely high performance IVR system (1.5m calls/day)
- Efficient Database Design through Data modeling
- Full understanding of Database libraries, and transaction handlers
- Deep knowledge of Electronic Time Keeping Techniques
- Efficient Database Table Structuring and Indexing Techniques
- RDO/ADO interface techniques, incl. port 1433 direct interface
- Point of Sale Time Keeping Integration with Payroll
- Comprehensive data transformation, tallying through data analysis
- VB6 and .NET(2.0) bounded and unbounded objects
- GPS "as-Time Keeping" object, tracking, and analysis techniques
- Presentation of sophisticated data in easily-understood terms
- Web-Services data integration and multi data-source integration
- Networked Multi-Location Database Components related to Timekeeping
- An early investor in, and partial developer of QL2, a data-analysis tool for turning web-pages into rich-data searchable sources of information. QL2's customers include 7 of the top 10 global airlines, 5 of the top global online travel agencies, and Global 100 energy, car rental, retail, pharmaceutical and life science companies.

## Professional Experience ***(consulting that resulted in deliverables)***

**University of Illinois, Champaign-Urbana** (1986, 1987, 1988). Employed to Program computer terminals attached to a Mainframe computer system (PLATO) that were used to generate databases containing class schedules based upon prospective students' interests and SAT scores. Curriculum was graphically represented on Plasma Display Terminals attached to the University's PLATO computer Plato Computer Mainframe. Student Curriculums included travel time between classrooms in different buildings and items related to classroom proximity. Worked under the auspices of Don Bitzer, inventor of the Plato Computer System and co-inventor of the Plasma Display Panel, and Hugh Satterlee, Ombudsman of the University of Illinois, Champaign-Urbana.

**Computer Services Office, San Joaquin Delta College, Stockton California** (1991, 1992). Maintained campus-wide network of mainframe-based computer terminals used for class scheduling and curriculum development;

**Delta Telecommunications, Stockton, Ca** (1993). Founded a California Based Public Utility (U-5410-C) focusing on a network of telephone switching systems connected to databases that were used to route telephone calls of customers within the State of California. I invented the efficient IXC-10 Network Switch and the associated databases, as there were no highly efficient telephone switches during that time that took up a small amount of space, yet could handle the demands of a full-scale telephone switching office.

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

**TelSwitch, Inc., Stockton, Ca** (1994). I authored the Airnet Billing and Call Collection Database software that was used at TelSwitch, Inc for the purpose of billing residential and commercial long distance customers for the calls that they made. I wrote database formulas to establish the rating of telephone calls based upon the elements provided by the switching network: call setup, call type, call routing, and rate plan assigned to customer. Determined the rates and taxes to charge the customers on each call, based upon the rate plans assigned, the time of day, the time and duration of the call, and whether that call was intrastate, interstate, or Intra-lata. Processed millions of telephone calls through my database.

**Japan Telecom America, San Ramon, Ca** (1996). I adopted the Airnet Billing Software and Call Collection Database that I had authored to specifically meet the needs of an international telecommunications corporation doing business in the United States, Japan, and in Canada, presenting bills to customers in multiple languages and font sets, accepting various currencies, which all had to be computed against the dollar in real time.

**Oersted Corporation (Sunstrand Contract)** (1997). Designed and authored an Automation Control and Database system used for the mass-production of mission-critical magnetic armatures used in Air Conditioning, and Electric Vehicle, and Aerospace applications. I created the process control mechanism that allowed the machine to "manufacture the part" and measure the results, and report the results to a master database that contained Quality Control statistics. This machine continues to operate at a Sunstrand Corporation facility in Wisconsin and has successfully manufactured hundreds of thousands of components.

**Network Services Solutions, LLC., Reno, Ca** (2001). Customized a database for tracking the overlapping time elements of telephone calls, and establish audit trails of telephone calls through the phone network, based upon origination, destination, time, and jurisdiction. The system is in use to track the costs for telephone lines and services to hundreds of schools, dozens of hospitals, and is the backbone for a national communication network, with over five million transactions being tracked through my database monthly.

**Decisionet, St. Charles, Il. (Experian Project)** (2004). I was contacted to build a Database and Electronic Gateway "Appliance" Device for customers to acquire credit reports from Experian's secure database. The system was used to facilitate the delivery of 7.2 million credit reports to commercial users, including credit unions, banks, car dealerships. The system tracked usage, report lengths, type of reports, and reporting tools to Experian's customers to view the quantities of reports that were used through the system, types of reports, and other information pertaining to the acquisition of reports. The service allowed Decisionet to extend the life of legacy interface environments between Experian and its' clients by several years.

**BankVOD / Billing Solutions, Inc. - (Bank of America, Wells Fargo Bank, JP Morgan Chase, PNC, Bank of the West)** (2005). Designed and built a network of Database Applications for the mortgage industry using Microsoft SQL and ASP.net. The system created a protocol for banks and mortgage brokers to exchange information on the status underwriting of loan applications, providing tracking of Verification of Income, Verifications of Deposit and Verification of Mortgage applications, as well as providing the analysis back to the banks for items such as Check Verification(s). The database also triggered the disbursements of processing costs and reimbursements toward the banks. To date, my system has been an integral part of the processing of over 1.2 million mortgage applications.

**SAIC - Patriot Missile Systems / Training Division (Subcontract) (DPAS Rated)** (2007). Designed the hardware, software, and firmware used within the modern-day re-instrumented version of Patriot Missile consoles. I was tasked with developing a hardware and software combination that retained full compatibility with both modern and legacy equipment, that could provide data to commercial and proprietary databases efficiently and reliably in extreme environments. I am proud that my work is considered to be an integral part of the battle-field readiness and preparedness of ground troops, and that dozens of our implements are in use throughout the world.

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

**Department of Justice, Sacramento California** (2007). Authored a specialized interface to work with a telephone company database.

**Practice Technologies, Inc.** (2007). I was contracted to develop the database to maintain the billing and session tracking portion of Real Deal Docs, part of the Real Practice Suite of document management tools used by dozens of law firms, including Littler. I had been tasked with developing the billing methods for tracking the use of Real Deal Docs, a Web Site that indexes the documents that are filed by publicly-held companies, into searchable terms, and maintaining presentations.

**Cogent Communications, Inc.** (2008). I was tasked with authoring the database system for tracking the timings and overlaps of telephone calls, and establishing an audit trail of telephone calls through the phone network, based upon time, duration, origination, destination, and other characteristics. The database continues to be used to capture hundreds of thousands of telephone transaction per month that traverse the Cogent Communications Network, and maintains a detailed audit trail of service changes and inventories of equipment and.

**Gallium Visual Systems - ATS (Air Traffic Control System)** (2008). Incorporate modern software, hardware, and firmware into Aircraft Control Training Systems. I was tasked with manufacturing Operator Keyboards and Consoles using modern day technologies as part of the Air Traffic Control Training System, enabling ATS equipment to work with USB-enabled computers, and modern data collection systems, including databases.

**First National Collection Bureau, Reno, Nv.** (2008). Built a system of interconnected databases and computers capable of capturing over 250 million telephone records per year, and deep-content analyze the telephone calls for type-of-call, timing characteristics, and customer contact effectiveness. System had to maintain a minimum of 56 million phone calls per year, any of which could be instantly retrieved. The Microsoft SQL database components required that I author an exacting set of high-performance SQL database analysis scripts in conjunction with several inter-related computers, all operating autonomously operating software programs that I wrote. I have been told that I wrote the highest performance (civilian use) telephone call analysis system in the world.

**American Automated Payroll, Charleston, Sc** (2009) - Payroll and Time Keeping. I Authored a set of scripts to work with databases to allow payroll companies to integrate their payroll systems with the telephone network. The program that I wrote allows the electronic entry of time keeping records via telephone. Employees can use a telephone to clock in and out of work sites, or an employer can use the telephone to enter time entries into their payroll production. I am an ongoing consultant to American Automated in the area of timekeeping, payroll database integration, paycheck and time clock reporting, and phone network integration. Additionally, I authored a database system that comprises of an automated inbound and outbound calling interface for customers of payroll companies to be able to input their daily time sheets into payroll programs, for purposes of generating payroll. The software and hardware mechanism that I authored interfaces with system such as "Evolution" (a popular and widely used payroll program), as well as Microsoft SQL, Oracle, and mySQL American Automated Payroll and TelSwitch, Inc. are engaged in an ongoing partnership tasked with developing further market verticals for my software.

**Reunion Communuications, La Grange, Il** (Airlink Wireless) (2010). Database for keeping track of usage, balances, and remaining minutes for a National Prepaid Wireless provider. I authored a database, and associated network interface protocol, so that customers may access real-time information about their accounts via telephone calls from their handsets. The system also maintains real-time analysis of telephone the telephone companies' databases to determine where the telephone callers are going to be routed, based upon their "OEM" handset ID, calling characteristics, and other factors. The Database, located downtown Los Angeles, is used tens of thousands of times every day by prepaid mobile carriers and their customers all over the country, who rely my high-performance database application's speed and accuracy to delivery timely information on real-time usage.

**Rapid Announce, a Product of TelSwitch, Inc.** (2010). I authored the combined software (database) and hardware application that is used to conduct millions of daily inquiries into several linked databases. The databases, which contain approximately three hundred thousand new collection

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

accounts per day, are analyzed to determine to whom automated dialers should call and what those called individuals are being contacted regarding. The calls are indexed, and are reported to time tracking databases for later analysis and quality assurance. The system is currently in use by collection bureau(s), and makes decisions on hundreds of thousands of transactions per day. The system is also had been used for automated notifications in several non-collection industries.

**SAIC - Patriot Missile Systems / Training division** (2011). Tasked with adopting some of the database SQL analysis tools that I use in expert database analysis toward use in personnel management and battlefield equipment positioning. Expand the methods I developed for analyzing GPS data points, so that data points coming from disparate data sources could uniformly be applied into databases and then analyzed. According to SAIC, the database formulas that I had applied in my capacity as an expert in the Moreno, et al. v. J. Redfern, Inc. (RG08375539) closely mimic the GPS data point analysis that is conducted GPS data points from projectiles (missiles) and personnel movement.

**AggravationSense and VoiceVault, a Product of TelSwitch, Inc.** (2011). Built a database to analyze the voice characteristics of telephone calls in real-time, to determine when someone becomes aggravated, so that they can be proactively routed to customer Service supervisors. VoiceVault contains approximately 130 characteristics of the human voice, and can be used to determine whether a telephone caller is who they say they are, with a very high degree of accuracy. The partners in this project were Qwest, AT&T Business Services, Network Services Solutions LLC, and American Automated Payroll;

## Education:

San Joaquin Delta College (1991-1994); Majored in Sociology and Cultural Anthropology.

## Publications, Awards, Authored Works

1996, Young Entrepreneur of the year, San Joaquin County; California.

Authored Foundational White Paper on Voice Over Internet Protocol, and filed patent application on Wide Area Centrex using Internet as Communication Backbone, as part of the Tempo Networks LLC partnership between me and two of the co-founders of Worldcom.

Authored patent application for SMS (Text Message) Initiation of a telephone call between two people by connecting two outbound calls initiated by a phone switch in a foreign country. One leg was placed to the "initiating party" and the other leg to the "called party", which were connected together to create a circuit through an intermediate county.

Co-wrote a paper presented to DARPA on the best-practices method of designing a database to conduct the analysis of large volumes of Telephone Calls. Authored in conjunction with Ted Kubaitis, the founder and Chief Software Architect of QL2.

Analysis of Scheduled Flights and the Merger Effect on Flight Availability re: Merger of United Airlines and Continental Airlines (Declaration) – In Matter of the Merger of United Airlines and Continental Airlines, before the Senate Judiciary Subcommittee to Examine United/Continental Merger, May 27th, 2010, 2:15pm – Dirksen-226

## Professional Certifications:

1994-2011; Certification Granted by California Public Utilities Commission (U-5410-C) to operate as a California Public Utility, after passing the standards for expertise necessary related to the operation of

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

telephone communication systems and telephonic records database recording and billing / rating mechanisms.

2004; NACHA certification achieved for network integration of Payment Transaction Processing between financial institutions; (Bank Interchange Network).

2006-2012; Credit Card Interchange Network Certification issued by Global Payments for Software written by Aaron Woolfson related to the Networked Interchange of card member payment transactions between merchants and correspondent banks, on behalf of Master Card/Visa/American Express/Discover.

2010-2012; Certificate of PCI DSS Compliance issued by Security Metrics for maintaining best-practices in database management related to secure transaction processing between mechanized database systems.

2016-2023: Participant in the Apple Developer Program for handset-based applications and programs running under iOS.

2017-; Certification Granted by California Public Utilities Commission (U-7327-C) to operate as a California Public Utility as Tel-One Network Services, Inc. The company continues to operate as a *stand-alone* company.

2017-2026; TelSwitch, Inc. is registered with the Federal Trade Commission ("FTC") as Organization ID is 10159990-70991, Subscription Account Number ("SAN") 10376173-476173-26 for the daily download and use of the Federal Do-Not-Dall database.

2019-2026; Certificate of PCI DSS Compliance issued by Trusted Site for maintaining best-practices related to secure transaction processing between interconnected computer systems.

2023-2026; Authorized reseller of iConectiv for resale of WDNC data used for maintaining compliance with TCPA; availability of, and use of data authorized by FCC-15-35A1 (03/27/2015).

## Summary:

I continue to be actively involved in the development of telecommunications technology, including that used by call centers. I also continue to maintain Airnet AMS, which is used by providers of telecommunications services to bill their customers and conduct network planning.

Additionally, I been retained as either a consulting or testifying expert in database analysis in over 1,000 cases involving the analysis of timekeeping, payroll records, telephone call records, Do-Not-Call ("DNC") database records, credit card records, reimbursement records, travel records (e.g., GPS data and locations where employees worked), as well as provide analysis of technology related to Call Center and Collection Operations.

I have worked with both plaintiffs and defendants, and have been qualified by State and Federal courts as an expert in databases and as an expert in telecommunications.

1937 Oak Park Blvd, Ste D – Pleasant Hill, Ca 94523 - (209) 915-2483 mobile

Materials, and supplies – billed to client: Airfare, Hotels, Meals, Parking, Gasoline, Car Rental.

Billable travel time charged at ½ of the regular rate, and is calculated as a measurement of the most efficient routing, not the actual duration of the flights that we choose. You will be billed for the lesser of (a) the amount of time for the flight that is actually booked, or (b) the amount of time for the alternative flight that would have been most efficient, even if we elect to take a longer flight or a flight with more connections. Time is capped at eight hours per day.

**Deposition Policy.**

Party noticing deposition acknowledges and accepts this policy.

The hourly rate for depositions is $675.00 per hour.

Payment (deposit) is due in advance for the anticipated duration of the deposition. If a deposit is not received by the date of the deposition, the deponent has the right to cancel or postpone the deposition until a deposit is received.

**No depositions will be given if the noticing attorney or law firm owes any balance for any previous depositions or services.**

Unused funds will be returned within seven (7) days.

rev. 08/24/2026

# EXHIBIT 2

**Aaron Woolfson's List of Cases in which Testimony was Provided**
**(as a Deponent or as an Expert at Trial within approx. previous four years)**

- *Taylor Carroll et.al. v SGS Automotive Services, Inc.* (Case No. 16-537-SDD-RLB (MD, La)

- *Adrian Diaz et. al. v. Bald Eagle Security Services, Inc.* (Case No. 37-2018-00009703-CU-OE-CTL, Superior Court of California, Los Angeles County)

- *Christopher Dueker et. al. v. CRST Expedited, Inc.* (Case No. 2:18-cv-08751-FMO-FFM, ND Ca)

- *Bruce Wright, Jorges Valdes, Edwin Diaz, individually and on behalf of himself and all others similarly situated, v. eXp Realty, LLC, a Washington Limited Liability Company* (Case No. 6:18-CV-01851-PGB-TBS MD Fl)

- *Joseph Cabardo, Donnabel Suyat, Mactabe Bibat, Marissa Bibat, Alicia Bolling, Renato Manipon, Carlina Cabacongan, And John Dave Cabacongan, on behalf of all current and former employees and the State Of California v Marilyn Patacsil and Ernesto Patacsil* (Case No. 2:12-cv-01705-TLN-KLN, ED, Ca, Sacramento Div.)

- *Robert Fischer et al v. Trivita, Inc.*
  (Case No. 6:19-cv-02333-CEM-EJK, MD Fl, Orlando Division)

- *Austin and Marrero et al v Public Reputation Management*
  (Case No. 9:20-CV-80161-RS, SD Fl.)

- *Deanna Hicks et al v Houston Baptist University*
  (Case No. 5:17-cv-00629-FL, E.D., NC, Western Div.)

- *Paramjit Lalli et al v. First Team Real Estate Orange County*
  (Case No. 8:20-cv-000270-JLS-ADS, C.D. Cal., Southern Division)

- *Jodi Judson et al v. Goldco Direct, LLC*
  (Case No. 2:19-cv-06798-PSG-PLA, CD, Ca)

- *ABM Industries Overtime Cases*
  (Case No JCCP 4502, San Francisco Superior Court)

- *Kenneth Johansen, et al. v. Bluegreen Vacations Unlimited, Inc.*
  (Case No. 9:20-cv-81076-SMITH, S.D. Fla.)

- *Jeremy Gilmore et al v. Vansh, Inc.*
  (Case No. HG18930348, Superior Court of California, County of Alameda)

- *Aldapa et al. v. Fowler Packing, Co., et al.*
  (Case No. 1:15-CV-00420-DAD-SAB, ED, Ca, Fresno Division)

- *Anderson et al v. The Berry Man, Inc. and All About Produce, Inc. et al.*
  (Case No. 16-cv-0377, Superior Court of California, County of San Luis Obispo)

- *Raymunda E. Menjivar v Angelo's Gourmet Deli, Inc., Jae Choi, Anna Lee, et al*
  (Case No. C20-00885, Superior Court of California, County of Contra Costa)

- *Amanda Boardman et al v Green Dot Corporation*
  (Case No. 21-cv-00174-FDW-DSC, W.D., Nc, Charlotte Div.)

- *Annette Barnes et al v. Allsup Employment Services, LLC.*
  (Case No. 1:21-cv-21121, S.D. Fl,, Miami Div.)

- *Pineda et al. v Lithographix, Inc.*
  (Case No. BC612372, Superior Court of California, County of Los Angeles)

- *Andrew Perrong et al. v Victory Phones LLC.*
  (Case No. 2:20-cv-05317-GEKP, E.D. PA)

- *Floyd Steve Bales et al v. Bright Solar Marketing, LLC*
  Case No. 5:21-cv-00496-JSM-PRL, M.D. Fl, Ocala Div.

- *George Moore et al v. Club Exploria, LLC*
  Case No.1:19-cv-02504, ND. Illinois, Eastern Div.

- *Eric Laguardia, Sophia Wingate, Lindsay Rucker and Nicole R. Austin v Designer Brands Inc., F/K/A DSW, Inc., an Ohio Corporation; and DSW Shoe Warehouse, Inc., a Missouri Corporation.* (Case No. 2:20-cv-02311-SDM-EPD, SD OH, Eastern Div.)

- *Varas et al v Paras et al* (Case No. RG20072221, Superior Court of California, County of Alameda, Eric C. Davidson Courthouse)

- *Marisol Gomez and Ignacio Osorio et al, v. J Jacobo Farm Labor Contractor, Inc. et al*
  (Case No. 1:15-cv-01489, ED, Ca)

- *Robert E. Stafford, Jr., Melissa Bonetti, Michelle Layton, Herbert Mallet, Jacqueline Johnson, Cathrine Allen, Devron Jones, Laura Shope, Tabitha Daniel, Damian Prentice, Debra Call, Laquasha Osaghee, Ronda Cole, Marquita Smith, Jennifer Wester et al v. Bo Jangles' , Inc.* (Case No. 3:20-cv-266-MOC, WD, Nc, Charlotte Div.)

- *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

- *Mark Fitzhenry v Brokers Data, Inc.* (Case No 2:21-cv-04043-RMG, DC, Sc)

- *Nathan Rowan v Brock Pierce* (Case No 2:21-cv-04043-RMG, DC, PR)

- *Samantha Doup v Van Tuyl Group LLC et al* (Case No. 3:20-cv-02742-X, ND, TX)

- *Teresa E. Mendez Villegas, Maria Navarro, Loyda Aguilar, Olimpia Cano De Peral et.al. v. Duarte Nursery, Inc., Jeff Duarte, John Duarte, Patricia Lopez, Engracia Lopez* (Case No. 2014-212, Superior Court of Stanislaus County)

- *Annette Bayles v Hertz Corporation* (Case No. 1:22-cv-01092-JRS-MKK, SD, IN, Indianapolis Div.)

- *Dennis Glazer et al v. Sunnyvale Massage LLC and Lisa Meteyter* (Case No. CIV 527399 Superior Court of California, County of San Mateo).

- *Juan Navas et al. v. Fresh Venture Foods, et al.* (Case No. 17-CV-02222, Superior Court of California, County of Santa Barbara)

- *Carbajal et al v. Imperial Maintenance et al* (Case No. STK-CV-UOE-2016-0001100, Superior Court of California, County of San Joaquin)

- *Faucett et al v. Move.com et al* (Case No. 2:22-cv-04948-ODW-AS, CD, Ca, Western Div.)

- *Mackey et al v. Bankers Life & Casualty et al.* (Case No. JCCP No. 4954, Superior Court of California for the County of San Diego)

- *Dancey et al v.* Walmart, Special Coordinated Proceeding 5136, *Tamara Dancy v. Walmart Inc., et al* (Superior Court, County of Santa Clara, Case No. 19CV360648)*;*

and *Lynette Branco v. Walmart Associates, Inc.* (Superior Court, County of Santa Clara, Case No. CV-20-002265).

- *Mohamed Mallem et al, v C&C Security Patrol, Inc.*; and, *C&C Security Patrol, Inc.* (cross-complainant) v *Manning & Kass, Ellrod, Ramirez*, *Trester LLP* (cross-defendant); and, *Manning & Kass, Ellrod, Ramirez, Trester LLP* (cross-complainant) v *C&C Security Patrol, Inc.* (cross-defendant) (Case No. RG16814153, Superior Court of California, County of Alameda)

- *US EEOC and Anonymous Plaintiff Intervenors 1 through 4 v. Fresh Venture Foods LLC, and Babe Farms, Inc.* (Case No. 2:21-CV-07679-CBM-DFM, CD, Ca)

- *Ma de Jesus Vergara, Pahola Ramos, Roberto Reyes, et al v. Kombu Kitchens SF, LLC (dba Nybll), Keven Thibeault, Kristen Thibeault, Alfonso Ventura et al* (Case No. RG20057449, Superior Court of California, County of Alameda) and *Aja de Coudreaux, Zena Evans, Daeun Hwang, Vera Lopez, Myriah Sims, Nicole Vassallo et al v. Kombu Kitchens SF, LLC (dba Nybll), Keven Thibeault, Kristen Thibeault, et al* (Case No. RG20058323, Superior Court of California, County of Alameda)

- *Julie Campbell, Diana Bickford And Kerrie Mulholland, Et Al V. Sirius Xm Radio, Inc.* (Case No. 2:22-cv-02261-CSB-EIL, CD, Il, Urbana Division)

- *Dan L. Boger v. The Maids International, LLC* (Case No. 8:24-cv-01466-TDC, DC, Md.)

- *Robert Hubble v. Loan Depot.com LLC* (Case No. 1:24-cv-11173-TLL-PTM, ED, Mi.)

- *Michael Smith et al v. Examworks, LLC and GEICO et al*. (Case No. 8:21-cv-02746-PX, DC, Md)

- *Byron Espanol et al v. Capital Vision Services, LLC, d/b/a myEye Dr. Optometry of Florida, LLC* (Case No. 6:24-cv-01024-PGB-DCI, MD. Fl)

- *Michael Osborn et al v. Hogarth California LLC et al* (Case No. CGC-22-598537, State of California, County of San Francisco)

- *Lee Abraham et al v. Loan Depot LLC* (Case No. 2:23-cv-00728-SMB, DC, Az)

- *Diaz et al. v Tri-City Auto Wash, Inc. et al* (Case No. 21CV003425, Superior Court of California, County of Alameda)

- *Robert Mason v. Spring EQ LLC* (Case No. :24-cv-01833-MWC-AGR, CD, Ca)

- *Tatiana Eastman et al v. United Parks and Resorts, Inc.* (Case No. 6:24-cv-01534-PGB-DCI, MD. Fl, Orlando Div.)

- *Sara Reyes V Five Diamond Cold Storage, Inc., Grow Smart Labor, Inc., Pedro Arellano-Moya And Jorge Esteban Fuentes* (Case No. 1:24-cv-00028-JLT-SAB, ED Ca, Fresno Div.)

- *Irma Barbosa and Cecilia Mata et al v. Delta Packing Company of Lodi, Inc. aka "Delta Fresh"; Salinas Farm Labor Contractor, Inc.; Ernie Costamagna, an Individual, Annamarie Costamagna, an Individual.* (Case No. 2:20-cv-01096-TLN-CSK, ED, Ca., Sacramento Div.)

- *Bronstin v Servbank* (Case No. 1:25-cv-06182, ND, Il)

- *George Moore et al. v. C&N Construction, Inc.* (Case No. 1:25-cv-04568, ND, Il)

- *Ramirez, et al. v.Clearwater Nursery, Inc., et al* (Case No. 11-cv-0083, Superior Court of California, County of San Luis Obispo)

- *Peggy Banks et al v. Sunrun, Inc.* (Case No. 4:24-cv-07877-JST, ND, Ca)

- *Rick Shafer et al v. Toyota of Boardman* (Case No. 4:25-cv-00941-BMB, ND, Ohio, ED)

- *Raikka Brent et al v My Goals Solutions Inc. et al.* (Case No. 1:25-cv-03584-JPO, SD NY)

- *Andrew James Mcgonigle et al v. Shopperschoice.com et al, L.L.C.* (Case No. 25-cv-00152-SDD-RLB, MD, LA)

- *Shante Watson et al v. Georgia Auto Pawn, Inc.* (Case No. 1:25-cv-00906-LMM, ND, Georgia)

# EXHIBIT 3

Filed 12/11/17; Certified for Publication 1/10/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502<br><br>A132387, A133077 & A133695<br><br>(City & County of San Francisco<br>Super. Ct. No. CJC-07-004502) |

Respondent ABM Industries, Inc. (collectively with related respondents, ABM) is a large facility services company with employees throughout the United States, including thousands of janitorial workers at hundreds of job sites in California. Appellants (referred to herein as plaintiffs) are present or former ABM janitorial employees. On behalf of themselves and similarly situated Californians, plaintiffs filed their complaint in this coordinated proceeding in September 2007, alleging that ABM violated California labor laws by, among other things, failing to properly record and compensate employees for meal breaks; requiring employees to work split shifts without appropriate compensation; and failing to ensure that employees were reimbursed for expenses incurred when traveling between work sites. In June 2010, plaintiffs moved for class certification of a general class of ABM workers and various subclasses of such workers who had been subjected to particular wage and hour violations. After briefing and argument, the trial court found plaintiffs' expert evidence inadmissible and indicated orally that it was denying the class certification motion. In response, plaintiffs filed a

motion pursuant to Code of Civil Procedure section 473, subdivision (b) (the 473(b) motion), attempting to supplement the evidence previously provided with respect to the qualifications of their expert. By order dated June 29, 2011, the trial court denied plaintiffs' 473(b) motion. Thereafter, on September 1, 2011, the trial court issued its written order, formally denying plaintiffs' class certification motion. We conclude that the trial court's wholesale exclusion of plaintiffs' expert evidence in this case was error. We further determine that the trial court's refusal to grant class certification on these facts was an abuse of discretion, and therefore reverse.

## I. BACKGROUND

### A. *Facts Underlying the Consolidated Complaint*

ABM's numerous California janitorial employees work at customers' workplaces scattered throughout the state. ABM's job sites in California are organized into two regions (Northern California and Southern California), various branches within a region, and dozens of distinct districts within a branch. A district is a number of buildings within a geographic area. Each branch is under the supervision of a different branch manager. Employees report to an individual site supervisor, who in turn reports to the branch manager. According to ABM, the site supervisor is responsible for "the daily operations of the location, including assurance that employees are paid properly and provided with their meal and rest breaks . . . ." However, it appears that ABM's wage and hour policies are controlled centrally and thus applied uniformly throughout all janitorial job sites. In addition, ABM pays all of its employees through use of a single software application, the Labor Management System (LMS).

ABM provides janitorial services to clients under contracts obtained through competitive bidding. According to ABM, "[t]he low cost of entry in the facility services business has led to strongly competitive markets comprised of a large number of mostly regional and local owner-operated companies, primarily located in major cities throughout the United States." In order to compete, ABM provides various contracts at agreed-upon prices. For instance, ABM provides a fixed price contract where "the client agrees to pay a fixed fee every month over a specified contract term." Under the cost-

plus arrangement, "the clients reimburse [ABM] for the agreed-upon amount of wages and benefits, payroll taxes, insurance charges and other expenses associated with the contracted work." Given the fixed-price nature of these contracts, it is ABM, not the customer, who is responsible for higher labor costs if their employees cannot finish their assigned work within budgeted timeframes. As Faisal Algaheim, ABM's Regional Operations Manager for Northern California, testified: "The customer paid the contracted amount; the contracted price. And if it is a fixed job—which means the customer will only pay us a contracted amount—whether we work more or less, it is our problem to maintain the cleaning specifications, and pay the employees currently."

All of ABM's non-exempt janitorial employees, who provide the services under these contracts, are entitled to the benefits prescribed by California's labor laws and the related wage orders promulgated by the Industrial Welfare Commission (Wage Orders). For instance, "[p]ertinent meal period provisions require that '[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . . .' (Cal. Code Regs., tit. 8, § 11050, subd. 11(A).) '[A]n employer's obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work.' (*Brinker* [*Restaurant Corp. v. Superior Court* (2012)] 53 Cal.4th [1004,] 1049 [*Brinker*].) To qualify as a lawful meal break under California law, an employee must be relieved of all duties for an uninterrupted 30 minutes. (*Id.* at p. 1040; Cal. Code Regs., tit. 8, § 11050, subd. 11(A).) If an employer fails to comply with these requirements it must pay one hour of pay at the employee's regular rate 'for each workday that the meal period is not provided.' (Cal. Code Regs., tit. 8, § 11050, subd. 11(B); see Lab. Code, § 226.7, subd. (c).)" (*Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 400 (*Alberts*).) We refer to any extra hours of wages potentially due to employees under the labor laws as premium pay.

Similarly, pursuant to Wage Order 5-2001(4)(C): "When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday . . . ." (See Lab. Code, § 1197 ["The minimum wage for

employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful."]; see also *id.*, §§ 1194, subd. (a) & 1194.2 [allowing civil action for recovery of unpaid wages].) For purposes of this requirement, "split shift" is defined to mean "a work schedule which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods." (Wage Order 5-2001(2)(R).) Although the Wage Order does not define "bona fide meal period," the Division of Labor Standards Enforcement (DLSE) has historically taken the position that a bona fide meal period "is one that does not exceed one hour (60 minutes) in length." (DLSE Of Counsel H. Thomas Cadell, Jr., letter to Paul K. Schrieffer, Dec. 11, 2002.)[1]

Finally, California law requires employers to fully reimburse employees for expenses actually and necessarily incurred in the discharge of their duties, including automobile expenses. (Lab. Code, § 2802; *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 569 (*Gattuso*).) This right to reimbursement cannot be waived. (*Gattuso, supra*, 42 Cal.4th at p. 561.) However, an employer can discharge its reimbursement obligation in a number of different ways, including through reimbursement for actual expenses or mileage, or through lump sum payments. (*Id.* at pp. 567–571.)

On September 19, 2007, plaintiffs filed their consolidated class action complaint in this matter (Complaint). The Complaint alleges numerous violations of California's labor laws and Wage Orders, including violations related to missed meal periods, failure to provide mandatory split shift premium pay, and failure to compensate ABM employees for travel expenses incurred when travelling between job sites. The Complaint additionally alleges unfair competition under Business & Professions Code section 17200, based on the asserted labor law violations. Finally, it contains a claim

---

[1] Although the DLSE is responsible for enforcing California's labor laws, including Wage Orders, its interpretations of Wage Orders—while entitled to consideration and respect—are not binding. (*Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 573 (*Aleman*).)

under the Private Attorneys General Act of 2004, Labor Code section 2698 et seq. (PAGA), to collect penalties based on ABM's alleged systemic wrongdoing.

**B. *Class Certification Motion***

After a number of years of discovery and other preliminary matters, plaintiffs filed their motion for class certification on June 14, 2010. The motion sought certification of a general class described as "[a]ll non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present" (ABM Workers) (italics omitted). This putative class was estimated as of 2007 to include approximately 35,000 ABM janitorial employees. In addition, the motion proposed seven subclasses of ABM Workers, the following four of which are relevant here: (A) "ABM Workers who . . . suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period . . ." (Unpaid Time/Meal Period Subclass); (B) "ABM Workers who were not paid premium meal period wages when they (1) worked shifts of at least five hours without an uninterrupted meal period of at least 30 minutes, (2) worked shifts of at least 10 hours without a second uninterrupted meal period of at least 30 minutes, or (3) were provided a first meal period *after* the fifth hour of work" (Unpaid Meal Premium Subclass); (C) "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal period, but were not paid an additional hour of wages for each split shift" (Unpaid Split-Shift Premium Subclass); and (D) "ABM Workers who were not reimbursed for expenses that were necessary to carry out their duties, including (1) the use of their own vehicles to travel between jobsites, or transport ABM supplies or equipment" (Reimbursement Subclass).[2]

Plaintiffs argued that class certification was warranted because, among other reasons, common legal and factual issues predominated. For instance, plaintiffs alleged

---

[2] Plaintiffs declined to appeal from the denial of class certification for their other three proposed subclasses—the Unpaid Rest Premium subclass, the Unpaid Reporting Time subclass, and the Paystub subclass.

that ABM applied a uniform payroll policy which compensated employees according to anticipated work *schedules* rather than for hours actually worked, leading to uncompensated time. In particular, according to plaintiffs, the LMS, ABM's payroll system, automatically deducted 30 minutes of work time for a meal period whenever an employee was scheduled for a shift of five or more hours, without sufficient documentary evidence that those meals were actually taken. In addition, plaintiffs averred that analysis of the LMS disclosed a company policy of never paying statutorily required premium wages for missed meal periods or split shifts, despite the fact that some employees were scheduled to work split shifts and, reportedly, many routinely missed meals if they otherwise had insufficient time for cleaning. Finally, plaintiffs claimed that, although ABM scheduled route workers to provide janitorial services at different locations within the same workday—and required them to travel between sites—the LMS disclosed very few instances in which employees were reimbursed for expenses.

According to plaintiffs, the legality of these common practices could most appropriately be decided on a classwide basis, and ABM's computerized payroll records could be used both to identify violations and to establish common policies. In support of their motion, plaintiffs submitted declarations from 50 ABM Workers, including four named plaintiffs, stating that the schedules under which employees were paid often bore little relationship to the hours actually worked. For instance, they often worked through meal periods because there was too much work to do. In addition, plaintiffs provided evidence of company practices from various ABM supervisors and officials. Finally, plaintiffs also submitted expert declarations from Aaron Woolfson, a provider of database services who analyzed certain timekeeping and payroll data maintained by ABM with respect to its employees. For example, Woolfson determined that, of the 1,141,903 shifts greater than five hours that failed to show any time-out/time-in entries during the scheduled workday, 1,070,517 of those shifts (94 percent) nevertheless showed an automatic 30-minute meal period deduction. Further, there was no indication in the records that premium pay was ever provided for missed meal periods. In addition, although Woolfson identified 6,331 employees for whom ABM reported at least one shift

containing shift segments separated by more than one hour, there was no indication in the payroll records that split shift premium pay was ever provided. Finally, as stated above, analysis of the payroll records disclosed very few instances in which employees were reimbursed for travel expenses (12,834 checks to 826 employees out of the 6,396 employees who worked 155,485 shifts at more than one job site).

ABM opposed plaintiffs' class certification motion, claiming that plaintiffs had failed to offer any "common evidence of a pattern or practice of wrongdoing." Rather, ABM asserted, it promulgated its written meal policy both in its employee handbook and, as of late 2006, on timecards used by some employees.[3] ABM also had a policy for travel reimbursement, and stated that its practice was not to schedule split shifts. With respect to payroll, ABM acknowledges that there is no data in the LMS that describes when a meal period is taken. Rather, the LMS shows the hours scheduled for each employee, by listing the scheduled start and end time for each shift. In addition, the LMS automatically deducts a 30-minute meal period when warranted due to the length of the scheduled shift. According to ABM, when employees have worked their regularly scheduled shifts, they are paid according to their schedule as listed on the LMS. In contrast, if an employee worked additional time, including through a meal break, the site supervisor was required to submit an exception report for input into the payroll system, showing that the employee worked different hours than scheduled.[4] Under these

---

[3] Specifically, the employee handbook stated: "If you are a non-exempt employee . . . you may receive at least one half hour time off as a meal period. Your supervisor schedules meal . . . periods." The timecards, as of late 2006, stated more directly: "State law requires that you take a meal break of at least thirty (30) minutes whenever you work five consecutive hours or more in a day. The meal period must begin before you exceed five hours of work and you must sign in and out for your meal period." According to the plaintiffs, however, timecards that recorded meal breaks were used by less than 15 percent of ABM employees.

[4] According to Woolfson, however, despite ABM's "timesheet maintenance" policy, of the 1,836,083 time entries in the data he reviewed, only 5,625 (0.3 percent) contained any adjustments to pay. Moreover, at least one ABM manager testified that exception reports did not list missed meal breaks and that, in fact, supervisors were not required to report missed meals.

circumstances, ABM argued that class treatment was inappropriate because resolution of plaintiffs' claims would turn on multiple individualized inquiries, such as whether and when each employee took lunch breaks, why an employee failed to take a lunch break, how many miles a particular employee drove between work sites, whether a split shift employee received total wages for that day less than the minimum wage that they would otherwise have been owed, and whether the employee requested a split shift.

In support of its opposition, ABM submitted declarations from 14 current employees as well as excerpts from the depositions of certain of plaintiffs' declarants. According to ABM, the deposition testimony of plaintiffs' declarants cast "serious doubts" on their credibility. With respect to expert testimony, ABM did not provide its own expert, but argued generally that Woolfson's expert declaration should not be considered. ABM also requested that the court take judicial notice of certain deposition testimony provided by Woolfson in another case.

After hearing on April 19, 2011, the trial court issued its oral ruling denying class certification. As a preliminary matter, the court opined that the evidence submitted by Woolfson was inadmissible because his declarations failed to qualify him as an expert on anything material to the class certification motion. Although the court did not strike the Woolfson material, it concluded that it was not admissible "because it doesn't prove anything." When asked about the validity of the many factual findings set forth in the Woolfson declarations, the trial court responded that the question at hand was "whether or not a class should be certified" and that, in this regard, it was "not sufficient to ferret out individualized common questions." With respect to Woolfson himself, the court found many of the statements regarding his expertise conclusory and thus believed that he had not "demonstrated that this court should accept him as a person with particular background, experience, skills, [or] expertise to differentiate him from the rest of the world so he should be accepted by this court as an expert."[5] Since the trial judge rejected

[5] Although there was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court, it was attached to an attorney declaration rather than incorporated into Woolfson's own declaration. Under these

Woolfson as an expert, he was not qualified "to present to me opinions that are not generally understood by the rest of the world and to allow him to present hearsay material to rely on and to give me opinions."

On the merits, the trial court found certification inappropriate due to issues with the subclass definitions. In particular, the court appeared concerned that the subclasses were defined in terms of individuals who had been harmed, making class members unascertainable until the conclusion of the case. In addition, it concluded that the plaintiffs had failed to meet their burden to show that common issues of fact and law predominated over individual questions, "given the employment structure and the variety of circumstances that each worker finds him or her under." The trial court further noted with regards to predominance that the number of declarations submitted by plaintiffs disclosing labor code violations was insufficient standing on its own to establish commonality. Rather, it believed "evidence besides declarations would have to be submitted to show a common practice." However, when asked about whether the existence of ABM's auto-deduct policy for meal periods was evidence showing a common issue sufficient to support certification, the trial court responded: "Your class definition is wrong. It's not up to me to ferret through what you present and to see if I can craft a class somehow from what you are arguing." In the end, the trial court opined: "[T]he concept is not whether we can find a common question here. There are plenty of common questions, but the question is whether the common questions predominate over individual questions so that it would be appropriate to utilize the class action mechanism. And it's just a procedural device for the convenience and efficiency of the court and for the efficiency and economic self-interests of the litigants . . . . [¶] . . . Just because you might have a common question in here somewhere doesn't mean it's appropriate to have this case proceed as a class action."

Plaintiffs filed notices of appeal with respect to this oral ruling in June 2011 (case No. A132387).

---

circumstances, the court found it to be hearsay and indicated, regardless: "I feel it's my job to figure out whether somebody is an expert."

### C. *Motion for Relief Under Section 473, Subdivision (b)*

In the meantime, on May 11, 2011, following the oral denial of their class certification motion, plaintiffs filed their 473(b) motion, asking to augment the record with further evidence of Woolfson's credentials and expertise. Plaintiffs sought introduction of this additional evidence in hopes that the trial court would accept Woolfson as an expert, reassess its ruling that Woolfson's declarations were hearsay, and reconsider its class certification decision in light of Woolfson's expert findings and conclusions.[6] In support of their motion, plaintiffs argued that it was excusable neglect not to have made a more thorough demonstration of Woolfson's qualifications prior to the hearing on the class certification motion because ABM had given no indication that it was raising a serious challenge to those qualifications. Specifically, ABM had failed to lodge a formal objection to the evidence, move to strike the declaration, depose Woolfson on his credentials or conclusions, and/or provide their own contrary expert opinion. Instead, ABM simply made a brief argument in its opposition papers that Woolfson was not qualified to analyze the data in question and that the opinions he offered were conclusory and based on common experience.[7]

The trial court denied plaintiffs' 473(b) motion after hearing on June 8, 2011. According to the court, plaintiffs had not shown grounds for relief under that statute. In particular, the trial court opined: "Well, the problem with your certification motion was discussed in great detail at the hearing on the motion, and the problem was multifaceted. It covered a full range of matters, none of which falls into the category of a technical

---

[6] Code of Civil Procedure section 473, subdivision (b), provides in relevant part: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."

[7] This was apparently in contrast to a previous case where counsel for ABM (representing a different party) had vigorously challenged the same Woolfson declaration by submitting written objections, filing rebuttal declarations by defense experts, and extensively cross-examining Woolfson at deposition. According to plaintiffs' 473(b) motion, these efforts failed and Woolfson was nevertheless qualified as an expert in that case.

failing by the lawyer; in other words, the idea that the problem here is that the lawyers did something wrong and therefore I should relieve the parties from the lawyers' mistake is not what happened here."

According to the trial court, the real issue in the case was that ABM Workers were not a group of workers that were susceptible to being treated as a class, and thus there were no predominant questions of fact or law. The trial court also reiterated its problems with the plaintiffs' proposed class definitions. In the end, the court indicated that it had reviewed the supplemental evidence provided by plaintiffs and that—even if it agreed to consider it—it would not change the court's view on certification. As the court opined: "Whether or not this witness is qualified to give the opinions, the opinions are not material to this case . . . ." A written order memorializing the trial court's denial of the 473(b) motion was filed on June 29, 2011, and a timely notice of appeal with respect to that order was filed on August 29, 2011 (case No. A133077).

**D. *Order Denying Class Certification***

The trial court's written order denying class certification was ultimately filed on September 1, 2011. The court first reiterated its conclusion that the Woolfson declarations submitted by plaintiffs in support of their class certification motion were inadmissible, stating "there is no evidence that Mr. Woolfson is an expert in any area that is material to this case." As discussed above, the record did contain two orders (from state and federal courts) certifying Woolfson as an expert. The trial court, however, found that the facts set forth in those orders were hearsay and concluded, regardless: "Whether Mr. Woolfson was accepted as an expert in state and federal court is immaterial: the Court does its own work regarding the admissibility of expert testimony."

With respect to the merits, the trial court first concluded that plaintiffs' class definition was unworkable. It found plaintiffs' general class definition permissible: "All non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present." However, noting that courts have rejected class claims when the class definition is simply

shorthand for persons possibly wronged by the defendant, the trial court found fault with the plaintiffs' seven subclasses, opining that "defining the proposed class(es) by reference to the alleged injury or injuries sustained is a fatal defect, because the members of the class cannot be ascertained until the lawsuit is concluded." According to the trial court, under such circumstances, "it is impossible to identify who is a member of the putative class, which makes it impossible to provide them with notice of the lawsuit, and which therefore also makes it impossible to determine who will be bound by the judgment." The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class.

In addition to these ascertainability issues, the trial court also concluded that class treatment of plaintiffs' claims was inappropriate because plaintiffs failed to demonstrate that common questions predominate over individual inquiries. In particular, the court found that plaintiffs did not provide sufficient evidence of a common scheme with respect to the negotiation of contracts which, by their terms, led to ABM employees being underpaid. In addition, the court determined that the declarations submitted by plaintiffs regarding claimed labor law violations were insufficient in number, "without additional evidence," to demonstrate a common practice. In sum, the court opined that "consideration of all the factors relevant to class certification demonstrates that individual inquiries will predominate in determining all of the putative class members' claims, and therefore class certification is not a superior method of resolving the instant case."

Following entry of the trial court's written order denying class certification, appellants filed a third notice of appeal (case No. A133695). By order dated January 26, 2012, the three cases were consolidated for all future proceedings in this court. In addition, at the parties' request, we stayed the matter pending issuance by the Supreme Court of its decision in *Brinker, supra*, 53 Cal.4th 1004. Once the Supreme Court's opinion in *Brinker* was final, a briefing schedule was set, and the matter is now before us for decision.

## II. DISCUSSION

### A. *Admissibility of Expert Evidence*

As a preliminary matter, we must address the trial court's decision to disregard the declarations of plaintiffs' expert, Woolfson, in making its class certification determination. As both parties have accurately asserted, we review a trial court's ruling on the admissibility of expert evidence for abuse of discretion. (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187.) " 'However, the discretion to admit or exclude evidence is not unlimited. "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." ' " (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291–292 (*Kotla*).) This is especially true when, as here, a trial court's exercise of discretion "implicates a party's ability to present its case." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon Enterprises*); see *Brown v. Colm* (1974) 11 Cal.3d 639, 647 (*Brown*) ["the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal"].) Indeed, in this context, courts must "be cautious in excluding expert testimony" as the trial court's gatekeeping goal "is simply to exclude 'clearly invalid and unreliable' expert opinion." (*Sargon Enterprises,* at p. 772.)

Should we determine in this case that an abuse of discretion has occurred, that conclusion alone is not sufficient to support reversal of the trial court's certification decision. Rather, the "judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial." (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 (*Grail Semiconductor*); see Code Civ. Proc., § 475.) Article VI, section 13, of the California Constitution further provides that "a judgment may not be set aside based on the erroneous admission of evidence 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error

complained of has resulted in a miscarriage of justice.' " (*Grail Semiconductor*, *supra*, 225 Cal.App.4th at p. 799; see Evid. Code, § 353.) "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Grail Semiconductor*, at p. 799.) Thus, our task on appeal is to determine whether an abuse of discretion has occurred and, if so, whether it is reasonably probable that a result more favorable to plaintiffs would have been obtained absent the error.

As detailed above, the trial court in the present case based its decision to exclude Woolfson's expert declarations on two separate grounds—that Woolfson had not properly established himself as an expert and that, regardless, the information that he presented via expert declaration was not material to this case. With respect to Woolfson's expert qualifications, although the trial court acknowledged in its order denying class certification that Woolfson indicated an expertise "in creating, managing and analyzing large databases," it rejected him as an expert, finding no evidence that he had "formal training or degrees that would qualify him as an expert to review the timekeeping and payroll data at issue." The trial court also noted that "Mr. Woolfson's declaration does not set forth any evidence that he holds certificates, has obtained any kind of college or other professional degree, belongs to any professional organizations, has published any articles, taught or has ever testified as an expert witness at trial." Further, at the April 2011 hearing denying class certification, the trial court indicated that it believed the qualification information supplied by Woolfson in his expert declaration was too general to establish him as an expert. For example, the trial court stated: "[Woolfson] says he has extensive experience in creating, managing, and analyzing large databases, including, and then he lists a number of things. I have no idea what the term 'extensive' means. It looks to me like a conclusion that he hasn't explained in any way. He doesn't say how many years, how many assignments, what the nature of the assignments were, what the nature of his tasks were or anything of the like." Similarly, the trial court noted that "without any detail" Woolfson stated that he "has provided

payroll and timekeeping database analysis for attorneys in numerous wage-hour cases. That does not communicate any specific facts of the type that is usually relied upon to qualify an expert."

While the better course of action in this case clearly would have been to provide the trial court with a more extensive explanation of the specifics of Woolfson's expertise, we believe that, under the circumstances, the trial court erred by refusing to qualify Woolfson as an expert in database management and analysis based on the materials before it. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, *or* education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a), italics added.) "Expertise, in other words, 'is relative to the subject,' and is not subject to rigid classification according to formal education or certification." (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408.) Rather, an expert's qualifications can be established in any number of different ways, including "a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard Entertainment*).) In sum, with respect to expert qualification, "[t]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance." (*Brown*, *supra*, 11 Cal.3d at p. 645; see *Howard Entertainment*, at p. 1115.)

Once this threshold has been met, questions regarding *the degree* of an expert's knowledge go more to the weight of the evidence presented than to its admissibility. (See *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1079–1080; see also *Jordan v. Allstate Insurance Co.* (2004) 116 Cal.App.4th 1206, 1217 [where expert declaration was sufficient to demonstrate " 'special' " knowledge of the subject matter, the "weight and value" of the expert opinion was a matter for the trier of fact].) Finally, the ability of an expert witness to testify as to either facts or opinions is limited to matters that are not

common knowledge. Thus, for example, "[e]xpert testimony as to facts may be necessary where the facts from which conclusions are to be drawn are peculiarly within the expert's knowledge and are not a matter of common knowledge as to which an ordinary witness may competently testify." (1 Witkin, Cal. Evid. (5th ed. 2012) Opinion Evidence, § 27, p. 638.) Similarly, expert opinion should be excluded " ' "when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " ' " (*Kotla*, *supra*, 115 Cal.App.4th at p. 291; see Evid. Code, § 801, subd. (a).)

Here, Woolfson provided a declaration indicating that he was a founder of TelSwitch, Inc., a company which "builds and develops telephonic database service for several major telecommunications companies to manage their billing, as well as calculating and maintaining extensive databases related to the accurate calculation of the rates and rounding mechanisms used on telecommunications services." Woolfson further declared that he was a managing partner of Merkt-Woolfson, a company which "produces billing and database mechanisms for banks to keep track of the paperwork that banks require to maintain mortgage and loan origination" and also provides "extensive database management services to both government and private industries," including "the largest banks, military contractors, and publicly held telecommunications carriers where accuracy and accountability are a necessity." Moreover, according to Woolfson, a "typical transaction load" for an "average database" maintained by his company was approximately one million records a day; he was "accustomed to, and comfortable with, working with a large amount of data across a variety of industries, including for litigation purposes"; and he had "extensive experience in creating, managing, and analyzing large databases," including specifically timekeeping databases.

Woolfson's expert declaration additionally indicated that he had provided "payroll and timekeeping database analysis for attorneys in Northern and Southern California involving numerous wage and hour class action cases." He then described the timekeeping records he had received from ABM—including, for example, "1,836,083 Time Entries in Microsoft Excel™ files covering 27,183 employees who performed

1,500,175 shifts of work at 5380 Job Site locations from 12-08-02 through 07-18-07"—and walked through his step-by-step analysis of those records. Indeed, Woolfson went so far as to set forth the specific Structured Query Language (SQL) queries he used to extract relevant information from ABM's records.[8]

We reiterate that additional information regarding the specifics of Woolfson's expertise in matters relevant to this case would clearly have been preferable.[9] However,

---

[8] As stated above, in addition to Woolfson's expert declarations, the plaintiffs submitted an attorney declaration that, among other things, attached two court orders from cases in which Woolfson had reportedly been qualified as an expert under similar circumstances. (See *Avalos v. La Salsa, Inc.* (Super. Ct. Santa Barbara County, 2010, JCCP No. 4488 (*Avalos*) [order dated May 17, 2010, granting in part and denying in part plaintiff's motion for class certification]; see also *Hines v. KFC U.S. Properties, Inc.* (S.D. Cal., Oct. 22, 2010, No. 09-cv-02422-JM (POR) (*Hines*) [order granting in part and denying in part motion for class certification, which states at page 6 that "Mr. Woolfson is an expert in the compilation and analysis of databases, based upon his declaration which sets forth his qualifications and the methods and procedures adopted to analyze the data."].) At the April 2011 hearing on class certification, the trial court initially indicated that it believed there was evidence in the record that Woolfson had *not* previously qualified as an expert. When plaintiffs' counsel mentioned the two cases cited above as instances where Woolfson had been qualified, the court opined that the referenced court orders were hearsay and that, regardless, it chose not to take judicial notice of them because it believed it was the court's job "to figure out whether somebody is an expert." The court's written order denying class certification reiterated this sentiment, stating that whether Woolfson was "accepted as an expert in state and federal court is immaterial; the Court does its own work regarding the admissibility of expert testimony." We agree with both the trial court and ABM that one court is not *required* to adopt another court's conclusion that an individual is an expert in a particular matter, although it may do so. (See *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 513–514.) However, that a proposed expert has been previously qualified seems, at the very least, relevant to another court's subsequent qualification analysis and we question the trial court's perhaps overly technical application of the hearsay rule when establishing prior expert qualification via judicially noticed court order. Nevertheless, we need not finally reach the issue, as we would find error here regardless of whether Woolfson's history as a qualified expert is considered.

[9] For instance, in a supplemental declaration filed in connection with plaintiffs' 473(b) motion, Woolfson clarified that he had *over 24 years* of experience developing highly accurate database applications for companies such as Japan Telecom America, Experian, Bank of America, and JP Morgan Chase; that his database techniques were

we conclude that the materials submitted in advance of the April 2011 hearing on class certification in this case were sufficient to qualify Woolfson as an expert in database management and analysis, and that the trial court's conclusion to the contrary was an abuse of discretion. In particular, we find that the trial court's emphasis on formal education and membership in professional organizations was misplaced with respect to Woolfson's stated expertise, given his clear familiarity with numerous, highly complex transactions in that subject matter. (See *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115.) Indeed, while admittedly not detailed, Woolfson's declaration did indicate that he had "extensive experience" in database management and analysis, including statements that he held leadership positions in two database companies which serviced the "largest banks, military contractors, and publicly held telecommunications carriers"; that his company handled typical transaction loads of approximately one million records per day on "average" databases it maintained; and that he had previously provided payroll and timekeeping database analysis in numerous wage and hour class action cases in California. Moreover, although ABM did argue briefly before the trial court that Woolfson was not qualified to analyze the data at issue and that certain of his conclusions were overly broad and lacked sufficient factual foundation, ABM did not challenge the veracity of any of Woolfson's qualifications as set forth in his declaration, nor did it contest *even a single one* of the myriad factual findings made by Woolfson during the course of his analysis.

---

used by the federal government, including by the Department of Justice and the Patriot Missile Defense Training System; that he had a number of relevant professional certifications; that his authored works included an analysis of the merger between Continental Airlines and United Airlines that was presented to the Senate Judiciary Committee in 2010; that he had qualified as an expert in *Avalos* and *Hines*, both wage and hour class actions in which the courts relied on his analysis in granting class certification; and that he had been retained as an expert in over 40 cases (90 percent class actions) by both plaintiffs and defendants to analyze "timekeeping, payroll records, telephone call records, credit card records, reimbursement records, and travel records (e.g., gps data and locations where employees worked)."

Under these circumstances, plaintiffs' evidence supporting Woolfson's expert qualifications showed that he had "sufficient skill or experience" in the field of database management and analysis such that his declarations should have been considered by the trial court. (See *Brown*, *supra*, 11 Cal.3d at p. 645.) Nevertheless, the trial court chose to reject all of the information provided by Woolfson, despite the fact that, as we discuss further below, Woolfson's analysis of the ABM database was central to plaintiffs' class certification motion, and thus the trial court's decision effectively foreclosed plaintiffs' ability to put on their case. (See *Sargon Enterprises*, *supra*, 55 Cal.4th at p. 773; *Brown*, *supra*, 11 Cal.3d at p. 647.) This was error.

While we do not here pass on the admissibility of *every* opinion reached by Woolfson based on his manipulation of ABM's database, we find the many facts generated by Woolfson's analysis clearly admissible as matters beyond the common knowledge or experience of an ordinary witness.[10] (See *Business Objects, S.A. v. MicroStrategy, Inc.* (Fed. Cir. 2005) 393 F.3d 1366, 1368 [noting that SQL requires the user to "understand the structure and content of the relational database as well as the complex syntax of the specific query language" and that "[t]hese complexities generally prevent laypersons from drafting queries in query languages."].) Moreover, as evidence of ABM's common wage and timekeeping practices, Woolfson's results would unquestionably aid a jury in its search for the truth regarding any alleged classwide wage or hour violations in this case. (See *Brown, supra,* 11 Cal.3d at p. 645; *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115; see also *Brinker*, *supra*, 53 Cal.4th at p. 1033 ["Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."].)

---

[10] As just one example, Woolfson identified ABM workers scheduled to work shift segments separated by more than one hour on the same day, without any indication of premium pay, through use of the following SQL queries: "1. *select count (*) from workdata where SplitShiftViolation='YES' and isWork ='YES'* [¶] 2. *select distinct reference from workdata where SplitShiftViolation ='YES' and iswork ='YES'*."

Frankly, we are somewhat mystified by the trial court's wholesale exclusion of the entirety of Woolfson's evidence in this matter. Upon review, it appears that the trial court's conclusions regarding the admissibility of the Woolfson materials were impermissibly tainted by its strong views with respect to the underlying merits of plaintiffs' class certification motion—that is, that class certification was improper due to the individualized inquiries that would be required to establish which ABM employees, if any, had been harmed in this matter. This determination, moreover, appears to have been based, at least in part, on the mistaken notion that database analysis of timekeeping and payroll records cannot be used as a means to show common practices for purposes of class certification. Indeed, at the June 2011 hearing on plaintiffs' 473(b) motion, through which plaintiffs were attempting to bolster Woolfson's expert credentials, the trial court opined that ABM workers were "not susceptible to be treated as a class, period" and that the "basic problem" in the case was that "individualized analysis of working situations" would be needed "to understand why a worker may not have been given a lunch break." Thus, in the opinion of the trial court: "*Whether or not this witness is qualified* to give the opinions, the opinions are not material to this case." (Italics added.)

In sum, it was error for the trial court to completely disregard plaintiffs' proffered expert evidence of common practice, rather than accepting it for what it was and weighing it against the existence of any individualized inquiries that might properly have defeated plaintiffs' request for class certification. Moreover, as we discuss in detail below, the trial court's decision clearly prejudiced plaintiffs, as it left them without any evidence of systemic wrongdoing other than the information contained in the declarations and deposition testimony submitted in connection with their class certification motion, materials which the trial court found insufficient in number to demonstrate predominant common questions. Indeed, the trial court expressly stated: "The number of declarations [submitted by plaintiffs] compared to the number of employees by itself would not be sufficient [to demonstrate predominance]. . . . What I'm suggesting is that *evidence besides declarations would have to be submitted to show a common practice*." (Italics added.) Yet this was precisely the evidence that the trial court excluded. Since we find it

reasonably probable that a result more favorable to the plaintiffs would have been reached in the absence of this error, the trial court's order denying class certification cannot stand. (See *Kotla*, *supra*, 115 Cal.App.4th at p. 294.)[11]

**B. *Class Certification Issues***

1. *Rules Governing Class Actions and Standard of Review*

The requirements for class certification are well established and were recently summarized by our high court in *Brinker, supra,* 53 Cal.4th 1004, 1021: "Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' [Citations.] Drawing on the language of Code of Civil Procedure section 382 and federal precedent, we have articulated clear requirements for the certification of a class. The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "

" '[T]his state has a public policy which encourages the use of the class action device.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340 (*Sav-On*).) Further, whether class certification should be granted is a procedural question, and not a question of whether the action is " 'legally or factually meritorious.' " (*Id.* at p. 326.) As a general matter, " 'a class action is not inappropriate simply because

[11] Because we conclude that the trial court erred in failing to consider Woolfson's expert declarations when making its class certification determination at the hearing in April 2011 (as memorialized by the court's order denying plaintiffs' motion for class certification filed on September 1, 2011), we need not reach the issue of whether the trial court also erred in refusing to grant plaintiffs' 473(b) motion so that additional evidence of Woolfson's expert qualifications could be brought before the court.

each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages.' " (*Id.* at p. 333.)

In addition, with respect to the superiority of the class action mechanism—and as is pertinent to our present inquiry—we have previously noted that "[c]ourts regularly certify class actions to resolve wage and hour claims. [Citations.] In this arena the class action mechanism allows claims of many individuals to be resolved at the same time, eliminates the possibility of repetitious litigation and affords small claimants with a method of obtaining redress for claims which otherwise would be too insignificant to warrant individual litigation. [Citation.] Moreover, the issues slated for contest are primarily common issues involving common evidence. It would not be efficient or fair to relegate these complaints to multiple trials." (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 (*Bufil*); see *Brinker*, *supra*, 53 Cal.4th at p. 1033.)

Indeed, as our high court elaborated in *Brinker*, a theory of liability that an employer "has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.) "[I]n the general case to prematurely resolve such disputes, conclude a uniform policy complies with the law, and thereafter reject class certification . . . places defendants in jeopardy of multiple class actions, with one after another dismissed until one trial court concludes there *is* some basis for liability and in that case approves class certification. [Citation.] It is far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff." (*Id.* at p. 1034.)

"California courts consider 'pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate.' " (*Jaimez v. Daiohs USA, Inc.* (2010)

181 Cal.App.4th 1286, 1298 (*Jaimez*).) Other relevant factors include " 'whether the class approach would actually serve to deter and redress alleged wrongdoing.' " (*Ibid.*) Moreover, in the wage and hour context, "[w]e have recognized that retaining one's employment while bringing formal legal action against one's employer is not 'a viable option for many employees,' " and thus a class action may be appropriate as "a current employee who individually sues his or her employer is at greater risk of retaliation." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 459, abrogated on other grounds as stated in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 359–360; see also *Williams v. Superior Court* (2017) 3 Cal.5th 531, 558, citing *Gentry*.) And, in *Gentry* our high court noted that class actions may be particularly useful for immigrant workers with limited English language skills, as illegal employer conduct might otherwise escape their attention. (*Gentry*, at p. 461.)

A ruling on class certification is reviewed for abuse of discretion. (*Brinker*, *supra*, 53 Cal.4th at p. 1022; *Sav-On*, *supra*, 34 Cal.4th at p. 326.) Under this standard, " '[a] certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1022; see *Bufil*, *supra*, 162 Cal.App.4th at p. 1204 [noting that while "[t]rial courts enjoy wide discretion with regard to class certification," we will nevertheless reverse and order denying class certification "if the order is based on improper criteria or incorrect assumptions"].) Moreover, "[a]n appeal from an order denying class certification presents an exception to customary appellate practice by which we review only the trial court's ruling, not its rationale. If the trial court failed to conduct the correct legal analysis in deciding not to certify a class action, ' "an appellate court is required to reverse an order denying class certification . . . , 'even though there may be substantial evidence to support the court's order.' " ' [Citation.] In short, we must ' "consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial." ' " (*Alberts*, *supra*, 241 Cal.App.4th at p. 399.)

On the issue of predominance, a trial court's finding is generally reviewed for substantial evidence. (*Brinker, supra,* 53 Cal.4th at p. 1022.) Thus, "[w]e must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Ibid.*) However, since the focus of this type of certification dispute "is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the *theory of recovery* advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. [Citations.] 'Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question.' " (*Sav-On, supra,* 34 Cal.4th at p. 327, italics added.)

In the instant case, plaintiffs contend that the trial court abused its discretion, both in concluding that their proposed subclasses are not ascertainable and in determining that common issues do not predominate over individual inquiries. We consider each claim in turn.

2. *Ascertainability*

As stated above, the trial court refused to certify this matter as a class action because, among other reasons, it believed the subclasses proposed by appellants were not ascertainable. In particular, the trial court opined that defining the proposed subclasses by reference to the alleged Labor Code violations sustained was a "fatal defect," because the putative subclass members could not be identified without a determination on the merits of each class member's case. The court reasoned that, when the "class definition is simply shorthand for persons possibly wronged by the defendant," it is impossible to identify putative class members until the lawsuit is concluded, making it impossible both to provide appropriate notice and to determine who will be bound by the judgment. The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class of non-exempt janitorial employees, because some members of the general class may not have suffered any harm. Unsurprisingly, ABM agrees with

the trial court on appeal, arguing that "the only means by which the many subclasses could be ascertained was by a trial on the merits, requiring the testimony of each and every putative class member on each and every claim, a concept that is antithetical to the very concept of class litigation." In our opinion, however, both the trial court and ABM have fundamentally misapprehended the concept of ascertainability as it applies to the circumstances of this case.

"Ascertainability is achieved 'by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary.' " (*Bomersheim v. Los Angeles Gay & Lesbian Center* (2010) 184 Cal.App.4th 1471, 1483; see *Nicodemus v. Saint Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1212 (*Nicodemus*); *Aguirre v. Amscan Holdings, Inc.* (2015) 234 Cal.App.4th 1290, 1300 (*Aguirre*).) "In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and *the means of identifying class members*." (*Bufil, supra*, 162 Cal.App.4th at p. 1207, italics added.) Thus, a plaintiff is not required to establish the identity of class members at the class certification stage of the proceedings. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1274.)

Moreover, "[w]hile often it is said that '[c]lass members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records' [citations], that statement must be considered in light of the purpose of the ascertainability requirement." (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 101 (*Medrazo*).) " 'Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.' " (*Aguirre, supra*, 234 Cal.App.4th at p. 1300.) Therefore, "[t]he goal in defining an ascertainable class 'is to use terminology that will convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." [Citation.] " . . . Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." ' " (*Id.* at pp. 1300–1301; see also *Medrazo*, at p. 101

[ascertainability requirement is satisfied if "the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation"].)

In sum, a class is ascertainable if a plaintiff supplies a reasonable means of identifying potential class members and the class is defined in terms of objective characteristics and common transactional facts sufficient to allow a class member to identify himself or herself as having a right to recover based on that description. So long as these requirements are met, a class is ascertainable "even if the definition pleads ultimate facts or conclusions of law." (*Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915–916 (*Hicks*); see *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 226, 240–241 (*Faulkinbury*) [directing certification of subclasses based on meal break, rest break, and overtime violations]; *Jaimez*, *supra*, 181 Cal.App.4th at pp. 1291–1292, 1295–1296 [directing certification of classes found ascertainable by the trial court, including a meal break class "based upon the failure to permit or authorize meal breaks and the failure to pay one hour of wages for each meal break violation" and an overtime class "based upon the failure to pay overtime to the class"]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1529, 1539 [directing certification of two subclasses based on failure to pay earned wages and overtime and failure to provide mandatory rest breaks].) Under this established analytical framework—and when one considers the data supplied by Woolfson—the trial court's conclusion that the proposed subclasses in this case are unascertainable due to the need for individualized merit determinations is simply not defensible.

Indeed, we recently considered and rejected a similar argument in *Nicodemus*, *supra*, 3 Cal.App.5th 1200. In that case, the plaintiff filed an action alleging that she was overcharged for copies of her patient medical records, which were sought in anticipation of litigation by her attorney pursuant to Evidence Code section 1158. The named defendants were the plaintiff's hospital (Saint Francis) and HealthPort Technologies, LLC (HealthPort), a company that, during the relevant timeframe, provided Saint Francis

with patient medical record release of information services pursuant to a contract. (*Nicodemus*, at pp. 1205, 1207.) The plaintiff moved for certification of a class comprised of all patients who requested medical records from a California medical provider through an attorney prior to litigation and who were charged by HealthPort more than the statutory maximum set forth in Evidence Code section 1158. (*Id.* at pp. 1205–1206, 1208.) The trial court concluded that the plaintiff's proposed class was unascertainable. (*Id.* at p. 1210.) Although HealthPort tracked all attorney requests using a separate billing code in its database, the trial court concluded that the data set was over-inclusive because the plaintiff "had not presented a mechanism for determining whether attorneys' requests were submitted ' "prior to litigation" . . . without individualized inquiry, for example, by asking' each attorney." (*Ibid.*)

On appeal, we concluded that the trial court erred as a matter of law in finding that the proposed class was not ascertainable. (*Nicodemus, supra*, 3 Cal.App.5th at pp. 1213–1217.) Because it is highly relevant to the case at hand, we set out our reasoning in some detail: "[E]ven assuming the attorney request data set does include some unknown number of requests that were submitted after litigation was commenced (or after defendants' first appearance) or for reasons unrelated to litigation, this fact would not defeat ascertainability. HealthPort argued, and the trial court concluded, that a class is not ascertainable if the class members who are entitled to recover from the defendants cannot be identified without an individualized inquiry. That is not, however, the standard for determining whether a class is *ascertainable*. As noted, '[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata. [Citations.] . . . As long as the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation, the ascertainability requirement is met.' (*Medrazo, supra,* 166 Cal.App.4th at p. 101.) Plaintiff here has identified the class in terms of objective characteristics, tracking the provisions of section 1158; if it is determined later in the litigation that the '07' data set includes requests not made

pursuant to section 1158, 'those [persons] can be eliminated from the class at that time.' (*Aguiar v. Cintas Corp. No. 2, supra*, 144 Cal.App.4th at p. 136 (*Aguiar*); see also *Sav-On, supra*, 34 Cal.4th at p. 333 [' "a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery" ']; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743 [class of all employees in certain job categories ascertainable even though some employees may not have worked overtime and thus may not be entitled to any recovery].) Nor should a court 'decline to certify a class simply because it is afraid that insurmountable problems may later appear at the remedy stage.' " (*Nicodemus, supra*, 3 Cal.App.5th at p. 1214.) Thus, contrary to the trial court's belief, possible over-inclusiveness in the method proposed for identifying potential class members does not defeat ascertainability.

In reaching our conclusion in *Nicodemus*, we distinguished *Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50 (*Hale*)—a case relied on by ABM here—in which a class was decertified after nearly three years of litigation, discovery, and notice to potential class members. (*Id.* at pp. 53–55; see *Nicodemus, supra*, 3 Cal.App.5th at pp. 1215–1216.) *Hale* involved an allegation that a class of persons who self-paid for emergency room treatment were overcharged when compared to insured persons. (*Hale*, at p. 53.) In moving to decertify, the defendant argued that the class was not ascertainable because the defendant did not keep records in such a way "as to reasonably and readily identify those included in the class definition without individualized inquiries." (*Id.* at p. 55.) The trial court agreed with the defendant and the appellate court affirmed, opining with respect to ascertainability that "[i]t is the inability to reasonably distinguish those individuals [later determined to qualify for coverage] from individuals who were actually uninsured and then to identify any disparity in amounts paid that make it unreasonable to ascertain the defined class." (*Ibid.*) In *Nicodemus*, we distinguished *Hale*, both because of its "distinctive procedural posture" and because, under *Hale*'s facts, "it was indisputably demonstrated that there was simply no way to

avoid a complicated individualized inquiry to determine not just eligibility for damages but *to prove liability*." (*Nicodemus, supra*, 3 Cal.App.5th at p. 1216, italics added.)

In contrast, we found *Bufil, supra*, 162 Cal.App.4th 1193, instructive. In *Bufil*, which involved meal and rest break claims, "[t]he proposed class was defined as employees for whom the defendant's records showed a meal period not taken because the employee was the only person in the store or was the only person present except for a trainee." (*Nicodemus, supra*, 3 Cal.App.5th at p. 1216.) "Although employees who missed a meal period could be identified from the defendant's records, employees who missed a rest period could not." (*Ibid*.) However, Bufil submitted evidence that the defendant had a policy that hourly employees who were working alone or only with a trainee were not allowed to go off duty for any type of break, and argued that the records identifying class members who missed meal periods for the reasons specified thus also identified those who missed rest breaks. (*Bufil*, at pp. 1206, 1208.) Under these circumstances, the appellate court reversed the trial court's denial of class certification, concluding that "the class was ascertainable from the defendant's records." (*Nicodemus*, at p. 1216.) "In doing so, the court rejected the defendant's 'speculation' that an employee who missed a meal break nonetheless might have received a rest break, observing 'speculation that goes to the merits of ultimate recovery [was] an inappropriate focus for the ascertainability inquiry.' (*Ibid*., citing *Medrazo, supra*, 166 Cal.App.4th at p. 101 [defendant's sales records offered an objective means of identifying potential class members, and plaintiff's inability at the class certification stage to identify precisely which buyers qualified as class members was "irrelevant"] and *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 976 ["the need to individually examine each member's contract to ultimately determine whether he or she qualifies for inclusion in the class does not . . . demonstrate a lack of ascertainability or manageability"].)

Adopting this analysis in *Nicodemus*, we concluded that potential class members could be readily identified by reference to HealthPort's attorney request data set, and the "speculation" that the data set might be over-inclusive went "to the merits of each class member's recovery" and thus "was an inappropriate focus of the ascertainability inquiry."

(*Nicodemus, supra*, 3 Cal.App.5th at p. 1216.) Our analysis of ascertainability in the present case mirrors our conclusions in *Nicodemus*. Here, as established by Woolfson, the potential subclass members are all readily identifiable by reference to ABM's own employment and payroll records.

For instance, the subclass of ABM Workers who "suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period" can be identified through ABM's timekeeping and payroll records showing numerous instances where a meal deduction was made for a shift without any corresponding time entry indicating that a meal period was taken. The subclass of ABM Workers who were not paid premium meal period wages when they worked shifts of a particular length without a recorded meal period can similarly be ascertained through reference to the same records, reviewed to determine whether any required premium wages were paid where no meal period was recorded. The Unpaid Split-Shift Premium Subclass— "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal but were not paid an additional hour of wages for each split shift"—can be identified by examining ABM's timekeeping and payroll records to determine which employees worked two or more shifts in the same day separated by more than an hour, but were not paid premium wages related to the split shift(s).[12] Finally, members of the Reimbursement Subclass—ABM Workers who were not reimbursed for expenses related to the use of their own vehicles for travel between jobsites—can be identified by searching ABM payroll records to determine which employees worked at multiple jobsites separated by a certain baseline number of miles during the same workday, but did not receive reimbursement for travel.[13]

---

[12] As discussed above, the DLSE has historically taken the position that a bona fide meal period is one that does not exceed one hour in length. (See *ante* at p. 4 & fn. 1.)

[13] Woolfson opined below that the ABM databases contained location information for each worker's shift and that from this information, along with the addresses of the

In addition, the subclasses are all defined using objective characteristics and common transactional facts sufficient to allow a potential class member to identify himself or herself as having a right to recover pursuant to that subclass. For example, the nonexempt ABM workers who would receive notice as part of the general class would all be aware whether they worked though meal periods, failed to receive reimbursement for their travel expenses between worksites, or otherwise fell within the articulated subclasses. Under these circumstances, ABM's speculation that some potential class members identified in the data may ultimately not be entitled to relief—because, perhaps, they actually took an otherwise unrecorded meal, or were not entitled to a split shift premium on a particular day, or did not drive themselves between job sites—goes to the merits of each class member's recovery and, as such, was an inappropriate focus of the trial court's ascertainability inquiry. (See *Sav-On, supra*, 34 Cal.4th at p. 338 [class can be certified based on partial commonality, meaning not every single member of the proposed class needs to be exposed to the wrongful practice nor does the practice have to be unlawful or lawful as to every class member].)[14]

3. *Predominance.*

Having determined that the plaintiffs have proposed ascertainable classes, we must next address the trial court's conclusion that class certification was inappropriate in this matter because individual inquiries predominate over common questions. As mentioned above, "[t]he 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would

---

work locations, it would be possible to calculate the mileage each worker traveled each day.

[14] In this regard, we note additionally that "if necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable." (*Hicks, supra*, 89 Cal.App.4th at p. 916.) Thus, as this action progresses, the trial court should be open to making modifications to the class definitions as necessary to avert developing certification problems or to otherwise enhance the efficiencies of the class certification model.

be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker*, *supra*, 53 Cal.4th at pp. 1021–1022, fn. omitted.) Indeed, "at the class certification stage, as long as the plaintiff's posited theory of liability is amenable to resolution on a classwide basis, the court should certify the action for class treatment even if the plaintiff's theory is ultimately incorrect at its substantive level, because such an approach relieves the defendant of the jeopardy of serial class actions and, once the defendant demonstrates the posited theory is substantively flawed, the defendant 'obtain[s] the preclusive benefits of such victories against an entire class and not just a named plaintiff.' " (*Hall v. Rite Aid Corp.* (2014) 226 Cal.App.4th 278, 293–294, italics omitted.)

In short, when analyzing the element of predominance for purposes of class certification "the focus must be on the policy the plaintiffs are challenging and whether the legality of that policy can be resolved on a classwide basis." (*Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 940.) Thus, for example, in *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, the Court of Appeal affirmed the trial court's denial of class certification in a case alleging that the company required employees to purchase company clothing to wear to work but failed to reimburse such purchases. Because there were no clear companywide policies requiring employees to purchase company clothing as a condition of employment or describing what an employee was required to wear, the trial court determined there was no common method to prove the *fact of liability* on a classwide basis. Rather, individualized inquiries would need to be made regarding, among other things, what employees were told by store managers about

wardrobe, how employees interpreted any such discussion, and what each store manager actually required employees to purchase. (*Id.* at pp. 1356–1357.)

In contrast, numerous other cases have held that individualized issues regarding *proof of the amount of damages* class members may recover does not defeat a class action so long as there are *common questions of liability* amenable to class resolution. (See, e.g., *Faulkinbury*, *supra*, 216 Cal.App.4th 220, 232–240 [common issues of fact predominated for subclasses related to meal, rest, and overtime violations because liability could be determined classwide based on uniform policies, or lack thereof; individual issues, such as whether individuals took rest breaks, went to the issue of damages and did not preclude class certification]; *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 997 [a uniform policy denying compensation for preshift work presented predominantly common issues of fact and law because liability depended on the existence of the uniform policy, rather than individual damages determinations]; *Benton v. Telecom Network Specialists, Inc*. (2013) 220 Cal.App.4th 701, 726 [theory that defendant violated wage and hour requirements by failing to adopt meal and rest break policies is amenable to class treatment; whether employee was able to take required breaks goes to damages].)

The common theme in these cases is that the plaintiff's theory of liability could be determined based on common uniform policies applicable to the class as a whole. (See also *Department of Fish & Game v. Superior Court* (2011) 197 Cal.App.4th 1323, 1356 ["Class treatment is not barred where a single wrongful act has different effects on different claimants such that some may have claims while others may not. ' "In such cases, the Courts will generally certify a class if the defendant's action can be found to be wrong in the abstract even if no individual person has been damaged. [Citations.] These situations are distinguishable from situations where the Court cannot determine the wrongfulness of an action without reference to individuals." ' "].)

In line with this precedent, and of particular relevance to the case at hand, is the Second District's opinion in *Jaimez*, *supra*, 181 Cal.App.4th 1286. In *Jaimez*—a case, like this one, involving claims of various wage and hour violations, including meal break

issues—the appellate court concluded that the "trial court misapplied the criteria [for determining whether a class should be certified], focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class treatment.' " (*Id.* at p. 1294.) Since the plaintiff's theory of recovery focused on uniform policies and practices (such as the defendant's failure to compensate employees for missed meals, rest breaks, and earned overtime), it was "more amenable to class treatment than individual disposition." (*Id.* at p. 1300.) Indeed, in *Jaimez*, the defendant had a policy and practice of automatically deducting 30 minutes per shift for each employee's meal break regardless of whether that meal break was actually taken, and the appellate court expressly found that this policy raised common legal and factual issues. (*Id.* at pp. 1294, 1304.)

Further, in balancing these common issues against any individual inquiries necessary, the *Jaimez* court rejected the trial court's notion that common questions of fact and law did not predominate because the defendant had submitted declarations indicating that some employees did, in fact, get meal breaks, rest breaks, and proper pay stubs and thus there was a " 'strong indication that there could be conflicting testimony regarding whether these employees have common factual issues to be presented at trial.' " (*Jaimez, supra,* 181 Cal.App.4th at p. 1296.) Specifically, the appellate court declared that the trial court had improperly "focused on the *merits* of the declarations, evaluating the contradictions in the parties' responses to the company's uniform policies and practices, not the policies and practices themselves." (*Id.* at p. 1300.) Unfortunately, the trial court in this case fell prey to the same errors that infected the trial court's certification decision in *Jaimez.*

Specifically, instead of identifying the principal legal issues presented in this matter and determining whether those "operative legal principles, as applied to the facts of the case, render the claims susceptible of resolution on a common basis' " (*Alberts, supra,* 241 Cal.App.4th at p. 399), the trial court here improperly focused on the minutiae of each individual janitor's personal situation. This was a legal error and appears also to

have been the reason the trial court found Woolfson's evidence irrelevant to the class certification inquiry. However, when the merits of the ultimate damages issues are set aside and Woolfson's analysis of ABM's payroll practices is considered, along with the other evidence submitted by plaintiffs, it becomes clear that numerous common issues predominate in this matter, rendering class certification appropriate.

For instance, the legality of ABM's uniform payroll policy—which assumes each employee works his or her scheduled shift and takes any legally required meal breaks absent some type of exception report—is a legal question that can be determined by reference to facts common to all class members. Certainly, the evidence provided by Woolfson that a mere 5,625 of the 1,836,083 time entries for ABM Workers he investigated (0.3 percent) contained adjustments to pay calls into question the efficacy of ABM's asserted "timesheet maintenance" procedure, as does the evidence presented by plaintiffs that ABM does not generate exception reports for missed meals periods. Moreover, the legality of ABM's auto-deduct policy for meal breaks in light of the recordkeeping requirements for California employers is also an issue amenable to classwide resolution. (See Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) In addition, ABM's apparent uniform practice of never providing premium pay to its employees, either for split shifts or missed meal breaks, is susceptible to classwide treatment. Moreover, ABM's defenses with respect to split shift premium pay—that voluntary split shifts are not compensable and that class members are paid more than the threshold under which premium pay is mandated—are also susceptible to common proof. (See *Saechao v. Landry's, Inc.* (N.D. Cal. Mar. 15, 2016, No. C 15-00815 WHA) 2016 U.S. Dist. LEXIS 33409 at pp. *22–23; *Kamar v. Radio Shack Corp.* (C.D. Cal. 2008) 254 F.R.D. 387, 405; see *Aleman*, *supra*, 209 Cal.App.4th at pp. 574–575 [interpreting split shift Wage Order as a legal matter].) Finally, whether ABM fails to properly reimburse its employees for work-related travel, despite its asserted policy to do so, is also subject to common proof. (See *Brewer v. General Nutrition Corp.* (N.D. Cal. Nov. 12, 2014, No. 11-CV-3587 YGR) 2014 U.S. Dist. LEXIS 159380 at pp. *27–30 [predominance of common questions on a travel reimbursement claim supported by evidence of

"exceedingly small percentage of employees who sought reimbursement"; evidence of mileage incurred could be determined on a class-wide basis where all relevant locations known].) Under these circumstances, fear that the determination of individual damages might prove overly complex should not have provided a basis for denial of class certification.

Indeed, although we do not reach the issue, the trial court's concern regarding the need for numerous individualized damage inquiries in this case may turn out to be over-exaggerated, given existing precedent indicating that the burden of proof shifts to employers "in the wage and hour context when an employer's compensation records are so incomplete or inaccurate that an employee cannot prove his or her damages." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1189; see *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" '[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages.' "], overruled on another ground as stated in *York v. Starbucks Corp.* (C.D. Cal. Sept. 12, 2012, No. CV 08-07919 GAF (PJWx)) 2012 U.S. Dist. LEXIS 190086.) Thus, for example, since employers have a duty to record their employees' meal periods, "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." (*Brinker, supra*, 53 Cal.4th at p. 1053 [Werdegar, J., conc.]; see Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) Under such circumstances, a court may award damages, even if they are only approximate and based on statistical sampling. (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at pp. 746–751.)

In summary, given that the classes proposed by plaintiffs in this case were ascertainable and plaintiffs' allegations presented predominantly common questions, the trial court's determinations to the contrary cannot stand. Rather, we conclude that the trial court's denial of class certification—including its decision regarding the admissibility of the Woolfson materials—rested on improper criteria and erroneous legal

assumptions, amounting to an abuse of discretion. Plaintiffs have made a showing sufficient to allow them to take the next step in attempting to prove the merits of their contentions on a classwide basis.[15]

## III. DISPOSITION

The trial court's order denying class certification is reversed and the matter remanded for certification of classes as set forth in this opinion. Plaintiffs are entitled to their costs on appeal.

---

[15] In making this determination, we are cognizant of the trial management concerns raised by counsel for ABM at oral argument in this case, issues which may make the ultimate resolution of all or parts of this matter on a classwide basis problematic. However, as detailed above, our review following a denial of class certification is limited. (See *Alberts*, *supra*, 241 Cal.App.4th at p. 399.) Because the trial court's order was based on improper criteria and erroneous legal assumptions, we reverse. Moreover, based on the record before us and as we have detailed at length above, it appears that plaintiffs have identified a number of common questions suitable for classwide resolution. Should plaintiffs' trial plan subsequently prove unworkable, however, ABM may address any such issues to the trial court.

____________________________
REARDON, J.

We concur:

____________________________
RUVOLO, P. J.

____________________________
RIVERA, J.

Filed 1/10/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502<br><br>A132387, A133077 & A133695<br><br>(City & County of San Francisco Super. Ct. No. CJC-07-004502)<br><br>ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION<br><br>(NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed December 11, 2017, be modified as follows:

The citation to *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949 located on page 36 of the opinion shall be modified to delete the reference to subsequent history such that the case citation shall read in full: "see also *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" 'Where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages' "].)

There is no change in the judgment.

In addition, the opinion in the above matter was not certified for publication in the Official Reports when filed on December 11, 2017. For good cause it now appears that the opinion, as modified herein, should be published in the Official Reports and it is so ordered.

Dated: ________________________ ________________________
RUVOLO, P. J.

| | |
|---|---|
| Trial Court: | City & County of San Francisco Superior Court |
| Trial Judge: | Hon. Richard A. Kramer |
| Counsel for Appellants: | Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Christian L. Raisner, Emily P. Rich, Roberta D. Perkins; Mallison & Martinez, Stan S. Mallison, Marco A. Palau, Joseph D. Sutton; Rastegar & Matern, Matthew J. Matern |
| Counsel for Respondents: | Littler Mendelson, Keith A. Jacoby, Dominic J. Messiha, Lauren E. Robinson |

# EXHIBIT 4

Case4:13-cv-05665-YGR Document170 Filed06/18/15 Page1 of 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN LOFTON,
Plaintiff,

v.

VERIZON WIRELESS (VAW) LLC,
Defendant.

Case No. 13-cv-05665-YGR (JSC)

**ORDER GRANTING IN PART MOTIONS TO COMPEL AND FOR SANCTIONS**

Re: Dkt. Nos. 119, 129

Plaintiff John Lofton ("Plaintiff") brings this putative class action challenging Defendant Verizon Wireless (VAW) LLC's debt collection practices. Plaintiff alleges that Verizon engaged a third party, Collecto, Inc., to collect Verizon's past due accounts as Verizon's agent, and that in doing so Collecto violated state and federal law. In particular, Plaintiff alleges that he was not a current or former Verizon customer, but that Collecto nonetheless telephoned him on his cell phone on numerous occasions in violation of the California Invasion of Privacy Act ("IPA"), Cal. Penal Code § 630-38, and the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). Plaintiff alleges Verizon, through Collecto, violated the IPA by recording telephone calls with persons, such as Plaintiff, without the recipient's permission, and violated the TCPA by using an automatic telephone dialing system to make the calls. The action has been referred to the undersigned magistrate judge for resolution of discovery disputes.

Now pending before the Court is Plaintiff's motion to compel Verizon to respond to a number of outstanding discovery requests and Plaintiff's motion seeking sanctions against Verizon and Collecto. Having considered the parties' submissions, and having had the benefit of oral argument on June 4, 2015, the Court GRANTS IN PART Plaintiff's motion to compel and GRANTS IN PART his motion for sanctions.

United States District Court
Northern District of California

Case4:13-cv-03665-YGR Document170 Filed08/18/15 Page16 of 23



relevant to what sanction, if any, is imposed." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 523 (N.D. Cal. 2009).

However, courts often decline to impose sanctions for spoliation where the documents withheld are unlikely to material affect the outcome of the case, insofar as other evidence exists to provide the same information. *See Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) (declining to impose sanctions for destruction of a computer that contained the defendant's financial information where the plaintiff had other documents that provided "extensive information" about the defendant's finances); *see also Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 825 (9th Cir. 2002) (affirming district court's denial of sanctions where loss of original evidence was remedied by sufficient substitute).

Here, Collecto and Verizon concede that the call detail records are relevant to Plaintiff's claims and that Collecto deleted the call detail records for two years while this case was pending. And the Court concludes that Collecto was on notice of its duty to preserve the documents based on the filing of Plaintiff's complaint and even the *Powell* litigation before it, *see Montoya v. Orange Cnty. Sheriff's Dep't*, No. 11-1922, 2013 WL 6706992, at *7-9 (C.D. Cal. Dec. 18, 2013) (noting that the duty to preserve documents can arise from similar prior litigation). That Collecto nevertheless allowed the documents to be destroyed is spoliation—whether or not Collecto did so with a culpable mind. *See Glover*, 6 F.3d at 1329.

But this case does not involve spoliation of an entire swath of evidence with no possible substitution. Rather, Collecto still maintained archives for all of its dialers and has provided these records in discovery. On the other hand, Plaintiff has proffered sufficient evidence why that evidence is lacking. For one, it is more expensive and time-consuming to digest. Moreover, Plaintiff's review indicated that it was missing wrong number codes for a substantial portion of calls. On the other hand, Collecto's expert consultant has submitted a declaration explaining that the archived data provided contains the data that Plaintiff seeks. The Court therefore ORDERS Collecto and Verizon to bear the cost of having their own expert, Aaron Woolfson, reconstruct the archived data for the time period lacking call logs according to the categories Plaintiff identifies.

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Michael Anthony, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>The Federal Savings Bank, National Bancorp Holdings, Inc., and FDE Marketing Group LLC,<br><br>Defendants. | Case No. 21 C 2509<br><br>Hon. LaShonda A. Hunt |

**AMENDED MEMORANDUM OPINION AND ORDER**

Michael Anthony ("Plaintiff") filed this putative class action against The Federal Savings Bank ("FSB"), National Bancorp Holdings, Inc. ("NBH"), and FDE Marketing Group, LLC ("FDE") (collectively, "Defendants")[1], asserting violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c). Currently before the Court are Plaintiff's combined motion for class certification and to bar defense expert Jan Kostyun (Dkt. 128) and Defendants' cross-motion to bar plaintiff's expert Aaron Woolfson (Dkt. 134). Upon consideration of the legal arguments presented in the submissions as well as during oral argument, the Court grants the motion for class certification and denies each motion to bar for the reasons discussed below.

**BACKGROUND**

In the age of the digital world, many have been on the receiving end of a phone call, text message, email, or fax that they have found annoying. Recognizing the disturbance caused by these

[1] On May 16, 2023, counsel for FDE was allowed to withdraw. In light of the FDE representative's statement that new counsel would not be retained to defend the case, Plaintiff was granted leave to seek entry of default against FDE at any appropriate time. (*See* Dkt. 139). FDE has never opposed the relief sought by Plaintiff here. As such, the Court uses the term "Defendants" for simplicity sake even though arguments were submitted on behalf of FSB and NBH only.

unwanted communications, in 1991, Congress enacted the TCPA which provides a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . . ." 47 U.S.C. § 227(c)(5). And since 2003, individuals have been able to register their residential and/or cell phone numbers on the National Do Not Call registry ("Registry") to further avoid telemarketers.

In May 2004, Plaintiff added his residential phone number to the Registry. Nevertheless, from about January 2020 to January 2022, he received "numerous unsolicited calls to his phone asking for someone named 'Needle Dee,'" a name he does not and has never used. (Compl. ¶¶ 32, 33). After receiving three such unsolicited calls in April 2021, Plaintiff "feigned interest" in an effort to identify the caller. (*Id.* ¶¶ 33-38). He subsequently learned that the caller was an FSB representative. FSB, which is owned by NBH, provides traditional banking services and sells residential mortgages. Defendants hired third-party companies, including FDE, to place these telemarketing calls to consumers. Upon a successful pitch with a potential customer, FDE would transfer the live call to one of Defendants' representatives to complete the sale. (*Id.*).

Plaintiff says that despite instructing FSB not to contact him again, he received four more unwanted calls from that same number. Plaintiff contends that he never provided consent to receive such communications and had no prior relationship with Defendants to justify the calls. He therefore brought this action on behalf of himself and other individuals who had registered on the Registry but were contacted by Defendants without having provided prior consent to receive such communications. Following fact and expert discovery, he now moves to certify the following class and subclass:

(1) **"National DNC Class"** defined as "All persons within the United States whose phone numbers () are included in the Ytel call detail records of FDE Marketing Group, LLC ("FDE") produced in this matter, and (ii) received more than one call from FDE in any twelve-month period while their phone numbers were registered on the National Do Not Call Registry for at least 30 days."; and

(2) **"Transfer Subclass"** defined as "All members of the National DNC Class whose call resulted in a transfer to The Federal Savings Bank ("FSB") or National Bancorp Holdings, Inc. ("NBH")." (*Id.*).

(Pl.'s Mot. at 1, Dkt. 128). In conjunction with that motion, Plaintiff also moves to bar Defendants' rebuttal expert, Jan Kostyun. In turn, Defendants oppose class certification and cross-move to bar plaintiff's expert Aaron Woolfson.[2]

## LEGAL STANDARDS

Class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To be certified, a class must meet all prerequisites identified in Rule 23(a) and one of the three subsections of Rule 23(b). *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). Rule 23(a) requires: (1) a class that is "so numerous that joinder of all members is impracticable," ("numerosity"), (2) "questions of law or fact common to the class," ("commonality"), (3) "claims or defenses of the representative parties [that] are typical of the claims or defenses of the class," ("typicality"), and (4) that "the representative parties will fairly and adequately protect the interests of the class" ("fairly and adequately"). Fed. R. Civ. P. 23 (a)(1)-(4).

If those prerequisites are met, a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

[2] This case was reassigned to Judge Hunt's calendar on June 2, 2023 (Dkt. 146). Prior to the reassignment, District Judge Edmond Chang ordered consolidated briefing on Plaintiff's motion for class certification and any motions to bar expert testimony after the parties represented that expert challenges were "directly connected to the class-certification motion." (Dkt. 125).

corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), or Rule 23(b)(3)'s requirements of predominance and superiority are met. Specifically, Rule 23(b)(3) requires courts to find that:

> [T]he questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Furthermore, a class may be divided into subclasses when appropriate to protect divergent interests. Fed. R. Civ. P. 23(c)(5); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 940 (7th Cir. 2016). To be certified, a subclass must meet the same requirements as a regular class. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993).

In addition to satisfying the requirements in Rule 23(a) and (b), "a class must be sufficiently definite that its members are ascertainable." *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 577 (N.D. Ill. 2018). Finally, Plaintiff bears the burden of proving by a preponderance of the evidence that class certification is proper. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022).

The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Specifically, "expert testimony is admissible only if (1) the expert testifies to valid, technical, scientific, or other

specialized knowledge; and (2) that testimony will assist the trier of fact." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Stated another way, experts must be qualified and their testimony both relevant and reliable. *Daubert*, 509 U.S. at 589. This inquiry is flexible, and "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. "When an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010).

## DISCUSSION

### I. Ascertainability

In determining whether class certification is appropriate, ascertainability is a threshold question. *Toney*, 323 F.R.D. at 577. Like other courts, the Seventh Circuit has "long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins*, 795 F.3d at 657. At issue is the "adequacy of the class definition," not "the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." *Id.*

Plaintiff relies on testimony from his expert, Aaron Woolfson, in proposing the National DNC Class and the Transfer Subclass. Defendants offer the opinion of their rebuttal expert, Jan Kostyun, in seeking to bar Woolfson's testimony. And Plaintiff counters that Kostyun's methodology is unreliable. Because Defendants repeatedly contend that ascertainability hinges on the admissibility of expert testimony, the Court begins by analyzing each of the parties' motions to exclude. *See Am. Honda Motor Co.*, 600 F.3d at 816 (requiring courts to "resolve any challenge

to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification"). Even where the significance of the testimony is doubtful, courts are required to make an explicit *Daubert* ruling. *Messner*, 669 F.3d at 812.

## A. Daubert Motions

### 1. Aaron Woolfson's Expert Report

Woolfson reached three conclusions after reviewing call detail records ("CDRs") obtained from Ytel, FDE's carrier: (1) that "there is a reliable method to identify which calls in the call records were made to telephone numbers (a) to which two or more times were called in a twelve month period by [FDE], and (b) that were registered with the [Registry] for more than thirty days before each of the calls"; (2) that "using the CDRs and Defendants' call transfer logs, there is a reliable method to identify the calls in the CDRs that were to phone numbers that also appear in the call transfer log ("Live Transfers"); and (3) that he is "able to identify contact information, including names and mailing addresses, related to the individuals to whom the calls were placed, based upon the records that are maintained by phone carriers in their ordinary course of business." (Woolfson Decl. at ¶3, Dkt. 128-2).

Woolfson has "over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls." (*Id.* at ¶7). And it is through this "hands-on work experience" that he has "become very familiar with the [relevant] technology . . through which calls are processed, received and transmitted" as well as "how dialing systems work, and how telephone systems handle inbound and outbound calls." (*Id.* at ¶12). He has been qualified as an expert in other TCPA cases requiring

him to analyze call records and compare them against records of leads. (*Id.* at ¶¶15-16). Plaintiffs thus rely upon Woolfson's opinion in proposing the National DNC Class and the Transfer Subclass.

Defendants do not take issue with Woolfson's qualifications, which appear to be more than adequate for him to opine about the subject matter here. Instead, relying upon the rebuttal report of Kostyun, Defendants contend that Woolfson's methodology used to identify potential class members is faulty and therefore Plaintiff cannot establish that the proposed classes are ascertainable. In particular, Defendants maintain that the Ytel CDRs are unreliable because, among other things, they fail to include disposition information specifying the outcome of the call (connected, disconnected, busy signal, picked up by an answering machine, etc.); round up every call of more than zero seconds to a six-second duration, making it unclear if such a call was successfully connected; and include six-second calls placed to numbers there were not in service or were otherwise unavailable for assignment. (Dfts.' Resp. at 13, Dkt. 134). Second, they complain that Woolfson's process for identifying individuals on the Registry as of the date of a call is unsound because he used his personal records covering a portion of the relevant class period rather than a reliable vendor who maintained daily registration lists. *Id.* at 14. Next, they take issue with Woolfson reviewing the wrong database records to identify eligible calls in the Transfer Subclass. *Id.* at 15. Last, Defendants highlight the practical difficulties of Woolfson's proposal to subpoena hundreds of potential carriers to identify registered phone users from years ago. *Id.*

Based on his review of the data, Woolfson opined that Defendants violated the TCPA by calling 2,294,457 phone numbers in the National DNC Class, and transferring calls of 27,088 class members in the Transfer Subclass. Defendants' critique of Woolfson's opinion essentially falls into two buckets—(1) disagreements about how he interpreted certain datapoints to reach his specific conclusions; and (2) concerns about the difficulties of his proposed process for identifying class

members. However, neither contention constitutes a valid basis for exclusion of his opinions at the class certification stage or denial of class certification, for that matter.

First, with respect to the underlying data relied upon by Woolfson, the parties agree that the Ytel CDRs do not include call disposition information that affirmatively indicates if every telephone call placed by FDE actually connected to an active number on the Registry. Because of that, Woolfson determined that an appropriate measure of this critical detail was call duration. Defendants take issue with the fact that the CDRs contain multiple six-second calls, and many of those, according to Kostyun, but only some of those according to Woolfson, were misread as connected and placed to assigned residential numbers. Similarly, Defendants' challenge the scope of Registry lists Woolfson consulted to identify registered numbers, and argue that he misread a chart provided by Defendants in assessing which calls were transferred from FDE.

At bottom, Defendants attack the reliability of Woolfson's conclusions and whether they are supported by the data, not the validity of the methodology he employed in forming his opinions. "[T]he court's gatekeeping function focuses on an examination of the expert's methodology [while] [t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). "Assuming a rational connection between the data and the opinion. . . an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower, Inc. v. Ins. Co. of the State of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013).

That is indeed the situation here. Both sides argue at length in their extensive briefs that the opposing expert has erroneously interpreted the relevant data, and as a result, the opinions reached are wrong. But such "arguments about how the selection of data inputs affect the merits

of the conclusions produced by an accepted methodology" are substantive considerations rather than proper *Daubert* challenges. *Manpower, Inc.*, 732 F.3d at 808. Woolfson sufficiently explained the process he used to query the data and then analyze the output. That Defendants disagree with Woolfson's ultimate decisions does not render his method or opinion excludable as unreliable.

Second, Defendants' attempt to connect the identification of exactly who falls within the proposed class to the ascertainability analysis is a nonstarter. As they conceded at oral argument, the Seventh Circuit soundly rejected any notion of this "heightened" ascertainability standard requiring proof of a reliable and administratively feasible way to identify class members at the certification stage. *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 658 (7th Cir. 2015). The cases cited by Defendants were all decided after *Mullins* and are therefore irrelevant. Because this is an issue that does not even impact class certification, the Court is hard-pressed to see how skepticism about Plaintiff's ability to actually track down proposed class members would be a consideration for *Daubert* purposes.

Accordingly, Defendants' motion to exclude Woolfson as an expert is denied.[3]

**2. <u>Jan Kostyun's Rebuttal Expert Report</u>**

After reviewing Woolfson's expert report, Kostyun reached the four conclusions discussed *supra*. (Kostyun Rebuttal Rep. at ¶15, Dkt. 134-1). Kostyun is an "independent technology consultant with over 35 years of experience covering the areas of telecommunications, enterprise architecture, and information technologies." (*Id.* at ¶3). He "developed expertise in areas such as . . . landline and wireless order entry, including the collection of subscriber contact information

---

[3] At oral argument and in their briefs, Defendants also argued in passing that Woolfson's opinion should be excluded on commonality and predominance grounds. As with ascertainability, the Court disagrees that either factor is relevant to the *Daubert* analysis. Defendants do raise substantive arguments that are addressed *infra* in connection with the class certification analysis and are mostly rejected as premature or more appropriate for a merits determination.

[and] initial implementation of the National Do Not Call registry" and has "extensive experience in database methodologies, data analysis, and data mining" in addition to "call center operations and various dialing systems, including those used for inbound and outbound calling campaigns." (*Id.* at ¶¶4-6). He has "personally performed database queries and data analysis against hundreds of data stores [such as] National Do Not Call lists, Wireless Block identifiers, Number Portability transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns." (*Id.* at ¶5). Defendants thus rely upon Kostyun's opinions in opposing class certification.

Similar to Defendants, Plaintiff does not take issue with Kostyun's qualifications as they too appear to be more than adequate for him to offer a rebuttal opinion as to this TCPA claim. Plaintiff contends, however, that Kostyun's methodology is not reproducible, as evidenced by his deposition testimony that he ran "hundreds and hundreds of queries against the data" which he cannot itemize or reproduce. (Pls. Mot. at 7, Dkt. 128). Essentially, Plaintiffs complain that Kostyun gave answers but did not and cannot show his work.

In his rebuttal report, Kostyun described his methodology as follows:

> I developed hypotheses regarding the methods used by Plaintiff's expert Woolfson to identify Plaintiff's classes. Those hypotheses are fundamental foundations of each of the opinions that I will detail in this report. I have tested and confirmed my hypotheses using a combination of related documentation, research, data analysis and experience – similar to the techniques that I have used during my career as a telecommunications system architect. I have analyzed the results of my analysis and testing, and used the results of the analysis to form my opinions and document them in this report.

(Kostyun Rebuttal Rep. at ¶14). True, this paragraph does not set forth step-by-step how Kostyun determined that Woolfson in fact made some mistakes, as evidenced by Woolfson's corrected errata sheets. That said, Defendants explained that Kostyun's analysis "was undertaken in a forensic

Case: 1:21-cv-05609 Document #: 181 Filed: 11/06/25 Page 11 of 27 PageID #:3453

manner" that involved both "simplistic" and "more complex" queries of the data, and the "entire database and structure" were produced to Plaintiff. (Dfts.' Resp. at 10). Plaintiff does not contend that Kostyun used an unacceptable methodology for the relevant industry. In fact, given that Woolfson's reply (Dkt. 128-5) offers substantive grounds for some of the anomalies noted by Kostyun, this signals that Plaintiff, like Defendants, do nothing more than disagree with the opposing expert's conclusions. As already explained, the *Daubert* inquiry focuses on assessing if Kostyun's methodology lacks analytically sound bases, not if his rebuttal opinions are correct. Those remain questions for cross-examination, not motions to bar experts. All the ink spilled in the briefs about the flawed assumptions and misunderstandings of each expert clearly establish that these disputes go to the weight of their opinions, not their admissibility. *See Toney*, 323 F.R.D. at 579-580. As such, for the reasons outlined *supra* for rejecting the Defendants' *Daubert* challenge to Woolfson, Plaintiff's opposition to Kostyun also fails.

Accordingly, Plaintiff's motion to exclude Kostyun as an expert is denied.

**B. <u>Class is Ascertainable</u>**

In 2015, the Seventh Circuit articulated the governing standard in this circuit for assessing if a class is ascertainable:

> [The Seventh Circuit] and other courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind. In addressing this requirement, courts have sometimes used the term "ascertainability." They have applied this requirement to all class actions, regardless of whether certification was sought under Rule 23(b)(1), (2), or (3). Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called "fail-safe" classes). This version of ascertainability is well-settled in our circuit . . . .

*Mullins*, 795 F.3d at 657. And while some circuits have imposed an additional hurdle that there be a "reliable and administratively feasible way to identify all who fall within the class definition," as discussed, the Seventh Circuit has stated in no uncertain terms that it declines to adopt such a requirement because "[n]othing in Rule 23 mentions or implies this heightened requirement." *Id.* at 657-58. In determining ascertainability, the focus is simply on whether the definition of the class is adequate, rather than the difficulty of identifying class members. *Id.* at 659.

Plaintiff's proposed National DNC Class and Transfer Subclass are ascertainable under that standard. First, the class and subclass definitions are not vague. A vague definition frustrates a court's ability to determine who, upon class certification, will receive notice, share in recovery, and be bound by judgment. *Id.* at 660. *Mullins* instructs that a definition generally avoids vagueness concerns if it identifies "a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* Plaintiff's proposed class and subclass are clearly defined, and Defendants do not argue that the proposed definitions are vague.

Second, neither the class nor subclass definition involve subjective criteria or rely upon a proposed class member's state of mind. To the contrary, both use purely objective criteria—namely call records and transfer records—to determine class membership. In other words, the proposed classes are defined by FDE's conduct of placing the calls and transferring certain call recipients, rather than by any thoughts or actions by the proposed class members. Defendants do not contend that the Plaintiff's proposed class or subclass definitions are subjective. They also do not argue that Plaintiff has proposed a fail-safe class or subclass. To the extent there are concerns about identifying and managing class members and/or the claims process, any problems can be addressed through scheduling orders or other case management tools that district courts routinely use in overseeing these actions. *Mullins*, 795 F.3d at 664.

Accordingly, the Court finds the proposed National DNC Class and Transfer Subclass are ascertainable and thus proceeds to analyze the enumerated requirements for class certification under Rule 23.

## II. <u>Rule 23(a)</u>

### A. <u>Numerosity</u>

Class certification requires a class that "is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). The focus of the numerosity requirement is the practicability of joinder, which requires evaluating "the nature of the action, the size of the individual claims, and the location of the members of the class" with forty class members typically satisfying this requirement. *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (citation omitted). Plaintiff argues, and Defendant does not contest, that numerosity is met. The proposed class and subclass will include over 2.2 million members and over 27,000 members, respectively, who are dispersed across the country and whose individual claims would be small. (Pl.'s Mot. at 12).

Accordingly, numerosity is satisfied.

### B. <u>Commonality</u>

Questions of law or fact must be common to a class for that class to be certified. Fed. R. Civ. P. 23(a)(2). For this element to be met, every question need not be common to the class. *Wal-Mart v. Dukes*, 564 U.S. 338, 359 (2011). Indeed, "[i]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). A mere superficial question, such as whether the proposed class members all suffered a violation of the same statute, will not suffice. *Wal-Mart*, 564 U.S. at 350. In analyzing whether there are common questions of law or fact among the class, it is the conduct of the

defendant that matters. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek*, 764 F.3d at 756. "[C]laims must depend upon a common contention . . . [which] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 564 U.S. at 350. It is the generation of common answers to the common questions that matters. *Id.* Usually, commonality can be satisfied if there is "[a] common nucleus of operative fact." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Plaintiff argues that there are common questions of law and fact, including the injury, the amount of statutory damages, and evidence of liability. Beyond this, Plaintiff contends that questions of standing and consent will include evidence that is common among class members. As stated, the fact that class members suffer the same injury does not render a class susceptible to class certification. On the other hand, even if every proposed class member would not receive the same statutory damages, that itself does not justify denial of class certification. *Mullins*, 795 F.3d at 671. Defendants do not contest that every class member would receive the same statutory damages.

Standing, consent, and vicarious liability are all common questions of law or fact. There is a common nucleus of operative fact in this case—Defendants allegedly contacted Plaintiff and proposed class members, without their consent, after they had been registered for more than 30 days on the National Do Not Call registry. Because the Defendant engaged in the same conduct against each proposed class member, the commonality requirement is met. *See, e.g.*, *Paldo Sign and Display Co. v. Topsail Sportswear, Inc.*, Case No. 08 C 5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010) (finding common questions of law and fact when "[t]he evidence presented to

the Court reflects that the [defendant] acted with regard to the class in a common and consistent way and engaged in a standardized course of conduct out of which the class members' alleged injuries arise.").

Accordingly, commonality is satisfied.

**C. <u>Typicality</u>**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [plaintiff's] claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp*, *Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citations and quotations omitted). Some factual variation among claims will not defeat typicality. *Id.* "Typicality . . . should be determined with reference to the [defendant's] actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Plaintiff argues his claims are typical of those of the class because all claims in this case arise from the same course of conduct by the Defendants and are premised on the same legal theories of TCPA violations and vicarious liability. Pl.'s Mem. at 13. Defendants do not address typicality in their briefing.

The Court agrees that Plaintiff's claims are typical of the proposed class members. Just like Plaintiff, the proposed call members had phone numbers that were registered on the Registry and had been for at least 30 days prior to receiving a non-consensual phone call from FDE. The legal theories at issue in the case—that the calls violated the TCPA and that FSB is vicariously liable—are the same for each class member.

Accordingly, typicality is satisfied.

**D. <u>Fairly and Adequately</u>**

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent" and to ensure that the representative party "possess[es] the same interest and suffer[s] the same injury as the class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

According to Plaintiff, this requirement is met because he and the proposed class members have identical interests in prosecuting TCPA claims, Defendants do not have any unique defenses to Plaintiff's claims, and Plaintiff has retained competent counsel. (Pl.'s Mem. at 14). Defendants do not present any arguments to the contrary.

Accordingly, adequacy is satisfied.

**III. <u>Rule 23(b)(3)</u>**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Further, the rule identifies pertinent considerations in determining whether the predominance and superiority requirements are met. *Id.*

**A. <u>Predominance</u>**

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels*, 29 F.4th at 843-44. Notably, this Court need not decide, from a merits standpoint, whether any common question will be answered in the class's

favor. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015). Additionally, the proposed class need not be devoid of individual questions; rather, the common questions must simply predominate. *Messner*, 669 F.3d at 815. While the Plaintiff says that no individualized issues are present, Pl.'s Mem. at 15, Defendants contend that consent, vicarious liability, standing require individualized inquiries and thus prevent class certification. The Court finds Defendants' arguments unpersuasive.

**1. <u>Standing</u>**

Defendants maintain that standing requires individualized inquiries as there is "strong evidence suggesting that individual class members may lack standing" and "the very existence of a transfer subclass negates an inference of injury." (Dfts.' Resp. at 28). Defendants are correct that standing requires a concrete harm. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2012). But the Plaintiff and the proposed class members have suffered a concrete harm. Determining whether TCPA violations constitute concrete injury for standing purposes requires looking to history and Congressional judgment. *Gahelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020). In terms of history, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Of course, intrusion upon seclusion has long been recognized in the common law, and the *Gahelhak* court notes that the "irritating intrusions" that such a common law tort protects against are analogous to "harm posed by unwanted text messages." *Id.* In recognition of this, "Congress identified a modern relative of a harm with long common law roots." *Id.*

Standing here is not an individualized question, though, as the Plaintiff and proposed class members suffered a concrete injury when they received unwanted telemarketing phone calls. In

Case 4:21-cv-00250-9 Document 9-15 Filed 11/18/26 27 Page 10 of 160

*Aranda v. Caribbean Cruise Line, Inc.*, the district court held that "[b]oth history and the judgment of Congress suggest that violation of [the right to be free from unsolicited telemarketing calls to which the recipient did not consent] is sufficient to constitute a concrete, de facto injury." 202 F.Supp.3d 850, 857-58 (N.D. Ill. 2016). The harm lies in the unwanted contact itself; additional tangible harms such as "cell phone battery life, actual annoyance, and financial loss" are not required. *Id.* at 858. *See also Toney*, 323 F.R.D. at 582-83 ("Loss of time and privacy responding to unsolicited communications are concrete injuries that confer Article III standing . . . .").

Defendants' argument that "the very existence of a transfer subclass negates an inference of injury" fares no better. The *Aranda* court addressed a similar factual scenario. There, proposed class members received telemarketing calls offering a free cruise in exchange for the recipient completing a political survey. *Aranda*, 202 F.Supp.3d at 851-52. Some class members engaged with the call, completed the survey, and earned the free cruise. *Id.* at 859. Even those class members, the *Aranda* court held, had standing:

> [T]he intangible, concrete injury plaintiffs allege is that defendants violated a right Congress sought to protect through section 227: the right to be free from prerecorded non-emergency telemarketing calls they did not consent to receive. This concrete injury is alleged to have been suffered by every plaintiff—even plaintiffs who completed the survey, spoke with a [company] representative, and accepted defendants' vacation offer had a right to be free from unsolicited telemarketing calls, just as a homeowner has a right to be free from trespass even if she accepts a gift from the trespasser after he commits the offense. **The key common question is whether defendants made unlawful calls to plaintiffs using a prerecorded voice without consent to make them**; plaintiffs win if the answer to this question is yes, and defendants win if the answer is no.

*Id.* at 858-59 (emphasis added).

The same is true here for the proposed classes. Contrary to Defendants' argument that Transfer Subclass members demonstrated that they did not find the calls unwanted by engaging with the call, the concrete injury lies in the fact that the class as a whole is comprised of individuals

with phone numbers registered on the Registry but who were contacted anyway. This alone makes the contact unwanted, warranting a finding that every proposed class member has Article III standing.

### 2. **Consent**

Defendants also argue that whether proposed class members consented to FDE's calls involves individual questions rendering class certification improper. According to Plaintiff, Defendants would have needed prior, expressed, written consent to call the proposed class members without violating the FCPA, and Defendants obtained no such consent and have not provided evidence of consent by any class members.[4] In response, Defendants contend that they only purchased lead data for individuals who had already consented to the calls. (Dfts.' Resp. at 5-6).

"Whether issues of individualized consent defeat the predominance requirement in a TCPA case is made on a case-by-case basis after evaluating the specific evidence available to prove consent." *Legg v. PTZ Insurance Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017)." Because consent is an affirmative defense, Defendants bear the burden of proof. *Blow v. Bijora, Inc.*, 855 F.3d 793, 806-07 (7th Cir. 2017). In *Gorss Motels*, the Seventh Circuit addressed whether a situation like the one in this case would require individualized inquiries:

> There are certainly instances in which the issue of prior express permission might be amenable to class-wide proof. For example . . . in some cases brought under the [TCPA], where the fax sender purchased a contact list from a third-party vendor and made no attempt to seek permission from any of the recipients before sending the fax advertisement, there is a generalized, class-wide manner of proving lack of consent.

[4] Plaintiff also argued that Defendants' "concede that they lacked consent when they voluntarily dismissed their counterclaim." (Pl.'s Mot. at 16). The Court disregards this point. Parties settle and dismiss claims for a variety of reasons that do not necessarily involve concessions of liability.

29 F.4th at 844. Similarly, in *Paldo Sign and Display Co. v. Topsail Sportswear, Inc.*, the court found that obtaining proposed class members' fax numbers by purchasing them from an outside source with no follow-up attempts to verify consent "likely rules out the possibility of individualized consent defenses." Case No. 08 C 5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010).

Unlike in *Gorss Motels*, where the defendant obtained proposed class members' phone numbers from a variety of sources (including non-uniform franchise agreements, badges that were swiped at trade conventions, prior existing relationships, etc.), Defendants contend that FDE obtained all the proposed class members' numbers from the same commercial source, making the question of consent suitable for class-wide resolution, just as *Gorss Motors* contemplated. Further, Defendants have not pointed to any evidence to suggest that any attempts to obtain consent were made prior to making the calls.

Defendants make much of the fact that the Transfer Subclass cannot challenge their consent because they agreed to the transfer. However, just as the *Aranda* court rejected the reasoning that those who engaged with the illegal call lacked standing, this Court finds that those who were transferred are not deemed to have waived consent. As Plaintiff points out, the TCPA serves to stop unwanted calls from being made in the first place. At the time the call has been placed, any potential harm has already occurred.

**3. <u>Vicarious Liability</u>**

Finally, the parties disagree about whether evidence used to establish vicarious liability presents individualized questions precluding class certification. TCPA actions may involve questions of federal common law agency.[5] *See Bilek v. Federal Insurance Co.*, 8 F.4th 581, 587

[5] *See Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (2013) ("seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers;" "seller may

(7th Cir. 2021). Plaintiff argues that the same evidence will be used to establish vicarious liability through actual authority, apparent authority, or ratification. (Pl.'s Mot. at 17-20). Defendants contend that because FDE had multiple clients, determining which of the calls were placed on FSB's behalf requires individualized inquiry. In the event that FSB was not FDE's only client, Plaintiff argues that this would render others jointly and severally liable,[6] thus maintaining that it does not preclude class certification. (Pl.'s Mot. at 20).

**a. <u>Actual Authority</u>**

The parties spend a great deal of time arguing about whether the facts demonstrate actual authority in this case, specifically regarding whether FDE was an independent contractor hired by FSB. The merits of the question are not before the Court, though. The only issue to be decided now is whether the evidence used to establish actual authority will be common to all class members. Instead of addressing the salient question, Defendants' response offers argument on the merits only. Failing to see how evidence of actual authority would vary from class member to class member, the Court finds that the question presents common evidence and thus supports class certification.

**b. <u>Apparent Authority</u>**

Apparent authority is a closer call. "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is

---

be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification;" "Federal statutory tort actions, such as those authorized under the TCPA, typically are construed to incorporate federal common law agency principles of vicarious liability where, as here, the language of the statute permits such a construction and doing so would advance statutory purposes. Consistent with the precent, and the presumption that 'legislatures act with case law in mind,' we find that section 227(c)(5) contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations.")

[6] The Court notes that Plaintiff discusses joint and several liability in his briefing. (*See* Pl.'s Mot. at 20). At this juncture, the Court need not address the merits of any such argument, but only whether the question requires common or individualized evidence.

reasonable and is traceable to a manifestation of the principal." *Toney*, 323 F.R.D. 567 at 744 (quoting Restatement (Third) of Agency § 2.03 cmt. c (2006)). *Toney* held that "to plead apparent authority, [plaintiff] must allege that she reasonably believed that [telemarketer] called her as [company's] agent and that her belief is traceable to a manifestation of [telemarketer's] authority from [company]." *Id.* According to Defendants, the fact that apparent authority relies upon subjective belief requires individualized analysis precluding class certification.

Defendants' argument is not entirely without merit. *See Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) ("Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent."). Indeed, Plaintiff notes that FDE only identified FSB after identifying a potential customer, that FDE does not identify itself unless someone asks, and that "*in certain instances*, FSB loan officers represented to consumers that FSB called them." (Pl.'s Mot. at 21 (emphasis added)). However, the FCC has provided "illustrative examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations," among which are:

- evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information;
- the ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant;

- whether the seller approved, wrote or reviewed the outside entity's telemarketing scripts; and
- whether the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*In re Petition Filed by Dish Network, LLC*, 28 F.C.C. Red. 6574, 6592-93 (F.C.C. 2013). While the FCC's opinion is not binding, the Court finds persuasive its examples and that the answers to these and similar questions will require common rather than individualized evidence.

Defendants also contend that determining whether a call matched the criteria for FSB, as opposed to a different client, requires individualized inquiry. According to Defendants, "[v]endors do not know when they place the call if it is for FSB or another of the vendor's clients, because the filters are premised on the answers provided on the phone call. [] [W]hen a vendor places a call if is not for FSB—it is for the vendor which may transfer the lead to FSB, or to any number of other clients they may have at the time." (Dfts.' Resp. at 3 (citing Ex. C at 19:1-6)). Apparently, there were times when FSB was FDE's only client, and other times when FSB had multiple clients. Defendants argue that at some points in time, FSB was FDE's sole client; at other times, FDE had many clients. (Dfts.' Resp. at 24). Therefore, Defendants insist, "agency cannot be determined by common proof and would require the type of fact-specific, individualized inquiry dependent on the number of FDE clients at any given time when a particular call was placed." *Id.*

The Court fails to see how whether FDE had one or multiple clients at a given time creates individual questions. It is undisputed that FDE placed the calls. There are three possible outcomes regarding FSB's liability and agency: agency never existed, agency always existed, or agency existed only when FSB was FDE's sole client. If the latter is true, the result may be that FSB is

liable to a smaller subset of class members who were illegally contacted by FDE during a particular timeframe. At most, this lends itself to the creation of different subclasses, not a decision to deny class certification altogether. After all, Rule 23 permits more than one subclass, Fed. R. Civ. P. 23(c)(5), and the Court has discretion to modify a class. *See Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021) (finding that in light of new evidence, the court properly exercised its discretion in modifying the class and holding that "[i]n many cases, a modified class may satisfy Rule 23 for the reasons the original class did, and a court may simply say so."). Defendants will be afforded "a fair opportunity to present its defenses when putative class members actually come forward." *Mullins*, 795 F.3d at 670.

**c. <u>Ratification</u>**

The parties' arguments regarding ratification also focus on the merits of the question, which is not before this Court at this time. The Court sees no reason why the evidence that is discussed in the briefing would not apply equally to all class members. As a result, the question of ratification does not require individualized considerations that may preclude class certification.

**B. <u>Superiority</u>**

Finally, and undoubtedly, a class action is the superior method for fairly and efficiently adjudicating this case. "Rule 23(b)(3)'s superiority requirement, unlike the freestanding ascertainability requirement, is comparative: the court must assess efficiency with an eye toward other available methods." *Mullins*, 795 F.3d at 664 (quotations omitted). Of the pertinent matters to be considered, as identified in Rule 23, only two are applicable in this case: the class members' interests in individually controlling the prosecution of separate actions, and the likely difficulties

in managing this case were it to proceed as a class action. Fed. R. Civ. P. 23(b)(3)(A), (D). Both support class certification.

Cases brought pursuant to the TCPA are often worth far too little to justify bringing an individual suit. The Seventh Circuit has gone as far as to state that in claims of relatively small value, "only a lunatic or a fanatic would litigate the claim individually." *Mullins*, 795 F.3d at 665 (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)). As a result, courts have long recognized the value of the class action mechanism for claims of low value, as failure to do so could have the unintended consequences of insulating defendants from liability so long as the alleged damage to each individual is outweighed by the cost of litigation. The *Carnegie* court addressed this exact concern, stating that a realistic alternative to a class action in suits of low value is "not 17 million individual suits, but zero individual suits." 376 F.3d at 661.

As most, an individual Plaintiff may receive $1,500 per TCPA violation if they can demonstrate a willful or knowing violation. 47 U.S.C. § 227(b)(3). But that maximum figure of $1,500 must be considered in light of a plaintiff knowing his rights, his willingness and ability to find (and pay) an attorney and subject himself to the sometimes slow and cumbersome process of litigation, all over what may have initially been a 10-second unwelcomed phone call. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (discussing these factors in reviewing denial of class certification in a case alleging violation of the FDCPA, where maximum recovery is $1,000). The case at hand is precisely the type of scenario where the class action mechanism is valuable, rendering it a superior alternative to individual suits.

Similarly, the difficulties in managing the case as a class action do not preclude class certification. It is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns," as "a district judge has discretion to (and [the Seventh

Circuit] think[s] normally should) wait and see how serious the problem may turn out to be after settlement or judgment . . . [a]nd if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation." *Mullins*, 795 F.3d at 654, 663-64. In responding to Plaintiff's argument that a class action is superior, Defendants again argue that the inability to identify class members renders individualized suits superior.

The fact that it may be difficult to identify class members does not persuade this Court that a class action is not a superior method of adjudication in this case. *See Mullins*, 795 F.3d at 664 ("[B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be challenging to identify particular class members."). Having considered the alternatives, this Court is satisfied that there are options for alleviating Defendants' concerns regarding class member identification. But in the event that those prove unworkable, this may be revisited at a later stage in the litigation. *Id.* at 664 ("[I]f a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.").

## CONCLUSION

For all the foregoing reasons, Plaintiff's combined motion for class certification and motion to bar defense expert Jan Kostyun is granted as to class certification[7] and denied as to excluding Kostyun. Both Plaintiff's proposed "National DNC Class" and "Transfer Subclass" are certified for the period of 12/11/2019 to 2/4/2022. Defendants' cross-motion to bar Plaintiff's expert Aaron Woolfson is denied.

**DATED**: November 6, 2025

**ENTERED**:

LaShonda A Hunt

LASHONDA A. HUNT
United States District Judge

[7] Plaintiff also argues that his proposed class and subclass satisfy the requirements of Rule 23(b)(2), because "[g]iven the potential liability for past violations Defendants face in this litigation, there is a substantial possibility that Defendants may be unable to satisfy money judgments in *subsequent* class actions." (Pl.'s Mot. at 15 (emphasis in original)). However, Plaintiff offers no evidentiary support for this contention, and Defendants fail to address the point in any briefing. Because Plaintiff offers only a conclusory allegation for this Court to consider regarding whether injunctive relief is "necessary" to fully protect any proposed class, class certification based on Rule 23(b)(2) is denied.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings: (In Chambers) The Court DENIES Defendant's motion to dismiss (Dkt. # [141]) and DENIES Defendant's motion to decertify the class (Dkt. # [144])**

Before the Court are two matters. First is a motion to dismiss filed by Defendant Spring EQ LLC ("Defendant" or "Spring EQ"). Dkt. # 141 ("*MTD*"). Plaintiff Robert Mason ("Plaintiff") opposed, Dkt. # 152 ("*Opp.*"), and Defendant replied, Dkt. # 156 ("*Reply*"). Second is Defendant's motion to decertify the class. Dkt. # 144 ("*Mot. Decertify*"). Plaintiff opposed, Dkt. # 153 ("*Decertify Opp.*"), and Defendant replied, Dkt. # 159 ("*Decertify Reply*"). The Court finds the matters appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the papers, the Court **DENIES** Defendant's motion to dismiss and **DENIES** Defendant's motion to decertify the class.

## I. Background

The Court has summarized the allegations underlying the First Amended Complaint ("FAC") in a prior order, so it repeats only those necessary to decide the current motions. *See* Dkt. # 118 ("*Class Cert. O.*").

This matter arises under the Telephone Consumer Protection Act ("TCPA"), which makes it unlawful for any person or entity to "initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or his telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government." *See* Dkt. # 18 ("*FAC*") ¶ 32, citing 47 C.F.R. § 64.1200(c). Plaintiff alleges Defendant, a national mortgage lender,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

promotes its services by purchasing lead information from non-party LendingTree, LLC ("LendingTree"), including residential cellular telephone numbers. *Id.* ¶¶ 2, 11, 12. Plaintiff alleges he visited the LendingTree website; then, Defendant sent him telemarketing text messages. *Id.* ¶¶ 12, 17. Plaintiff alleges he did not provide Defendant express written consent to receive telemarketing text messages from Defendant. *Id.* ¶¶ 13–14. Plaintiff also alleges he was contacted despite being on the National Do Not Call Registry for more than 30 days prior to receiving Defendant's telemarketing texts. *Id.* ¶¶ 30–31. Plaintiff, on behalf of himself and all others similarly situated, brings this class action against Defendant asserting one cause of action for violation of the TCPA, 47 U.S.C. § 227. *See id.*

On September 25, 2025, the Court certified the following class, finding the requirements of Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2)–(3) met:

> Do Not Call Registry Class: All persons in the United States who, within the four years prior to the filing of this action: (1) were sent a text message by or on behalf of Defendant; (2) more than one time within any 12-month period; (3) where the person's cellular telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of selling Defendant's products and services; and (5) whose cellular telephone number Defendant obtained solely from LendingTree.

*See generally Class Cert. O.*

II. Motion to Dismiss

First, Defendant moves under Federal Rule of Civil Procedure ("Rule") 12(b)(2) to dismiss the claims brought by non-California resident class members for lack of personal jurisdiction. *See generally MTD.*

Motions under Rule 12(b)(2) may be waived if a defense available to a party was not asserted before a responsive pleading. *See* Fed. R. Civ. P. 12(g)(2), (h)(1)(A). A court order certifying a class "brings unnamed class members into the action and triggers due process limitations on a court's exercise of personal jurisdiction over their claims." *Moser v. Benefytt, Inc.*, 8 F.4th 872, 878 (9th Cir. 2021) (quoting *Molock v. Whole Foods*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

*Mkt. Grp., Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020) (concluding the issue was "premature" to decide on a motion to dismiss because "prior to class certification putative class members are not parties to the action.")). The defense Defendant raises—that the Court may not exercise personal jurisdiction over it with respect to the claims asserted by unnamed, non-California class members—was not "available to the party" prior to class certification. *See* Fed. R. Civ. P. 12(g)(2). Therefore, the defense was not waived and is now ripe for adjudication. *See Moser*, 8 F.4th at 877–78.

A. Legal Standard

"Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citation omitted). When a defendant objects to the Court's personal jurisdiction over it pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Absent an evidentiary hearing, however, the plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* "Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* at 800–01. For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).

B. Discussion

Since the Supreme Court's "seminal decision in *International Shoe*," courts "have recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779–80 (2017) (citation omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

*i. General Jurisdiction*

For general jurisdiction to exist over a nonresident defendant, the defendant must engage in "continuous and systematic general business contacts" that "approximate physical presence" in the forum state. *Schwarzenegger* at 801, quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

Plaintiff does not dispute Defendant's contention that it is not subject to general jurisdiction in California, because it is a Delaware company with its principal place of business in Pennsylvania. *Not. Mot.* 2:12-13. Nor do the parties dispute the Court may exercise specific jurisdiction over the named California Plaintiff. Accordingly, the Court finds Defendant is not subject to general jurisdiction and turns to whether it may exercise specific personal jurisdiction over Defendant with regard to non-plaintiffs' claims.

*ii. Specific Jurisdiction Over Non-resident, Unnamed Class Members*

The Ninth Circuit has "established a three-prong test for analyzing a claim of specific personal jurisdiction." *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 802 (9th Cir. 2004). In particular:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id*. (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)) (emphasis added). "The plaintiff bears the burden on the first two prongs," and once those are established, the defendant must show a "'compelling case' that the exercise of jurisdiction would be unreasonable." *Ayla, LLC v. Alya Skin Pty. Ltd*., 11 F.4th 972, 983 (9th Cir. 2021)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

(citation omitted). "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270–71 (9th Cir. 1995).

The core dispute here concerns the second prong of the test. Defendant, relying on *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255 (2017), argues that the Court lacks specific jurisdiction over claims brought by non-California residents in the nationwide class, because those class members "do not claim to have suffered harm in [this] State." Mot. 9, quoting *Bristol-Myers*, 582 U.S. at 265. Without having suffered harm in California, a non-resident's "claims do not arise from or relate to Spring EQ's actions in California." *Not. Mot.* 2.

In *Bristol-Myers*, the Supreme Court held that a California state court did not have personal jurisdiction over consumer claims asserted by nonresident plaintiffs in a mass tort action because there was no "adequate link" between California and the claims of the nonresident plaintiffs, who did not allege that they had purchased the defendant's product in California or suffered any injury there. *Bristol-Myers*, 582 U.S. at 264–65. The only connections between the plaintiffs' claims and the defendant's conduct arose in connection with other named plaintiffs' claims. *Id*.

Defendant also analogizes this case to *Harrington v. Cracker Barrel Old Country Store, Inc.*, 142 F.4th 678, 687 (9th Cir. 2025). There the Ninth Circuit applied *Bristol-Myers* to a Fair Labor Standards Act ("FLSA") collective action and found that the court lacked specific personal jurisdiction over absent plaintiffs' claims, because the FLSA does not include nationwide service of process. *Harrington*, 142 F.4th at 682, 685–86.

Whether *Bristol-Myers* applies to a class action where a plaintiff injured in the forum state seeks to represent a nationwide class of plaintiffs, not all of whom were injured in that state, has not been squarely addressed by either the Supreme Court or the Ninth Circuit. *See Bristol-Myers*, 582 U.S. at 278 n.4 (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there."); *Harrington*, 142 F.4th at 686 ("[W]e [the Ninth Circuit] have not yet considered the application of *Bristol-Myers* in a class action[.]"). Nonetheless, Defendant argues the reasoning of *Bristol-Myers* and *Moser*, and their application to an FLSA collective action in *Harrington*, "compel the conclusion" that *Bristol-Myers* applies equally to class actions. *Reply* 10:25-26. Thus, a

nationwide class action may only be properly heard where a defendant is subject to general jurisdiction. *Reply* 10:26-11:1.

The Court declines to extend *Bristol-Myers'* holding as Defendant suggests. Absent binding authority to the contrary, the Court turns to persuasive authority from other circuits and California district courts and finds the weight of decisions decline to apply the *Bristol-Myers* personal jurisdiction inquiry to absent class members. *See, e.g.*, *Owino v. CoreCivic, Inc.*, 700 F. Supp. 3d 939, 950 (S.D. Cal. 2023) ("to exercise personal jurisdiction over the claims of the class as a whole, the Court need determine only whether it may exercise specific jurisdiction over the claims of the named class representatives."); *Choi v. Kimberly-Clark Worldwide, Inc.*, No. SA CV 19-0468, 2019 WL 4894120, at *5 (C.D. Cal. Aug. 28, 2019) ("While the claims of non-resident named plaintiffs were 'pertinent to the issue of specific jurisdiction in *Bristol-Myers*,' [citation], the claims of unnamed class members are 'irrelevant to the question of specific jurisdiction.'"); *Lyngaas v. Curaden Ag*, 992 F.3d 412, 433 (6th Cir. 2021) ("We decline to extend *Bristol-Myers Squibb* in this manner. Long-standing precedent shows that courts have routinely exercised personal jurisdiction over out-of-state defendants in nationwide class actions, and the personal-jurisdiction analysis has focused on the defendant, the forum, and the *named plaintiff*, who is the putative class representative."); *Zuehlsdorf v. FCA US LLC*, No. EDCV 18-1877, 2019 WL 4422673, at *6 (C.D. Cal. Aug. 7, 2019) (concluding that "*BMS* did not alter the consensus that specific personal jurisdiction is based on the claims of the class representative only."); and *McCurley v. Royal Seas Cruises*, Inc., No. 17-CV-00986-BAS-AGS, 2019 WL 3006469, at *7 (S.D. Cal. July 10, 2019) ("In the wake of *Bristol-Myers* . . . , numerous federal courts have rejected the personal jurisdiction defense [defendant] raises to the claims of absent class members precisely because class actions are fundamentally different than the mass tort action at issue in *Bristol-Myers*. In particular, class actions do not call for a personal jurisdiction inquiry for absent class members, thus rendering *Bristol-Myers* inapposite.").

The Court finds the reasoning of these decisions persuasive, as they rely on Rule 23's rigorous certification procedures, which do not apply to mass tort or collective actions. The certification process ensures that the addition of nonnamed class members' claims does not render the class representative's chosen forum unduly burdensome, thereby protecting defendants' due process rights. *See Owino*, 700 F.Supp.3d at 947. Given "the procedural protections built into class actions—including the inquiry into the common nature of the named plaintiffs' and the absent plaintiffs' claims," and the fact

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

that the *Bristol-Myers* court sought to cabin its holding to its particular circumstances, the requirements of Rule 23 offer sufficient "additional due process protections for nonnamed class members that justify treating them differently than [parties] in nonclass litigation." *Id*.

*Moser* and *Harrington* do not compel a different result. Regarding *Moser*, the sentence on which Defendant relies—that class certification "brings unnamed class members into the action and triggers due process limitations on a court's exercise of personal jurisdiction over their claims"—is quoting an opinion from the D.C. Circuit (*Molock*) that the *Moser* court specifically notes the "did not reach whether *Bristol-Myers* applied to class actions." 8 F.4th at 878, citing *Molock*, 952 F.3d 293. Therefore, the Court may not extrapolate from *Moser* that *Bristol-Myers*, or even *Molock*, applies to class actions. Even if the principle stated in *Molock* could apply here, Rule 23's certification procedures address the "due process limitations on a court's exercise of personal jurisdiction over the[] claims" of unnamed class members triggered by class certification. *Moser*, 8 F.4th at 878. For these reasons, the Court does not rely on *Moser* to extend *Bristol-Myers* to a nationwide class action.

Regarding *Harrington*, the Ninth Circuit expressly stated "that a collective action under the FLSA is not a comparable form of representative action [to class actions]. The FLSA collective mechanism is more accurately described as a kind of mass action, in which aggrieved workers act as a collective of *individual* plaintiffs with *individual* cases." 142 F.4th at 686 (citation omitted) (emphasis original). Thus, a collective action is much more similar to the mass tort at issue in *Bristol-Myers*, whereas this case is more similar to the aforementioned class action cases that this Court finds persuasive.

To exercise personal jurisdiction over the claims of the class as a whole, the Court need determine only whether it may exercise specific jurisdiction over the claims of the named class representative. *Owino*, 700 F. Supp. 3d at 950. It is undisputed that the Court may exercise specific jurisdiction over Plaintiff's claim. Therefore, the Court may exercise specific jurisdiction over Defendant with respect to the claims of the class as a whole.

Accordingly, the motion to dismiss for lack of specific jurisdiction over claims brought by unnamed non-resident plaintiffs is **DENIED.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

III. Motion to Decertify the Class

The Court turns to Defendant's motion to decertify the class.

A. Legal Standard

An order granting or denying class certification may be altered or amended at any time before the entry of final judgment. Fed. R. Civ. P. 23(c)(1)(C). A district court retains "the flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809-10 (9th Cir. 2010) ("Federal Rule of Civil Procedure 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court.") (internal citations and quotation marks omitted).

"The standard used by the courts in reviewing a motion to decertify is the same as the standard used in evaluating a motion to certify." *Id.* at 410. The Court incorporates the relevant legal standards pertaining to Rule 23 class certification from its Class Certification Order. *See Class Cert. O.* 3.

B. Discussion

The thrust of Defendant's motion to decertify is that "new evidence regarding the actual content of the millions of text messages at issue and the circumstances pursuant to which the messages were sent" reveals that individual issues have come to predominate. *Mot. Decertify* 1.

Defenses that must be litigated on an individual basis can defeat class certification. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). At the same time, courts may certify a Rule 23(b)(3) class "even though other important matters will have to be tried separately, such as some affirmative defenses peculiar to some individual class members." *Id.* (ellipsis omitted) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Thus, the Court is to "analyz[e] the consent defenses [defendant] has actually advanced and for which it has presented evidence." *True Health Chiropractic, Inc.*, 896 F.3d at 931. On a motion for class certification, the Court may consider all material evidence submitted by the parties to determine whether

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 5:24-cv-01833-MWC-AGR | Date: December 18, 2025 |
| Title: | Mason v. Spring EQ, LLC | |

the Rule 23 requirements are satisfied. *Blackie v. Barrack*, 524 F.2d 891, 900–01 (9th Cir. 1975).

The Court addresses Defendant's arguments for decertification in turn.

*i. Whether Individualized Analysis is Needed to Determine Defendant's Messages Were Unsolicited Solicitations*

Defendant has begun evaluating text messages sent to phone numbers associated with a California address in connection with implementing a stipulated class member discovery plan. *Mot. Decertify* 9. Defendant avers its analysis of the text messages confirm they "are not at all uniform," and that many demonstrate Defendant's messages were not unsolicited and/or not solicitations. *Id*. Therefore, the fact finder will need to evaluate individualized evidence regarding the issues such as (1) which of Defendant's texts constitute "solicitations," (2) which class members gave consent, and (3) which class members had an existing business relationship ("EBR") with Defendant. *Id.* 12–19.

*a. Solicitations*

Regarding whether Defendant's texts constitute solicitations, Defendant argues that the Court will need to review millions of messages, message-by-message. Gregory Gentek, Defendant's Senior Vice President of Sales, attests that in just the preliminary review of text messages to and from California class members, thousands of class members sent individualized communications to Spring EQ over the class period, and Spring EQ received more than 24,000 text messages that did not contain the word "stop." Dkt. # 144-9 ("*Gentek Decl.*") ¶ 13. Defendant, in turn, has sent thousands of individualized text messages to class members such as, "Yes, that is correct," "Likewise!", and "Just sent you an email." *Id.* ¶ 12. Defendant argues messages like these are not sent "for the purpose of selling Defendant's products and services" and are thus not solicitations, and each message would need to be reviewed to determine whether they are solicitations. *Mot. Decertify* 13-15.

The Court finds the issue of whether Defendant's texts constitute solicitations may be resolved through common proof. Plaintiff proffers excerpts from Mr. Gentek's deposition where Mr. Gentek describes a standard protocol that Defendant employs to engage in telemarketing. Opp. 2; *see* Dkt. # 153-2 (Gentek Dep. Tr.) at 185:22–188:17, 190:1-4, 191:8–20, 193:14–16, 195:7–16, 199:5-25. Overall, Mr. Gentek describes

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

Defendant's text message marketing as an automated system. Thus, common proof concerning Defendant's marketing "system," "cadence," and automated messages can resolve the issue of whether text messages from Defendant's representatives to class members were sent for the purpose of selling Defendant's products and services.

*b. Established Business Relationship ("EBR")*

Regarding EBRs, Defendant argues that "the content of each inbound message from class members must also be evaluated to determine if it constitutes an 'inquiry' about Spring EQ's products (i.e. home equity loans), which would exempt Spring EQ's subsequent communications over the next three months" from TCPA liability. *Mot. Decertify* 17-19; *see* 47 C.F.R. § 64.1200. Defendant contends that its "records indicate that Spring EQ received more than 24,000 text messages from potential California class members that did not have some iteration of the word 'STOP' to start the message." *Mot. Decertify* 18; *see Gentek Decl.* ¶ 13. Defendant avers these individualized messages from class members, including "Can you please call me now?", "I'm interested in HELOC. What are the rates[?]", and "What are the terms for a heloc?", constitute voluntary two-way communications that establish an EBR. Determining if the EBR defense applies thus requires message-by-message analysis.

Other California district courts have declined to certify TCPA class actions where an individualized inquiry is required to determine whether each class member had an EBR with the defendant. *See, e.g. Sapan v. Yelp., Inc.*, No. 3:17-cv-03240-JD, 2021 WL 5302908, at *5 (N.D. Cal. 2021) (denying motion for class certification because defendant had "identified evidence in the record showing an [EBR] with, or other prior consent provided by, putative class members," such as "some putative class members provid[ing] their residential phone numbers to Yelp sales employees via e-mail"); *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 557-58 (C.D. Cal. 2012) (denying class certification because defendant presented evidence that most of the putative class members had an EBR with defendant).

Nonetheless, the Court finds Plaintiff has sufficiently demonstrated individualized issues as to the existence of EBRs do not predominate. In *Sapan*, "[t]he crucial shortfall for Sapan's certification request [was] that he ha[d] not proposed a method of identifying class members without individualized inquiries along the lines [defendant] Yelp described." 2021 WL 5302908, at *6. Here, Plaintiff has proposed such a method. Plaintiff proffers the expert report of Aaron Woolfson, stating that he implemented a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

"Waterfall" methodology to identify and remove from the certified Class any data related to telephone numbers that responded to Spring EQ's messages with a non-"stop" message. *Opp.* 13–14; see Dkt. # 153-1 ("*Woolfson Decl.*") Ex. A ¶¶ 33-35.

In response, Defendant argues that "neither Plaintiff nor Woolfson account for the Spring EQ texts that appear to follow-up on inquiries made via phone calls or email (without a record of a text message response). . . . Additionally, many class members repeatedly submitted inquiries via LendingTree; thousands of phone numbers that appear to survive Woolfson's waterfall analysis are associated with multiple leads" or multiple phone numbers. *Decertify Reply* 10, citing to Dkt. # 159-1 (Kiser Reply Decl.) Ex. B, Declaration of Douglas Kidder ¶¶ 27-28; *id.* Ex. A ("*Kidder Rebuttal Decl.*") ¶¶ 10-11. In support of the motion to decertify, Defendant's expert, Douglas Kidder, attests he has identified text messages in the dataset "post-Waterfall" that indicate contact was occurring on another platform, such as by phone or email. Examples of non-"stop" messages indicating the recipient welcomed the texts but may have responded elsewhere include "I sent you an email," and "I see that I missed your call." *Kidder Rebuttal Decl.* ¶ 11.

Rule 23(b) "predominance" does not require that no individual questions exist, but those issues may not predominate over the action. The Court finds, in light of Plaintiff's proposed method to filter out class members who responded to Spring EQ in a manner other than opting out, the examples included in the Kidder declarations do not establish the EBR issue is sufficiently pervasive to defeat commonality. Thus the case is still suitable for adjudication on a classwide basis.

*c. Consent*

Regarding consent, Defendant bolsters its prior showing of the declarations of a dozen satisfied customers, with additional messages from class members demonstrating their desire to be contacted. These include messages like, "Get back to me, want to know about different equity lines," and "I want info on home equity loan." *Mot. Decertify* 16. Defendant argues "[t]hese messages provide evidence that thousands of potential California class members understood that by completing the LendingTree sign-up process, they were providing permission for up to five lenders to contact them with information on loan options." *Id.* 17.

The Court finds Defendant's argument regarding consent goes to the merits of their defense: that Plaintiff and Class members' provision of their information to the LendingTree website constituted consent to receive marketing text messages from Defendant. As the Court previously held, whether Defendant violated 47 C.F.R. § 64.1200(c) and the privacy rights of the class is a common question that can be answered by review of the language and form of the disclosures—in other words, common evidence. *Class Cert O.* 7. The issue of consent is not an appropriate argument for class certification purposes, and is better reserved for summary judgment or trial.

*ii. Whether Individualized Analysis is Needed to Determine If Messages Were Received on Residential Phone Lines*

Defendant argues that new evidence shows "thousands of potential California class members linked their phone numbers to loan requests related to investment properties and therefore used their telephone numbers for business purposes." *Mot. Decertify* 9, citing to *Gentek Decl.* ¶ 5. Mr. Gentek's declaration lists ten exemplar phone numbers of leads received by Defendant, from LendingTree, where the individual indicated the loan would be used for an investment property. *Gentek Decl.* ¶¶ 7, 8, 17. Plaintiff's expert, in turn, attests that reviewed those numbers and found most were not part of the post-Waterfall dataset, and that the numbers did not "indicate" investment purposes. *Woolfson Decl.* ¶¶ 36–40.

The Court finds the short list of exemplar phone numbers provided by Defendant does not defeat commonality. As the Court noted previously, "Plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers," which "has been deemed reliable by other courts to trim numbers with business associations from the class." *Class Cert O.* 8– 9, citing *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 388 (D. Mass. 2024). The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result.

*iii. Individualized Analysis is Needed as to Which Class Members Agreed to Arbitration*

Defendant argues the Class "includes many individuals who agreed to pursue their claim against Spring EQ in individual arbitration." *Mot. Decertify* 10, 19. Those who

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

used LendingTree's website or services after April 1, 2025, "accepted the Dispute Resolution Section in the April 2025 Terms and agreed to arbitrate any TCPA claim against Spring EQ on an individual basis." *Id.* 10-11. Defendant points to ten examples of individuals who requested rates from LendingTree during the class period and after April 1, 2025. *Gentek Decl.* ¶ 17. Therefore, Defendant argues "the fact finder will have to determine whether a particular member of the Certified Class requested rates through LendingTree *or* used LendingTree's website after April 1, 2025. The latter inquiry cannot be resolved with Spring EQ's data and can only be determined by individualized discovery." *Id.* 22. Plaintiff argues that, by thoroughly litigating this action, Defendant has waived its rights to compel any unnamed class members to individual arbitration and, even if it had not, the issue of arbitrability is capable of classwide resolution. *Decertify Opp.* 19-23.

Without deciding the issue of whether Defendant has waived its rights to arbitration as to class members who visited the website after April 1, 2025, this issue goes to the merits of Defendant's defense and is capable of being resolved through common evidence, so it does not defeat certification.

*iv. Personal Jurisdiction Over Non-California Residents' Claims*

Defendant argues "[t]he threshold issue of identifying members of the Certified Class whose claims are not subject to the personal jurisdiction of this Court will be highly individualized and fact-intensive," because "where a class member was located when he or she received the at-issue text message must be conducted on a plaintiff-by-plaintiff basis." *Mot. Decertify* 24.

For the reasons stated above, the Court rejects the argument that it may not exercise specific jurisdiction over unnamed non-California residents' claims, so the issue of jurisdiction over non-California residents does not compel the Court to decertify the Class. *See supra* Section II.B.ii.

*v. The Class does not meet the requirements of Rule 23(b)(2)*

Finally, since the Court does not find the action "overrun with individual issues," and because the wrongful conduct alleged can be enjoined with respect to all class members, Rule 23(b)(2) certification remains appropriate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:24-cv-01833-MWC-AGR Date: December 18, 2025

Title: Mason v. Spring EQ, LLC

Because none of Defendant's arguments justify decertifying the Class, the Court **DENIES** Defendant's motion to decertify.

IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss (Dkt. # 141) and **DENIES** Defendant's motion to decertify the class (Dkt. # 144).

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ

# EXHIBIT 7

```
--
USE [medicareAdvisors]
--
select top 10 * from cdr_style1
alter table cdr_style1 add newId char(36) null
alter table cdr_style2 add newId char(36) null

-- call detail style 1/style 2
update cdr_style1 set newId = newId();
update cdr_style2 set newId = newId();

drop table calls
-- next: build
select 'cdr_style1' as source,
filename, convert(int,counter) as counter,
rep, phone, state as originalState,
attempt, caller_ID as callerId,
inbound_source as inboundSource,
lead_ID as leadId, client_ID as clientId,
last as lName, first as fName,
import_Date as importDate,
call_Status as callStatus,
is_callable as isCallable,
duration as originalDuration,
convert(int, null) as duration,
call_type as callType,
details,
hangup,
holdTime as originalHoldTime,
convert(int, null) as holdTime,
hangup_source as hangupSource,
newId into calls from cdr_style1

alter table calls alter column counter varchar(120);
alter table calls alter column details varchar(600);

insert into calls
        ([source], [filename], [counter],
         [rep], [phone], [originalState],
         [attempt], [callerId], [inboundSource],
         [leadId], [clientId], [lName], [fName],
         [importDate], [callStatus],
         [isCallable], [originalDuration], [duration],
         [callType], [details], [hangup], [originalHoldTime],
         [holdTime], [hangupSource], [newId])

select
    'cdr_style2', filename, counter,
     rep, phone, state as originaState,
         attempt, caller_ID, inbound_source,
```

```
         lead_ID, client_ID, last, first,
         [date], call_status,
         is_callable, duration, null,
         call_type, details, hangup, holdTime,
         null, hangup_source, newId from
         cdr_style2;

select top 10 * from cdr_style2 (nolock)
select distinct iscallable, count(*) from calls group by isCallable
```

```
-- add this columns in
select * into ftc from rainer.npa.dbo.ftc

-- add a memo:
alter table calls add memo varchar(180);

-- these are the fields that need to be fixed.
select * into calls_fix from calls where isNumeric(phone) = 0;

-- clean up the misaligned columns;
update calls_fix set
 [rep]                = isNull([rep],'') + ' ' + isNull([phone],'') ,
 [phone]              = [originalState]   ,
 [originalState]      = [attempt]        ,
 [attempt]            = [callerId]       ,
 [callerId]           = [inboundSource]  ,
 [inboundSource]      = [leadId]         ,
 [leadId]             = [clientId]       ,
-- [clientId]           = [lName]          ,
 [lName]              = [fName]          ,
 [fName]              = [callStatus]     ,
-- [importDate]         = [callStatus]     ,
 [callStatus]         = [isCallable]     ,
 [isCallable]         = [originalDuration],
 [originalDuration]   = [callType]        ,
 [callType]           = [details]         ,
 [details]            = [hangup]          ,
 [hangup]             = [originalHoldTime],
 [originalHoldTime]   = [holdTime]

update calls_fix set hangupSource = replace(hangUPSource,',','') where
left(hangupSource,1) = ','
update calls_fix set hangupSource = lTrim(rTrim(hangupSource))

-- insert (replace);
delete from calls where newId in (select newId from calls_FIX)
insert into calls select * from calls_fix

-- fix
update calls
 SET originalDuration = calltype, calltype = details, details = hangup, hangup =
originalHoldTime where calltype like '%:%'

-- set the duration
update calls
  set duration = datediff(second,'0:0:00',originalDuration)
  where isDate(originalDuration) = 1  and originalDuration like '%:%'
    and duration is null
    and left(originalDuration,2) in ('0:','1:','2:','3:','4:','5:','6:')
```

```
-- add these columns
alter table calls add crossRef char(21), crossRef2 char(30)
alter table calls add isWireless char(3), isDNC char(3), npa char(3), stateName
varchar(30), isNanp char(3)
alter table calls add dest char(10)
alter table calls add state char(2)

-- set the dest (internal flag)
update calls set dest = right([phone],10);

-- this is the datetime stamp
alter table calls add date datetime, datetime datetime;
update calls set dateTime = (select date from cdr_style1 where cdr_style1.newId =
calls.newId and isDate(cdr_style1.date) = 1) where source = 'cdr_style1'
update calls set dateTime = (select date from cdr_style2 where cdr_style2.newId =
calls.newId and isDate(cdr_style2.date) = 1) where source = 'cdr_style2'

-- tag the date:
update calls set date = convert(varchar(30),datetime,101)

-- set crossRef, crossRef2:
update calls set crossRef = convert(varchar(30),date,101) + '|' + dest
update calls set crossRef2 = convert(varchar(30),date,101) + '|' +
convert(varchar(30),datetime,108) + '|' + dest

-- ==============================================================
-- partition npa, tag state
-- ==============================================================
update calls set npa = left(dest,3)
update calls set state = (select state from ftc where ftc.npa = calls.npa)
update calls set stateName = (select stateName from ftc where ftc.npa = calls.npa)
update calls set isNanp = 'YES' where state is not null and substring(dest,4,1) in
('2','3','4','5','6','7','8','9');
update calls set isNanp = null where substring(dest,4,3) = '555'

-- make a backup here!
select * into calls_complete from calls

-- =======================================================
-- waterfall: START (top)
-- =======================================================


select * into calls_notNanp from calls where isNanp is null
delete from calls where newId in (select newId from calls_notNanp )

select * into calls_ambiguous from calls where isNumeric(counter) = 0 or datetime
is null or dest is null or duration is null
delete from calls where newId in (select newId from  calls_ambiguous )
```

```
-- test to see how many of these.
select
 ( select count(*) from calls_notNanp ) +
 ( select count(*) from calls_ambiguous )

-- dup dup dup
select * into #d from calls
alter table calls add isKeep char(36)

update calls set isKeep = (select top 1 newId from #d where #d.crossRef2 =
calls.crossRef2)
select * into calls_dup from calls where isKeep <> newId
delete from calls where newId in (select newId from calls_dup)

select * into calls_inbound, count(*) from calls group by calls_inbound
select distinct calltype, count(*) from calls group by calltype

-- calls inbound
select * into calls_inbound from calls where callType like '%inbound%'
delete from calls where newId in (select newId from calls_inbound)

-- calls that were not 'outbound' with at least six (6) seconds
select * into calls_lessThanSix from calls where isNull(callType,'') <> 'outbound'
  or isNull(callType,'') = 'outbound' and isNull(duration,0) < 6
delete from calls where newId in (select newId from calls_lessThanSix )


-- ==================================================================
-- PUT THESE ASIDE FOR NOW:
--    Do-Not-Call tagged (internal) or wrong-number-DNC (DNC)
-- ==================================================================
select * into iDNC from calls where callStatus in ('DO NOT CALL','Wrong Number
DNC')

select * into calls_notAuthoritativelyConnected from calls where
isNUll(callStatus ,'') not in
('CR_CNCT/CON_PAMD','Ans. Machine','Not Eligible No Medicare','callStatus','Already
Has','DO NOT CALL','Wrong Number DNC')
delete from calls where newId in (select newId from
calls_notAuthoritativelyConnected);

-- add the first inbound call.
alter table calls add firstInbound datetime
update calls set firstInbound = (select top 1 datetime from calls_inbound where
calls_inbound.dest = calls.dest order by calls_inbound.datetime asc)

-- on or after receipt
select * into calls_onOrAfterReceiptOfInboundCall
```

```
 from calls where datetime > firstInbound or datediff(day,firstInbound,datetime) =
0
delete from calls where newId in (select newId from
calls_onOrAfterReceiptOfInboundCall)

-- tagging isDNC
update calls set isDNC = 'YES' where crossRef in (select crossRef from dnc where
isDNC = 'YES')

-- ===============================================================
-- BIFURCATION
-- ===============================================================
select * into calls1 from calls
select * into calls1_notDNC from calls1 where isDNC is null
delete from calls1 where newId in (select newId from calls1_notDNC )

select * into #c from calls1
alter table calls1 add prevDate datetime, nextDate datetime, prevDays int, nextDays
int, is2orMore365 char(3)

update calls1 set prevDate = (select top 1 datetime from #c where #c.dest =
calls1.dest and #c.datetime <= calls1.datetime and #c.newId <> calls1.newId order
by #c.datetime desc)
update calls1 set nextDate = (select top 1 datetime from #c where #c.dest =
calls1.dest and #c.datetime >= calls1.datetime and #c.newId <> calls1.newId order
by #c.datetime asc)
update calls1 set prevDays = datediff(day, prevDate, datetime)
update calls1 set nextDays = datediff(day, datetime, nextDate)
update calls1 set is2orMore365 = 'YES' where prevDays between 0 and 365 or nextDays
between 0 and 365
go

-- not 2 or more 365
select * into calls1_not2orMore365 from calls1 where is2OrMore365 is null
delete from calls1 where newId in (select newId from calls1_not2orMore365)

select count(*), count(distinct dest) from calls1


-- ===============================================================
-- BIFURCATION
-- ===============================================================

select * into calls2 from calls
-- not wireless
select * into calls2_notWireless from calls2 where isWireless is null
delete from calls2 where newId in (select newId from calls2_notWireless )
select count(*), count(distinct dest) from calls2
```

```
-- ================================================================
-- BIFURCATION
-- ================================================================

select * into calls3 from calls
-- not wireless
select * into calls3_notFlorida from calls3 where state <> 'FL'
delete from calls3 where newId in (select newId from calls3_notFlorida )
select count(*), count(distinct dest) from calls3
```

```
-- isWireless
select right([phone number], 10) as dest,
  convert(datetime, substring([LRN Activated Date],1,10)) as portDate,
  ocn,
  [carrier type] as companyType,
  convert(char(3), null) as isPorted,
  convert(char(3), null) as isWireless
into isWireless
   from [job_a45de66f-f903-41ea-b466-105e01660d23_medi_10-16-2026]

-- data typecasting:
update isWireless set portDate = null where portDAte = '' or portdate < '1/1/2000'
update isWireless set OCN = null where OCN = '';

--- tagging the isWireless designations.
update isWireless set isWireless = 'YES' where companyType in ('PCS','WIRELESS')
update isWireless set isPorted = 'YES' where portDate > '1/1/2000' --


-- isWireless/  tagging
alter table calls add /* isWireless char(3), */ isPorted char(3), portDate
datetime, companyType varchar(30)
update calls set isPorted = 'YES' where dest in (select dest from isWireless where
isPorted = 'YES')
update calls set portDate = (select portDate from isWireless where isWireless.dest
= calls.dest) where isPorted = 'YES'

update calls set companyType = (select companyType from isWireless where
isWireless.dest = calls.dest) where isPorted is null
update calls set companyType = (select companyType from isWireless where
isWireless.dest = calls.dest) where datediff(day,portDate,date) > 15
update calls set isWireless = 'YES' where companyType in ('PCS','WIRELESS')


select count(*) from calls where companyType is null
select count(*) from calls where companyType is not null and date > portDate

select top 10 date, portDate, companyTYpe, isWireless from calls
select top 10 * from fromSomos_isWireless
select distinct dest into #compare from calls
alter table #compare add somos varchar(30), veri varchar(30)
update #compare set somos = (select lineType from fromSomos_isWireless where
fromSomos_isWireless.dest = #compare.dest)
update #compare set veri = (select companyType from isWireless where isWireless
.dest = #compare.dest)
select * from #compare

select count(*) from #compare
```

```
select top 10 * from fromSomos_isWireless


-- test queries
select count(*) from calls where isPorted = 'YES'  and datediff(day,portDate,date)
> 15

-- test queries (e.g. scratchpad)

select count(*) from calls where date < portDate
select count(*) from calls where date >= portDate

select top 10 * from calls where date >= portDate
```

```
-- report

--
select distinct dest, count(*) as count into report1 from calls1 group by dest
alter table report1 add start datetime, finish datetime

update report1 set start = (select top 1 date from calls1 where calls1.dest =
report1.dest order by calls1.date asc)
update report1 set finish = (select top 1 date from calls1 where calls1.dest =
report1.dest order by calls1.date desc)

select count(*), sum(calls) from report1

select * from report1

--
--

select distinct dest, count(*) as count into report3 from calls3 group by dest
alter table report3 add start datetime, finish datetime

update report3 set start = (select top 1 date from calls3 where calls3.dest =
report3.dest order by calls3.date asc)
update report3 set finish = (select top 1 date from calls3 where calls3.dest =
report3.dest order by calls3.date desc)

select count(*), sum(calls) from report3

select * from report3
```

# EXHIBIT 8

# EXHIBIT 8

# Produced in Native Format

# EXHIBIT 9

# Produced in Native Format

# EXHIBIT 10

Saggio et al v. Medicredit, Inc. Doc. 126


**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON SAGGIO and JUDE FURR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:22-CV-01005-JAR |
| vs. | ) | |
| | ) | |
| MEDICREDIT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' motion to exclude the opinion testimony of Plaintiff's class notice expert, Carla Peak, in this putative class action under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. For the reasons stated below, the motion will be denied.

**BACKGROUND**

The TCPA prohibits robocalls to cellphones except in emergencies or with the recipient's consent. Plaintiffs Jason Saggio and Jude Furr, on behalf of a proposed nationwide class, allege that Defendant Medicredit, a medical debt collector, erroneously and unlawfully placed robocalls to their cellphones to collect debts they didn't owe. Plaintiffs propose a class consisting of persons and entities in the United States to whom Defendant placed a robocall, between September 26, 2018, and the date of certification, to a cellphone number that was not assigned to a person with past-due medical debt.

Plaintiffs retained Carla Peak as an expert in class action notice and administration. Peak is the Vice President of Legal Notification Services for Verita Global, which specializes in comprehensive class action administration services. (Doc. 108-1). Verita has administered more



Dockets.Justia.com

than 10,000 class actions, including TCPA wrong number cases, and has distributed settlement payments totaling over a trillion dollars in assets. (Doc. 111 at 1-2). Peak has more than 20 years of industry experience and has been involved in all aspects of the design and implementation of class action notice planning. She has served as an expert in over one hundred cases involving class action notice plans. Peak's curriculum vitae confirms her considerable experience and expertise in this field. (Doc. 108-1 at 15-25).

In discovery, Defendant produced spreadsheets of phone numbers designated as wrong numbers robocalled during the class period. Plaintiffs retained Peak to describe the notification process that Verita would undertake to effectuate notice to potential class members if this Court were to certify the proposed class. As detailed in her declaration (Doc. 108-1 at 2-13) and deposition (Doc. 108-2), the process can be summarized as follows. Verita would provide Defendant's list of wrong numbers to a database aggregator and identity verification service provider such as PacificEast, Nexxa, or Lexis Nexis. That company would perform a reverse look-up search to locate names and addresses associated with the cellphone numbers that received Defendant's robocalls during the class period. If one search leaves some numbers unidentified, the list could be provided to another company for another search, as their databases can vary. Addresses are checked against a database maintained by the United States Postal Service. The results of the searches can be cross-referenced with Defendant's collection records to verify that debtors are excluded from the mailing list. Notice is sent to all potential class members identified through the search process. Any notices returned undeliverable are re-sent to forwarding addresses if available, or further searches can be conducted using other databases. When necessary, Verita can undertake additional notification methods, such as paid media campaigns and messages to social media accounts of the targeted numbers.

Peak opines that this methodology "is consistent with other notice plans that have been utilized in similar court-approved TCPA class actions and has been deemed to provide the best notice practicable under the circumstances in those matters." (Doc. 108-1 at 12). She noted that a success rate of at least 70% is considered high, according to the Judges' Class Action Notice and Claims Process Checklist published by the Federal Judicial Center.[1] Peak cautioned that she offered no opinion or certainty of Verita's ability to precisely identify individual bona fide members of the class; she opined only on how to best effectuate optimal notice to potential class members. When asked how individual members would be identified, she explained that they would self-identify by responding to the notice.

Plaintiffs cite Peak's notice methodology in support of their pending motion for class certification under Fed. R. Civ. P. 23, which requires that a class be "adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016). Plaintiffs contend that the proposed class is ascertainable using Defendant's call records to obtain names and addresses, which Peak opines is a widely accepted method to identify and notify potential class members.

By the present motion, Defendant seeks to exclude Peak's testimony because (1) she is unqualified in data analytics and class member identification, (2) her proposed method for generating a notice list is unreliable for purposes of demonstrating ascertainability, and (3) her expertise in class notice *after* certification has no relevance to ascertainability as a *prerequisite* for class certification.

[1] https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last visited December 4, 2025).

## LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admission of expert testimony. It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which charges trial judges with a "gatekeeping" role to screen expert testimony for relevance and reliability. *Id.* at 590–93; *see also Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) ("The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony.").[2] To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was properly applied to the facts at issue. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019). To satisfy the reliability requirement, the proponent must show by a preponderance of evidence that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Id.* This basic gatekeeping obligation applies not only to scientific testimony but to all forms of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

[2] Throughout this order, citations are cleaned up and internal citations are omitted.

The inquiry envisioned by Rule 702 is a flexible one, designed to exclude "vague theorizing based on general principles" or "unsupported speculation," but not requiring an opinion to be "a scientific absolute" in order to be admissible. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 914–16 (8th Cir. 2017). In a recent amendment to Rule 702, effective December 1, 2023, the Advisory Committee noted that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Rather, proponents of expert testimony must establish admissibility of the proffered evidence by a preponderance of the evidence. Once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go to the weight of the evidence. *Id*.

A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 791 (8th Cir. 2024). As long as the expert's testimony "rests upon good grounds, based on what is known" it should be tested by the adversarial process rather than excluded at the outset. *Id*. *See also Kumho Tire Co.*, 526 U.S. at 141–42 ("the test of reliability is 'flexible,'" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability opinion.").

Even after the 2023 amendment to Rule 702, the touchstone for the admissibility of expert testimony is whether it will be helpful to the trier of fact. *O'Hara v. Lott, et al.*, 2025 WL 2549231, at *12 (E.D. Mo. Sept. 4, 2025) (citing *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010)).

## DISCUSSION

In their pending motion for class certification, Plaintiffs contend that the proposed class is ascertainable through Peak's notice methodology, using Defendant's call records to conduct a reverse look-up yielding names and addresses of potential class members. In the present motion to exclude Peak's testimony, Defendant centrally argues that Peak isn't an expert on ascertainability, and her opinions on post-certification notice aren't reliable or relevant when analyzing ascertainability as a criterion *for* certification.

On the merits of ascertainability, Defendant postulates several scenarios where a person who received a robocall might not be the registered subscriber (i.e., owner) of the number as identified by a search. Reverse look-up searches sometimes identify multiple individuals linked to a single phone number. Dates of ownership might be inaccurate in a database. The call recipient could be a family member on a joint phone plan or a former subscriber before a transfer of ownership. Or, a bona fide debtor may have given Defendant a spouse's or caregiver's number. In her deposition, Peak acknowledged that the search process is imperfect.

From here, Defendant cites unpublished cases where district courts found these flaws fatal, reasoning that the expert's methodology wasn't reliable and class member identification would necessitate extensive individual inquiry. *Hunter v. Time Warner Cable Inc.*, 2019 WL 3812063, at *11 (S.D.N.Y. Aug. 14, 2019) (denying class certification); *Carroll v. SGS Auto. Servs., Inc.*, 2020 WL 7024477, at *7 (M.D. La. Nov. 30, 2020) (excluding notice expert); *Davis v. Capital One, N.A.*, 2023 WL 6964051, at 9 (E.D. Va. Oct. 20, 2023) (excluding expert and denying certification).

Conversely, Plaintiffs cite published cases where courts have accepted Peak's methodology and ultimately granted certification. In *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277

(D. Utah 2021), the court found Peak's "accepted and often used method" reliable and found her testimony relevant to the court's analysis of class manageability. *Id.* at 288-89. The court found the class ascertainable in that (1) it was defined by objective standards – i.e., noncustomers who received a cellphone robocall during the period and (2) class members could be identified using call logs and reverse look-up searches as described in Peak's notice plan. *Id.* at 302. The court rejected the defendant's argument that individualized issues, such as consent or whether the message actually played, rendered the class unascertainable. *Id.*

Likewise in *Head v. Citibank, N.A.*, 340 F.R.D. 145 (D. Ariz. 2022), the court found Peak's notice methodology reliable and her testimony relevant, reasoning, "notice need not perfectly identify bona fide class members; it need only be 'the best notice that is practicable under the circumstances.'" *Id.* at 156 (citing Fed. R. Civ. P. 23(c)(2)(B)). "The notice procedure Peak describes appears to be the best practicable notice—one that has worked in previous cases and should reasonably identify putative class members." *Id.* As in *Wesley*, the court rejected the notion that individual issues would overwhelm class claims, instead finding common questions of fact and law predominant. *Id.* at 153-4.

Also in *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019), the court was "not concerned with whether the reverse lookup process will produce perfectly accurate results. Instead, the industry standard shows that the major data aggregators can be used, in connection with other methods like subpoenaing wireless carriers and cross-referencing addresses, to reasonably identify the most likely subscriber of the phone number on the relevant call date." *Id.* at 245.

Additionally, Plaintiffs note that Defendant previously acknowledged the adequacy of a notice plan similar to Peak's in an earlier TCPA class action before this Court. *See Miles v.*

*Medicredit, Inc.*, No. 4:20-CV-1186-JAR, 2022 WL 3643669, at *2 (E.D. Mo. Aug. 23, 2022) (preliminarily approving the class settlement).

Put simply, Defendant seeks to exclude Peak's testimony because she can't guarantee perfectly accurate identification of every class member. As in *Head* and *Knapper*, the Eighth Circuit squarely rejected such a standard in *Sandusky*. There, the defendant sent unsolicited fax advertisements to business numbers obtained from a directory of healthcare providers. 821 F.3d at 994. The plaintiffs asserted that the list of numbers was sufficient to identify class members. The district court disagreed, reasoning that the parties would need to explore who owned, operated, and used the fax machines associated with the numbers, necessitating individualized inquiry to determine who actually received a fax. *Sandusky Wellness Ctr. LLC v. Medtox Sci., Inc.*, 2014 WL 3846037, at *3-4 (D. Minn. Aug. 5, 2014). The Eighth Circuit reversed, reasoning that the best *objective* indicator of the recipient is the person who subscribed to the number. *Sandusky*, 821 F.3d at 997. "True, the subscriber … may not be the recipient of the fax. However, fax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable." *Id.*[3]

Here, Defendant has already produced call logs identifying wrong numbers and the date reported as such. The Court has ordered additional production of more detailed logs specific to each phone number, including the dates of each call. (Doc. 125). Peak proposes to use Defendant's data to identify potential class members, with cross-referencing and verification

---

[3] In its response opposing class certification, Defendant attempts to avoid *Sandusky*'s binding instruction by citing *St. Louis Heart Ctr., Inc. v. Vein Centers for Excellence, Inc.*, No. 4:12 CV 174 CDP, 2017 WL 2861878, at *1 (E.D. Mo. July 5, 2017), where the court decertified a class for lack of ascertainability. There, however, the evidence supplied only the number of faxes sent. There were no logs specifying which fax numbers resulted in successful transmission. By contrast here, Defendant can query its database to produce logs identifying cellphone numbers designated as wrong numbers and the dates of robocalls to those numbers, among other particulars.

steps to optimize accuracy. Guided by *Sandusky*, the Court finds that Peak's expert opinion is relevant to assist the Court in its evaluation of ascertainability. Separately, the Court finds Peak's opinion relevant to manageability as a component of superiority under Rule 23(b)(3). Further, the Court finds Peak's methodology reliable, as demonstrated through its wide acceptance and implementation by district courts throughout the country (Doc. 108-1 at 16-23 (collecting cases)) and confirmed by the Court's own experience with similar notice processes.

Finally, Defendant contends that Peak isn't qualified to opine on class member identification because she doesn't conduct the searches herself. Rather, Verita's operations team performs the technical work and Peak merely "runs a media team." This argument discounts Peak's experience and advancement in the industry and ignores the structural realities of the workplace. The Court finds it entirely reasonable that an expert at Peak's executive level would collaborate with technical staff to effectuate database queries of this nature. "An expert witness is permitted to use assistants in formulating [her] expert opinion." *Pietoso, Inc. v. Republic Servs., Inc.*, 2025 WL 2643684, at *6 (E.D. Mo. Sept. 15, 2025) (reasoning that a financial expert can rely on data analysts in forming his opinion, citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir.2002)). Peak is qualified to offer her opinions here.

## CONCLUSION

The Court finds expert Peak qualified to opine on the best process and procedures to identify potential class members and ensure optimal notice using Defendant's call logs and reverse look-up searches. According to Eighth Circuit precedent, Defendant's call logs provide objective criteria to ascertain the proposed class. *Sandusky*, 821 F.3d at 997-98. Accordingly, the Court finds Peak's opinions relevant to assist the Court in evaluating whether the class is ascertainable. Separately, the Court finds Peak's opinions relevant to the question of class manageability. The Court finds Peak's methodology reliable in that it has been widely utilized and recognized to identify potential class members and provide the best possible notice practicable in numerous class actions, including TCPA wrong number cases.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to exclude the testimony of Plaintiff's class notice expert, Carla Peak, is **DENIED**. (Doc. 107).

Dated this 9th day of December, 2025.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

# EXHIBIT 11

**Before the**
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Combatting Illegal Robocalls Through FCC Numbering Policies | ) | WC Docket No. 26-49 |
| | ) | |
| Implementation of TRACED Act Section 6(a) - Knowledge of Customers by Entities with Access to Numbering Resources | ) | WC Docket No. 20-67 |
| | ) | |
| Numbering Policies for Modern Communications | ) | WC Docket No. 13-97 |
| | ) | |
| Telephone Number Requirements for IP-Enabled Service Providers | ) | WC Docket No. 07-243 |
| | ) | |

**REPLY COMMENTS OF TELSWITCH, INC.**

## I. INTRODUCTION

TelSwitch, Inc.[1] respectfully submits these reply comments in response the comments of iConectiv[2] in the above-captioned proceeding to encourage the Commission in adopting rules that further facilitate an accurate, transparent, and equitably-administered numbering ecosystem while strengthening numbering policies to reduce and eliminate unwanted and illegal robocalls, including those prohibited under the Telephone Consumer Protection Act ("TCPA" or "The Act")[3] and related statutes.

---

[1] TelSwitch, Inc. is an independent data analytics and litigation support firm in the telecommunications and consumer protection ecosystem. Incorporated in 1994 and headquartered in Pleasant Hill, California's work includes tagging tens of billions of Do-Not-Call ("DNC") database records each year, operating specialized infrastructure for the documentation and analysis of North American Numbering Plan data, and providing litigation analysis and testimony as an independent expert to be assistive to the trier of fact. TelSwitch's clients include telephone companies in routing and billing, as well as compliance professionals, call centers, debt-collection firms, marketing agencies, and counsel representing both plaintiffs and defendants in Telephone Consumer Protection Act (TCPA) proceedings.
[2] https://www.fcc.gov/ecfs/document/1060834090508/1
[3] 47 U.S.C. § 227.

TelSwitch's perspective on numbering resources is founded on the experience gained from over thirty years of interfacing with regulatory agencies and those entities designated by the Commission to manage numbering resources and data such as Somos, the current North American Numbering Plan Administrator ("NANPA"), and Neustar and iConectiv, the previous and successor Local Number Portability Administrator ("LNPA") respectively.

As both a telecommunications carrier initially licensed in 1994 by the California Public Utilities Commission,[4] and later as a Provider of Telecommunication Related Services[5] ("PTRS"), TelSwitch, Inc. has been afforded a unique and meaningful vantage point from which it has gained unique insights into the symbiotic relationship between regulators and the companies which participate in that telecommunication landscape. This includes the practicalities of how numbering resources apply toward billing and rating, as well as the practical and aspirational applicability of numbering resources toward the adherence to, and enforcement of, the TCPA.[6]

The opinions of TelSwitch, Inc. are also founded upon participation in the Communications Fraud Control Association ("CFCA"),[7] which has led toward significant, constructive insights about trust and transparency and how to further advance layers of the trust framework within the network in a way that benefits all parties, and especially consumers.

TelSwitch, inc. is delighted that iConectiv has taken a position in its' June 8, 2026 comments to the FCC. [8] In specific, iConectiv stated that elements of the North American Numbering Plan Administrator's data related to the Operating Company Numbers ("OCN's")

---

[4] California Public Utility Number U-5410-C. TelSwitch, Inc. no longer maintains a CPCN.
[5] TelSwitch, Inc. continues to conduct billing and rating activities and transcoding on behalf of telecommunications carriers as a PTRS.
[6] Our particularized uses of the FCC's data for purposes related to the TCPA is described in depth within our January 7, 2026 filing. (https://www.fcc.gov/ecfs/document/10108094832323/1 last visited 07/06/2026)
[7] See CFCA website; TelSwitch's views expressed herein are its own and not representative of the CFCA
[8] https://www.fcc.gov/ecfs/document/1060834090508/1 (last visited 07/06/2026)

numbers should be made available to those who wish to identify those calls that have been placed in violation of the TCPA to *ported* numbers as well.

> "Pursuant to its Master Services Agreement with NAPM, LLC, the LNPA provides the PortData Validate service, which allows NPAC data to be used for assessing risk, mitigating fraud, and determining the risk for a call or text to be a robocall or robotext, as defined by the Commission." (page 11)
>
> and…
>
> "iconectiv supports the Commission's efforts to combat robocalls and robotexts. If the Commission believes that identification of resellers in the NPAC aids in combatting robocalls and robotexts, iconectiv as the LNPA is ready to support such requirements. As the Commission considers implementation of the number portability rule proposed in the NPRM, iconectiv recommends the Commission leverage the expertise of the industry through the NPIF, as well as the considerations described in these comments to enable the Commission to meet its objectives."

We are pleased that iConectiv's position is consistent with FCC 15-35A para 142, which states that the data shall be made for "purposes stemming from the TCPA" – a rule that is predicated on 47 C.F.R. § 64.1200(a)(1)(iii). iConectiv's public comments are also aligned with FCC 04-204 (published September 21, 2004) [9], which requires companies to comply with the following: "We will not find persons liable for placing such autodialed or prerecorded message calls where such calls are made to a wireless number ported from wireline service within the previous 15 days, provided the number is not already on the national do-not-call registry or the caller's company-specific do-not-call list."

We are grateful that, with iConectiv's *newly* stated position supporting the objectives of the FCC in identifying and abating robocalls under the TCPA – is further codified by the FCC. In specific, that the use of the NANPA-assigned Company Number ("OCN") elements to identify line-types for *ported* numbers is similarly made available in the same fashion as those data

[9] https://docs.fcc.gov/public/attachments/FCC-04-204A1.pdf (last visited 07/06/2026)

elements made from NANPA for non-ported numbers to support the Commission's efforts, consistent with that which has *already* been promulgated and relied upon by the Courts.[10],[11],

We thank iConectiv for their substantive and meaningful comments in support of the Commission's objectives in ensuring that data remains available[12] for purposes stemming from the TCPA, and are grateful that the Commission remains guided by the impartiality and equitable-access standards Congress imposed in Section 251(e)(1) of the Communications Act.

Respectfully submitted,



Aaron Woolfson
Founder, TelSwitch, Inc.
1937 Oak Park Blvd, Ste D,
Pleasant Hill Ca 94523
woolfson@telswitch.com
209-915-2483

[10] Defendants cite not a single judicial decision barring this sort of discovery ("NPAC data") based on FCC regulations, and the Court is aware of such discovery having taken place by Rule 45 subpoena. See Scoma Chiropractic, P.A. v. Nat'l Spine and Pain Ctrs., No. 2:20-cv-430-JLBMRM, 2021 WL 4991523, at *2 (M.D. Fla. Oct. 27, 2021). A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point." United States v. Giovannetti, 919 F.2d 1223, 1230 (7th Cir. 1990). See also Hakim v. Safari/and, LLC, 79 F.4th 861,872 (7th Cir. 2023) ("[W]e have made clear that ... perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (Order, ECF 213, *Michael Anthony et al v. The Federal Savings Bank et al*, Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

[11] The Court also places little weight in defendants' reliance on Rule 30(b)(6) deposition testimony of a private entity's ("iconnectiv") (Exhibit A to the Motion) in a separate lawsuit, and on and that entity's apparently internal document (Exhibit C to the Motion), both characterizing federal regulations and their purportedly limiting effect on federal discovery here. (*ibid*)

[12] We are hopeful that iConectiv's prima facia commitment toward the Commission's objectives and in the manner that Congress intended is followed up by their re-allowing our use of the FCC's data for purposes stemming from the TCPA.

# APPENDIX A

FEDERAL TRADE COMMISSION

# National Do Not Call Registry - Telemarketer

The complete states contained in the Subscription are:

AK (1) : 907
AL (6) : 205 251 256 334 659 938
AR (4) : 327 479 501 870
AS (1) : 684
AZ (5) : 480 520 602 623 928
CA (41) : 209 213 279 310 323 341 350 357 369 408 415 424 442 510 530 559 562 619 626 628 650 657 661 669 707 714 738 747 760 805 818 820 831 837 840 858 909 916 925 949 951
CO (6) : 303 719 720 748 970 983
CT (4) : 203 475 860 959
DC (2) : 202 771
DE (1) : 302
FL (23) : 239 305 321 324 352 386 407 448 561 645 656 689 727 728 754 772 786 813 850 863 904 941 954
GA (10) : 229 404 470 478 678 706 762 770 912 943
GU (1) : 671
HI (1) : 808
IA (5) : 319 515 563 641 712
ID (2) : 208 986
IL (17) : 217 224 309 312 331 447 464 618 630 708 730 773 779 815 847 861 872
IN (8) : 219 260 317 463 574 765 812 930
KS (4) : 316 620 785 913
KY (5) : 270 364 502 606 859
LA (5) : 225 318 337 504 985
MA (9) : 339 351 413 508 617 774 781 857 978
MD (6) : 240 227 301 410 443 667
ME (1) : 207
MI (12) : 231 248 269 313 517 586 616 734 810 906 947 989
MN (8) : 218 320 507 612 651 763 924 952
MO (9) : 235 314 417 557 573 636 660 816 975
MP (1) : 670
MS (4) : 228 601 662 769
MT (1) : 406
NC (10) : 252 336 472 704 743 828 910 919 980 984
ND (1) : 701
NE (3) : 308 402 531
NH (1) : 603
NJ (10) : 201 551 609 640 732 848 856 862 908 973
NM (2) : 505 575
NV (3) : 702 725 775
NY (22) : 212 315 329 332 347 363 516 518 585 607 624 631 646 680 716 718 838 845 914 917 929 934
OH (15) : 216 220 234 283 326 330 380 419 436 440 513 567 614 740 937
OK (5) : 405 539 572 580 918
OR (4) : 458 503 541 971
PA (15) : 215 223 267 272 412 445 484 570 582 610 717 724 814 835 878

FEDERAL TRADE COMMISSION

# National Do Not Call Registry - Telemarketer

PR (2) : 787 939
RI (1) : 401
SC (6) : 803 821 839 843 854 864
SD (1) : 605
TN (7) : 423 615 629 731 865 901 931
TX (29) : 210 214 254 281 325 346 361 409 430 432 469 512 621 682 713 726
737 806 817 830 832 903 915 936 940 945 956 972 979
UT (3) : 435 801 385
VA (10) : 276 434 540 571 686 703 757 804 826 948
VI (1) : 340
VT (1) : 802
WA (6) : 206 253 360 425 509 564
WI (8) : 262 274 353 414 534 608 715 920
WV (2) : 304 681
WY (1) : 307